IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN THE MATTER OF          )
THE EXTRADITION OF        )          No. 24-mj-01365-DLC
EYLEM TOK               )

## MEMORANDUM OF EXTRADITION LAW AND REQUEST
## FOR DETENTION PENDING EXTRADITION PROCEEDINGS

The United States, in fulfilling its treaty obligations to the Republic of Türkiye

("Türkiye"),[1] respectfully requests that the fugitive in this case, Eylem Tok ("Tok"), be held

without bond pending the hearing on the certification of her extraditability pursuant to 18 U.S.C.

§§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United

States and sets forth the reasons why Tok should be detained. In short, Tok should be detained

because she cannot overcome the strong presumption against bail in international extradition

cases. Specifically, she cannot meet her burden of showing that she poses no risk of flight and

that special circumstances exist warranting her release.

## BACKGROUND

Türkiye seeks the extradition of Tok so that she may be prosecuted for protecting an

offender, in violation of Articles 283 of the Criminal Code of Türkiye.[2]  Tok is accused of

assisting her 16-year-old son, "T.C.", immediately flee Türkiye after he caused a fatal car crash.

T.C., who is also sought for extradition to Türkiye, allegedly killed one person and injured

---

[1] Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of
America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (the "Treaty").

[2] As referenced in the government's complaint, Türkiye also sought Tok's extradition on a
charge of Destroying, Concealing, or Altering Evidence, in violation of Article 281 of the
Turkish Criminal Code, but the United States is not forwarding that charge to the court for
consideration.

several others when he drove his vehicle at an excessively high rate of speed around a corner late at night on March 1, 2024.  Within three or four hours of the crash, Tok and T.C. had purchased airline tickets and fled Türkiye for the United States, via Cairo, Egypt.

According to Turkish authorities, on the night of March 1, 2024, T.C. was driving a Porsche with three passengers, one in the front, A.K., and two in the back, A.A. and B.A.  T.C.'s friend, D.O.O., was driving another vehicle, also with passengers, directly behind T.C.'s vehicle.

At around 11:20 p.m., T.C. and D.O.O. were driving on a road with a speed limit of 30 kilometers per hour (approximately 18 miles per hour).  According to statements provided by T.C.'s passengers to Turkish authorities, T.C. suddenly began driving his vehicle faster after they passed a speed bump on the road.  The passengers requested that T.C. slow down, but he did not do so.  The passengers then put on their seat belts "just in case."

The vehicle approached a curve in the road, and according to T.C.'s passengers, T.C. was driving too fast through the bend.  As they were driving through the bend, T.C. and his passengers noticed something on the right side of the road.  It was a group of people with all-terrain vehicles ("ATVs").  In response, T.C. suddenly turned the steering wheel in apparent effort to avoid hitting the group, but the sudden turn caused the car to skid and crash into them.  T.C.'s car ended up on the opposite side of the road, and the air bags deployed.

According to D.O.O., who was driving behind T.C. at the relevant time, T.C. significantly increased his driving speed and entered a bend in the road too fast.  D.O.O. lost sight of T.C.'s vehicle for several seconds as it went around the bend.  When D.O.O. reached the bend, he saw T.C.'s vehicle lose control and crash into a water channel.  D.O.O. immediately stopped his vehicle and noticed two men lying on the side of the road.

At the time of the crash, five individuals had been stopped on the side of the road because one of their ATVs had broken down.  One of the individuals died from the impact with T.C.'s car; all of the others were injured.

According to witnesses, T.C. and his friends had been driving around for some time before the crash.  None of the passengers in T.C.'s or D.O.O.'s vehicles reported to authorities that T.C. had been intoxicated, although T.C. had fled the scene before any tests could be performed.  There also did not appear to be any indication that T.C.'s vehicle had malfunctioned.

According to a forensics report, authorities estimated that T.C.'s vehicle was traveling at approximately 170-180 kilometers per hour (approximately 105-111 miles per hour) at the time of the crash, which was significantly over the 30 kph speed limit on the road.

Additionally, Türkiye provided that pursuant to Article 76 of the Regulation on Road Traffic, a person must be at least eighteen years old to secure a driver's license in Türkiye. Accordingly, Turkish authorities confirmed that T.C. did not have a driver's license or otherwise have legal permission to drive at the time of the crash.

T.C. called Tok immediately after the crash.  One of Tok's employees told authorities that she and Tok then drove to the scene and took T.C. and two of his friends home.  According to Tok's private driver, he then left with Tok to return to the scene of the crash, but they turned around and returned to her residence as soon as they saw a police presence.

Tok's employee told authorities that she then took Tok and T.C. to the airport.  Video surveillance footage from Tok's residential complex and the airport corroborate the employee's account.  According to surveillance footage at the airport, Tok and T.C. arrived at the Egyptair ticket sales office around 2:35 a.m. on March 2, 2024, only three hours after the crash.  Tok purchased one-way tickets to Cairo, Egypt, for herself and T.C..  Tok and T.C. traveled to Cairo

and continued on to the United States, landing in New York later that day.  Tok and T.C. were later observed in New York City, New York. According to information provided from Turkish law enforcement to Interpol, Tok and T.C. may have attempted to secure fraudulent passports to facilitate further travel to Cuba.

In response to an extradition request from Türkiye, the United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181, *et seq.*, filed a complaint seeking a warrant for Tok's arrest.  Pursuant to an arrest warrant, Tok was arrested on this extradition matter on June 14, 2024.  Tok is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

## I.     LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.     The limited role of the Court in extradition proceedings

Extradition is a means by which a fugitive is returned to a foreign country, typically pursuant to a treaty, to face criminal charges or to serve a sentence of imprisonment.  Extradition is primarily an executive function with a limited role for the judiciary under the extradition statute.  *See* 18 U.S.C. § 3184; *see also, e.g.*, *In re Extradition of Hilton*, No. 13-7043, 2013 WL 1891327, at *3 (D. Mass. May 3, 2013) ("Extradition is an executive, not judicial, function.") (citing *Martin v. Warden,* 993 F.2d 824, 828 (11th Cir.1993)).  The Secretary of State, and not the court, makes the ultimate decision whether to surrender a fugitive to the requesting country.  18 U.S.C. §§ 3184, 3186; *Hilton v. Kerry*, 754 F.3d 79, 84 (1st Cir. 2014).  "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better

answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role will be to consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification— as the treaty, statutes, and case law define them—are present. *Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)); *Kin-Hong*, 110 F.3d at 109. If the Court finds that the requirements for certification are satisfied, the Court must furnish the certification to the Secretary of State, together with a copy of any testimony taken before the Court and must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *Hilton*, 754 F.3d at 84.

### B.    The requirements for certification

At the extradition hearing, the court's review will be limited to determining whether: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (3) the treaty covers the crimes for which extradition is sought; and (5) sufficient evidence exists to support a finding of probable cause as to each offense for which extradition is sought. *See* 18 U.S.C. § 3184; *In re Extradition of Howard*, 996 F.2d 1320, 1324 n.1 (1st Cir. 1993); *Skaftouros v. United States*, 667 F.3d 144, 154-55 (2d Cir. 2011). "If the judicial officer makes such a determination, he 'shall certify' to the Secretary of State that a warrant for the surrender of the relator 'may issue.'" *Kin-Hong*, 110 F.3d at 109 (quoting 18 U.S.C. § 3184).

1.     Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority," *Howard*, 996 F.2d at 1325 (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See, e.g.*, *id.*; *Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also* Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, Rule 1(e) (authorizing magistrate judges to "[c]onduct extradition proceedings, in accordance with 18 U.S.C. Section 3184").

2.     Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as T.C., who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged."); *see also Pettit v. Walshe*, 194 U.S. 205, 219-20 (1904) ("the evidence of the criminality of the charge must be heard and considered by some judge or magistrate authorized by the acts of Congress to act in extradition matters, and *sitting in the state where the accused was found and arrested*. Under any other interpretation of the statute [the court-appointed commissioner], proceeding under the treaty, could by his warrant cause a person charged with one of the extraditable crimes, and found in one of the Pacific states, to be brought before him at his office in the city of New York, in order that he might hear and consider the

evidence of the criminality of the accused. But as such a harsh construction is not demanded by the words of the treaties or of the statutes, we shall not assume that any such result was contemplated by Congress") (interpreting earlier statute that closely tracks 18 U.S.C. § 3184).

### 3.   Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See, e.g., Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000); *see also Hilton*, 754 F.3d at 84.  The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Türkiye. The Court must defer to the Department of State's determination in that regard. *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

### 4.   Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article 1 of the U.S.-Turkey Treaty provides for the extradition of fugitives who have been charged with or convicted of an extraditable offense.  In relevant part, Article 2 of the Treaty provides for extradition for (1) "Offenses, regardless of whether listed in the Appendix to this Treaty or not, which are punishable under both the federal laws of the United States and the laws of Türkiye be deprivation of liberty at least for a period exceeding one year or by a more severe penalty"; or (2) "Offenses listed in the Appendix to this Treaty which are punishable under both the laws of the Requesting Party and the Requested

Party for at least a period exceeding one year or by a more severe penalty." This Treaty is what is known as a "hybrid" treaty because it contains elements of both a list and the more modern dual criminality requirement. Notably, the Appendix to the Treaty expressly provides for extradition for the offense of manslaughter.

In assessing whether the crime for which extradition is requested is covered by the Treaty, the Court should examine the description of criminal conduct provided by Türkiye in support of its charge and decide whether that conduct constitutes an offense among those listed in the Appendix. *Factor v. Laubenheimer*, 290 U.S. 276, 299-300 (1933). An offense is "extraditable," regardless of whether it is expressly designated on the Treaty's list, so long as the underlying conduct constitutes one of the enumerated offenses. *See, e.g.*, *id.*; *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (treaty that listed "murder" as extraditable encompassed offenses charged as "war crimes").

In assessing whether the crime for which extradition is requested meets the Treaty's dual criminality requirement, the Court should examine the description of criminal conduct provided by Türkiye in support of its charges and decide whether that conduct, had it been committed here, would be criminal under U.S. federal law. *See Arias v. Warden*, 928 F.3d 1281, 1292-93 (11th Cir. 2019) (noting that "courts ask whether the conduct that the government describes would violate our laws if it occurred in this country"). A requesting country need not establish that its crimes are identical to ours. *See United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995) ("The principle of dual criminality does not demand that the laws of the surrendering and requesting states be carbon copies of one another."). Rather, "[d]ual criminality requires that an accused be extradited only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations." *In re Gambino*, 421 F. Supp. 2d 283, 306 (D.

Mass. 2006) (quotation omitted).  Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922); *see also* Treaty Article 2(1).

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor*, 290 U.S. at 301; *see also Kin-Hong*, 110 F.3d at 110 ("[E]xtradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement . . . ."); *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

5.   <u>Probable cause that the fugitive has committed the offenses</u>

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crime charged by Türkiye was committed by the person before the Court. *See, e.g.*, *Kin-Hong*, 110 F.3d at 120 ("An extradition hearing does not require a higher standard of evidence than a probable cause hearing.").  The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The "required probable cause hearing entails no

9

determination of the guilt or innocence of the relator, but only whether there is 'competent legal evidence which . . . would justify [the relator's] apprehension and commitment for trial if the crime had been committed in that state.'" *Koskotas v. Roche*, 931 F.2d 169, 177 (1st Cir. 1991) (quoting *Collins*, 259 U.S. at 314-15 (1992)); *see also Quinn*, 783 F.2d at 791.  Accordingly, "extradition proceedings are not to be converted into a dress rehearsal trial." *Koskotas*, 931 F.2d at 175.

### C.  An extradition hearing follows unique procedures

#### 1.  An extradition hearing is not a criminal proceeding

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal or civil proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828; *see also Hilton*, 2013 WL 1891327, at *3 ("Given the limited purpose of extradition hearings, the individual whose extradition is requested . . . does not benefit from most of the protections traditionally afforded to defendants in criminal proceedings."). Rather, it is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *see In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017), and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

2.      <u>Extradition hearings rely on written submissions and do not require live witnesses</u>

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings.  *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *Kin-Hong*, 110 F.3d at 120.  A fugitive has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005). The evidence at the extradition hearing "may consist of hearsay, even entirely of hearsay."  *Kin-Hong*, 110 F.3d at 120 (citing *Collins*, 259 U.S. at 317).  Accordingly, a certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government.  *See, e.g.*, *Harshbarger v. Regan*, 599 F.3d 290, 294 (3d Cir. 2010) (affidavits of Canadian law enforcement officers are competent and "provided ample evidence of probable cause"); *Skaftouros*, 667 F.3d at 155 n.16 ("unsworn statements of absent witnesses may be considered"); *Kin-Hong*, 110 F.3d at 120 (finding statements from witnesses in Hong Kong admissible); *Bovio v. United States*, 989 F.2d 255, 259-60 (7th Cir. 1993) (relying on statement of Swedish investigator); *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1450-52 (9th Cir. 1987) (relying on affidavit of German prosecutor).  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  *See, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *Shapiro v. Ferrandina*, 478 F.2d 894, 902 (2d Cir. 1973); *In re Extradition of Koskotas*, 88-MJ-73, 127 F.R.D. 13, 28 (D. Mass. July 13, 1989).  Requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty."  *Bingham*, 241 U.S. at 517.

11

3.    <u>Limitations on fugitives' defenses in extradition proceedings</u>

A fugitive's defenses in extradition proceedings are heavily circumscribed.  For example, a fugitive has (i) no Sixth Amendment right to a speedy extradition, *see, e.g.*, *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir. 1994); *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978); (ii) no Fifth Amendment guarantee against double jeopardy with respect to successive extradition proceedings, *see, e.g.*, *In re Extradition of McMullen*, 989 F.2d 603, 612-13 (2d Cir. 1993); (iii) no ability to invoke the exclusionary rule, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); (iv) no right to cross-examine his or her accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517; (v) no right to invoke defenses that "savor of technicality," *see id.*; and (vi) no right to introduce affirmative defenses, *see, e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 462 (1913).  Moreover, a fugitive generally has no right to discovery.  *See, e.g.*, *Quinn*, 783 F.2d at 817, n.41; *Koskotas*, 931 F.2d at 175 ("[I]n an extradition proceeding, discovery is not only discretionary with the court, it is narrow in scope.").

Relatedly, a fugitive's right to present evidence is severely constrained.  A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country; rather, she may only introduce evidence explaining the submitted evidence.  *See Charlton*, 229 U.S. at 457-58; *Koskotas*, 931 F.2d at 175 ("Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded.") (citations omitted).  A contrary rule might compel the "demanding government to produce all its evidence … both directing and rebutting, in order to meet the defense thus gathered from every quarter."  *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)).  Accordingly, "evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly

be excluded from the Magistrate's hearing." *Shapiro*, 478 F.2d at 901. "[S]tatements [that] would in no way explain . . . or . . . obliterate the government's evidence, but would only pose a conflict of credibility . . . should properly await trial in [the requesting country." *Id.* at 905 (internal quotation marks omitted).

### 4. Rule of non-inquiry: the executive considers all matters other than sufficiency

All matters a fugitive may raise as defenses to extradition, other than those concerning the requirements for certification, are for the Secretary of State to consider, and not the court. *See* 18 U.S.C. §§ 3184, 3186; *see also, e.g.*, *Kin-Hong*, 110 F.3d at 109 ("The Secretary may . . . decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations."). The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country. *See Kin-Hong*, 110 F.3d at 110 ("Under the rule of non-inquiry, courts refrain from investigating the fairness of a nation's judicial system and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country.") (internal quotation marks and citations omitted). This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's powers to conduct foreign affairs. *See In re Kaine*, 55 U.S. 103, 110 (1852); *see also, e.g.*, *Ahmad v. Wigen*, 910 F.2d 1063, 1066-67 (2d Cir. 1990). Similarly, a fugitive's contention that the extradition request is politically motivated or that the requesting state's justice system is unfair, should be addressed by the Secretary of State, not the court. *Koskotas*, 931 F.2d at 173 (motive of requesting state is a matter for consideration by the executive branch).

## II.     TOK SHOULD BE DETAINED

"The availability of bail in international extradition cases is extremely limited." *Drumm v. McDonald*, 15-cv-14221, 2016 WL 111411, at *2 (D. Mass. Jan. 11, 2016) (*Drumm II*).   The federal statutes governing extradition procedures in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail.  Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because an extradition proceeding is not a criminal case.  *See Collins*, 259 U.S. at 316; *In re Extradition of Drumm*, 150 F. Supp. 3d 92, 96 (D. Mass. 2015) (*Drumm I*) (noting that "[e]xtraditions are not criminal matters and the familiar standards of the Bail Reform Act . . . do not govern.").[3]   Unlike in domestic criminal cases, "[t]here is a presumption against bail" in extradition cases, and bail is "limited to situations in which the justification [for release] is pressing as well as plain."  *United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996) (internal quotation marks and citation omitted).

### A.     Applicable law

1.     <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, "there is a presumption against bond." *Martin*, 993 F.2d at 827; *see also Martinelli Berrocal*, 263 F. Supp. 3d at 1294 ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process."). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

---

[3] The Bail Reform Act applies only to "offenses" against the United States that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).  Here, the fugitive is not charged with an "offense" within the meaning of 18 U.S.C. § 3156 but, rather, with an offense committed against the requesting state, Türkiye.

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 56 (D. Mass. 2010) (citation omitted); *see also In re Extradition of Taylor*, 471 F. Supp. 3d 389, 393–94 (D. Mass. 2020) (same); *Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Wright*, 190 U.S. at 62; *see also Drumm II*, 2016 WL 111411, at *4 (noting that granting bail in extradition cases creates the potential for damaging the foreign policy interests of the United States). "In fact, because of treaty obligations, admission to bail should be in practice an unusual and extraordinary thing." *Koskotas*, 127 F.R.D. at 17 (internal quotation marks and citation omitted).

Further, while forfeiture of bail in domestic criminal cases is designed to compensate, at least in part, the court that is seeking the accused's presence for trial, forfeiture of bail in international extradition cases due to the failure of the fugitive to appear would leave Türkiye without either remedy or compensation. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1284 ("No amount of money could answer the damage that would be sustained by the United States

were the appellant to be released on bond, flee the jurisdiction, and be unavailable for surrender, if so determined.") (quoting *Jimenez v. Aristiguieta*, 314 F.2d 649, 653 (5th Cir. 1963)).

> 2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *Drumm I*, 150 F. Supp. 3d at 96 (internal quotation marks and citation omitted) (emphasis added).[4] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, age, and incentive to flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *Kin-Hong*, 913 F. Supp. at 53 (finding that fugitive with "considerable wealth," "worldwide influence and connections," family and business in a third country, and no ties to the community presented a "very serious risk of flight.").

Crucially, the special circumstances inquiry is separate from, and additional to, considerations of danger to the community or risk of flight. *See, e.g.*, *Kin-Hong*, 83 F.3d at 524.

---

[4] Several courts have required fugitives to meet this burden with clear and convincing evidence, reasoning that the presumption against bail in extradition cases justifies a heightened standard of proof. *See, e.g.*, *Taylor*, 471 F. Supp. at 394; *Castaneda-Castillo*, 730 F. Supp. 2d at 55 (citation omitted).

"Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Martin*, 993 F.2d at 827 (stating that "a defendant in an extradition case will be released on bail only if he can prove 'special circumstances'" and declining to consider the fugitive's argument that the district court erred in determining that he was a flight risk); *Salerno v. United States*, 878 F.2d 317, 317-18 (9th Cir. 1989) (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996) (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Noeller*, No. 17-CR-664, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Noeller*, 2017 WL 6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Matter of Extradition of Carr*, 20-CR-370, 2020 WL 4816052, at *6 (N.D. Ill. Aug. 18, 2020); *Matter of Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *Martin v. Warden,* 993 F.2d 824, 827-28 (11th Cir. 1993); *United States v. Leitner*, 784 F.2d 159, 160-61 (2d Cir. 1986);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno*, 878 F.2d at 318; *Martinelli Berrocal*, 263 F. Supp. 3d at 1297-98; *Antonowicz*, 244 F. Supp. 3d at 1070; and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1298-99; *Antonowicz*, 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### B.    Analysis

The Court should detain Tok without bond because she is a significant flight risk.

*First*, Tok's past behavior shows that she is likely to flee if she were released on bond. Within mere hours after her son killed someone with his car, she purchased airline tickets and fled Türkiye with her son. The fact that she immediately evaded Turkish authorities and the prospect of prosecution is highly indicative of her risk of flight were she to be released on bond

18

here.  *Cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges.  The intent is the same—the avoidance of prosecution.").

*Second*, Tok has the means to flee.  She provided her son the Porsche he was allegedly driving that caused the crash, had the family's private driver pick up her son from the scene of the crash, and purchased last-minute plane tickets to flee Türkiye within hours of the crash.  At the time of arrest, Tok was carrying approximately $5,000 in cash, a designer handbag, and was wearing a Rolex.  She was arrested as she was about to tour a private school in Boston that charges more than $46,000 in annual tuition.  Turkish media reports that Tok is a well-known author of a best-selling book, Mihr and that she was married to T.C.'s father, a world-famous plastic surgeon.  Tok has the means to flee and undoubtedly would do so again.

*Third*, the strength of Türkiye's case, the government's relatively low burden of proof in extradition hearings, and the prospect of serving a prison sentence in Türkiye render her an unmitigable flight risk. *See, e.g., In re Extradition of Adame*, 2013 WL 1222115, at *3  (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico"); *see also, e.g., Shaw*, 2015 WL 521183, at *9 ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee.").  Indeed, Turkish authorities have indicated that Tok may have attempted to secure fraudulent passports for her and her son to avoid possible arrest in the United States. Given her past history of flight, no amount of bail would guarantee Tok's presence at these proceedings.

the Court should find that Tok is a flight risk and therefore not eligible for bail in this extradition proceeding. This reason is sufficient alone for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that Tok is not a flight risk or danger to the community, the government is unaware of any "special circumstances" that would justify bail in this case. *Cf. Drumm I*, 150 F. Supp. at 97-100 (denying bail because of a failure to show a special circumstance, even though the court found that defendant posed no danger to the community and defendant's risk of flight could be adequately mitigated).

Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of Türkiye, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

## **CONCLUSION**

For the foregoing reasons, the United States requests that Tok be detained pending resolution of this extradition proceeding.

Dated: June 14, 2024

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

*/s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant United States Attorney

20

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Kristen A. Kearney
KRISTEN A. KEARNEY
Assistant U.S. Attorney