**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

IN THE MATTER OF
EXTRADITION OF T.C.

No. 24-MJ-01365-DLC

**ORDER ON GOVERNMENT'S MOTION FOR DETENTION AND**
**RELATOR'S MOTION FOR RELEASE FROM DETENTION**

CABELL, Chief U.S.M.J.

This matter arises out of an extradition request from the Republic of Türkiye ("Türkiye") pursuant to a treaty in force between the United States and Türkiye.[1] On June 14, 2024, federal authorities arrested relator T.C. ("T.C."), a sixteen-year-old minor at the time,[2] and his mother, Eylem Tok, ("Tok") on arrest warrants issued in the United States District Court in the Southern District of Florida. Pending before the court are competing bail motions; the government moves to detain T.C. during the pendency of these extradition proceedings, while T.C. seeks release to

---

[1] Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (hereinafter "Treaty on Extradition and Mutual Assistance").

[2] T.C. turned seventeen on June 28, 2024.

reside with his aunt in Amesbury, Massachusetts.  (D. 7, 22).  For the reasons stated below, the government's motion is allowed and T.C.'s motion is denied.

## I.   LEGAL STANDARD

Extraditions are not criminal matters and the familiar standards of the Bail Reform Act, 18 U.S.C. § 3141, do not govern. Rather, there is a presumption against bail and the burden is on the relator to show that (1) he is neither a flight risk nor a danger to the community; and (2) there are special circumstances that justify release on bail.  *United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996); *Matter of Extradition of Taylor*, 471 F. Supp. 3d 389, 393-394 (D. Mass. 2020); *Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 96 (D. Mass. 2015).[3]  The rationale for "the presumption against bail is that 'extradition cases involve an overriding national interest in complying with treaty obligations.'"  *Castaneda-Castillo*, 739 F. Supp. 2d at 56 (quoting *United States v. Taitz*, 130 F.R.D. 442, 444 (S.D. Cal. 1990)). "The potential for 'diplomatic embarrassment' and its 'effect on foreign relations' should a foreign fugitive be granted bail and abscond" provides additional rationale.  *Id.* (citing *Taitz*, 130 F.R.D. at 444); *see Wright*, 190 U.S. at 62 (noting "enforcement of

---

[3] In this case, no one contends that T.C.'s release would pose a danger to the community so the focus is on the issues of risk of flight and the existence of special circumstances.  While it is T.C.'s burden to demonstrate that he does not present such a risk, *Drumm*, 150 F. Supp. 3d at 96, the court is satisfied that danger is not an issue here.

the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment").

Special circumstances that warrant bail "are limited to situations in which '"the justification [for release] is pressing as well as plain."'" *Kin-Hong*, 83 F.3d at 524 (quoting *United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979)). "[W]hat constitutes a 'special circumstance'" falls within the "Court's sound discretion." *Drumm*, 150 F. Supp. 3d at 96 (citing *In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 736 (W.D. La. 1999)); *see Beaulieu v. Hartigan*, 554 F.2d 1, 1 (1st Cir. 1977) (stating "bail may be granted in the sound discretion of the district court" but "should be approached with caution" and granted "only upon a showing of special circumstances").

Examples of special circumstances are "case specific." *Castaneda-Castillo,* 739 F. Supp. 2d at 56. For instance, "'[s]pecial circumstances' may include a delayed extradition hearing." *Kin-Hong*, 83 F.3d at 524 (citation omitted). They "may also include the raising of substantial claims against extradition on which the relator has a high probability of success, a *serious* deterioration in the relator's health, or an unusual delay in the appeals process." *Id.* (emphasis added); *see Castaneda-Castillo*, 739 F. Supp. 2d at 56 (listing same). Of note for present purposes, the absence of a "suitable facility in which to detain a juvenile

extraditee" may amount to special circumstances. *Castaneda-Castillo*, 739 F. Supp. 2d at 56 (citing *Hu Yau-Leung v. Soscia*, 649 F.2d 914 (2nd Cir. 1981)).

## II.  THE PARTIES' ARGUMENTS

### A.  Risk of Flight

T.C. has been detained at all relevant times at the Manson Youth Institution ("Manson") in Cheshire, Connecticut.  He seeks release to the care of his family, specially, an aunt living in Amesbury.  He avers that she is a lifelong resident in the Boston area and adds that he is willing to reside by any conditions the court might deem appropriate, including house arrest,[4] continued loss of his passport, enrollment in some form of schooling, and mental health counseling.  (D. 22, p. 7).  He further elaborated at the detention hearing that his aunt could serve as a third-party custodian or a functional guardian ad litem.  He also has proposed the imposition of a $200,000 cash bond or, if more is required, a $2 million bond executed by T.C.'s father, Bulent Cihantimur, and secured by the father's home in Türkiye, which, he offers, is unencumbered and worth in excess of $2 million.  (D. 28, 41).  T.C. urged that his roots are in the United States and Türkiye and that he does not pose a risk of flight because, simply

---

[4] The Probation Office has indicated that electric monitoring is not available.

stated, he has no place to go.  He described Tok as the decision-maker and the impetus for their flight out of Türkiye.

In turn, the government stressed that T.C., who faces a ten-year sentence, is demonstrably a flight risk because he already fled by leaving Türkiye with Tok immediately after the accident. The government further argued that Bulent Cihantimur was aware that T.C. and Tok were going to the airport and could arrange for T.C. to flee.

**B.   <u>Special Circumstances</u>**

Pointing to deficient conditions at Manson, T.C. argues that his age "and lack of suitable detention facilities" constitute special circumstances justifying his release.   (D. 22, p. 5) (citing, inter alia, *Hu Yah-Leuing*, 649 F.2d at 920).   To that end, T.C. identifies multiple, purportedly deficient conditions at Manson: (1) housing T.C. in isolation in a medical unit with lights kept on twenty-four hours, no pillow,[5] and one telephone call every eight-hour shift; (2) an inability to obtain prescribed medication for a skin condition;[6] (3) T.C.'s name, birth date, inmate number, and location posted on the Connecticut Department of Correction's

---

[5] By affidavit, T.C.'s counsel adds "that T.C. has not had a pillow since his" June 14 arrival and was advised "he had to purchase a pillow through the canteen."  (D. 29, ¶ 9).

[6] By affidavit, counsel states that T.C.'s face was red and his lips peeled during counsel's June 16 visit to Manson.  T.C. explained to his counsel "that he normally took prescribed medication that caused a skin condition if not properly treated with moisturizing cream."  (D. 26, ¶ 10).

website in violation of, *inter alia*, a Connecticut statute; (4)
dissemination of his booking photograph in prison clothes with his
name and/or other identifying information on the photograph to the
Turkish media; (5) an inability to make international calls to his
father for at least the first ten days after his arrival at Manson;
(6) a Manson prison guard asking T.C. about various facts relating
to the alleged crime and whether he committed the crime; (7) the
long distance of Manson from T.C.'s aunt and counsel;[7] (8) guards
in prison uniforms and minors in prison clothes; (9) cubicles
separated by glass for noncontact visits; and (10) housing charged
youthful offenders and convicted youthful offenders in the same
housing units.  (D. 22, 26, 29, 40) (D. 22-1, p. 8).

   Next, T.C. notes that the Department of Justice investigated
Manson and in December 2021 concluded that the conditions violated
the Eighth and Fourteenth Amendments ("Justice Department
Report").[8]  (D. 22-1, p. 1).   T.C. also relies on his purportedly

---

[7] Counsel avers that the June 16 round-trip visit took seven hours.  As an
aside, T.C. asserts that he does not qualify under Connecticut state law for
imprisonment at Manson.   (D. 40, ¶ 7) (citing General Statute 18/73).
Regardless, the United States District Court for the District of Massachusetts
has a contract with Manson to house minors at Manson.

[8]  T.C.'s argument regarding the Justice Department Report is based on the
report's findings that:  (1) "Manson's isolation practices do not serve a
legitimate government purpose and show a deliberate indifference to" evidence
that isolation "is harmful to children"; (2) "Manson fails to provide children
with adequate mental health supports and services"; (3) "Manson's mental health
staff regularly fail to consider relevant information . . . when assessing a
child's mental health needs"; and (4) Manson's "[m]ental health assessments .
. . miss or minimize the significance of a history of exposure to severely
traumatic events" and the resulting "impact on the child's ability to function."
(D. 22, p. 5).  The Justice Department Report discusses these deficiencies and
further notes that the Due Process Clause of the Fourteenth Amendment protects

deteriorating mental health at Manson to support his release.   (D. 22, 26, 29, 40, 50).

The government argues in response that T.C.'s isolation at Manson lasted for only three days following his arrival and was solely for administrative purposes.   As for T.C.'s medication, the government represents that Manson officials will order the medication upon receipt of a valid prescription.   (D. 39).

The government acknowledges the posting of T.C.'s name and identifying information on the Connecticut Department of Correction's website but contends it was an inadvertent error which Manson officials rectified once notified by removing the information from the website.   (D. 39).

As to T.C.'s ability to talk to Cihantimur, the government points out that Manson did not have international calling capability prior to T.C.'s arrival but is working towards setting up international calls so that T.C. may communicate with his family in Türkiye.   (D. 39).

Finally, the government recently provided notice that it intends to move T.C. from Manson to another juvenile facility. (D. 58).

---

"children at Manson who are pretrial detainees."   (D. 22-1, pp. 8, 11-14). Adhering to this construct, the deficient conditions at Manson asserted by T.C. under the Justice Department Report are the isolation practices and the above mental health services.   T.C. does not otherwise develop an argument regarding the report.   *See Duval v. United States Dept. of Veterans Affairs*, 69 F.4th 37, 45 n.5 (1st Cir. 2023) (deeming "argument waived for lack of development").

III.  **BACKGROUND**[9]

A.  **Events in Türkiye**

Shortly before midnight on March 1, 2024, T.C. was involved in an automobile accident in Türkiye.  After the accident, the İstanbul Chief Public Prosecutor's Office began an investigation into T.C.'s alleged commission of the offence of reckless killing in violation of Articles 85/2 and 31/3 of the Criminal Code of Türkiye.[10]  (D. 12, pp. 95, 101).  At present, Türkiye is requesting

---

[9] The background is culled primarily from the extradition documents, affidavits by T.C.'s counsel, and a pretrial services report ("PSR").  The court also credits a limited number of representations by counsel made in the filings and in open court.  *See Cook v. Lynn and William, Inc.*, 344 F.R.D. 149, 154-55 (D. Mass. 2023) ("[A]ttorney's representations are presumed to be truthful absent any indication that they are untrustworthy.").  The facts determined in this opinion do not apply to the factual record regarding extradition.  To be clear, the court is not at this juncture making any factual findings regarding extraditability.

[10] Article 85/2 reads as follows:

> (1) Any person who causes the death of another by reckless conduct shall be sentenced to a penalty of imprisonment for a term of two to six years.

> (2) If the act results in the death of more than one person, or the injury of one or more persons together with death of one or more persons, the offender shall be sentenced to a penalty of imprisonment for a term of two to fifteen years.

(D. 12, p. 95).

Article 31/3 provides that:

> (3) Where a minor is older than fifteen but younger than eighteen years at the time of the offence, then for offences that require a penalty of aggravated life imprisonment, a term of eighteen to twenty-four years of imprisonment shall be imposed and for offences that require a penalty of life imprisonment twelve to fifteen years of imprisonment shall be imposed.  Otherwise, the penalty to be imposed shall be reduced by one-third, and in such cases, the penalty for each act shall not exceed twelve years.

(D. 12, p. 96).

T.C.'s extradition to conclude that investigation.  (D. 12, p. 101).

As outlined in the extradition documents, T.C. was driving a Porsche with three of his friends[11] in the vehicle on a two-lane, two-way road with a speed limit of 30 kilometers per hour (approximately 18 miles per hour).  (D. 12, pp. 112, 131, 135, 137).  As he turned a corner at the high rate of speed of 170-180 kilometers per hour (approximately 105-111 miles per hour), he hit three ATVs parked on the side of the road and five individuals, one of whom died.[12]  (D. 12, pp. 121-122, 129, 131, 135, 137).

Understandably distraught, T.C. got out of the Porsche, as did the other occupants.  (D. 12, pp. 131, 133, 137).  Two witnesses heard him say, "My life is over."  (D. 12, pp. 133, 135).  Another witness saw several injured individuals lying on the road.  T.C. "shouted, 'There was another person under the [Porsche],' and asked for help."  (D. 12, p. 131, 137).  He also telephoned his private driver and Tok, telling both that he had gotten in an accident.[13]  (D. 12, pp. 131, 137).

---

[11] For ease of reference, the court refers to these three passengers as T.C.'s "friends" even though one of them indicates that he did not know T.C. that well. (D. 12, pp. 130, 135).

[12] The ATVs were parked on the side of the road due to a breakdown of one of the ATVs.  (D. 12, p. 122).

[13] T.C. may have telephoned Tok a second time.

A fire truck arrived.  Tok arrived thereafter in a vehicle driven by Ayse Ceren Saltoğlu.  (D. 12, p. 131) (D. 11, p. 90). T.C., along with two of his friends, got into this vehicle whereupon the group drove away.  After dropping off T.C.'s two friends at their housing complex, Saltoğlu drove T.C. and Tok to their residence.

The residence is registered in the name of Bülent Cihantimur, T.C.'s father,[14] who has substantial financial means at his disposal.  In that respect, the residence "is worth over $2 million" and "is free and clear of encumbrances."[15]  (D. 41). Cihantimur also pays T.C.'s school fees and "hired a driver and a vehicle for [T.C.]."  (D. 11, p. 105).  Cihantimur's company pays Saltoğlu's salary.[16]  (D. 11, p. 105).  Cihantimur, who is being investigated by Turkish authorities in relation to the same incident (D. 37-1, p. 18), has a very close relationship with T.C. (D. 11, p. 105).

At around 12:30 a.m. on March 2, Tok called Cihantimur and asked him to come to the residence.  (D. 11, p. 90).  When he

---

[14] Cihantimur and Tok divorced in 2011.  (D. 11, p. 105).

[15] The above representation in T.C.'s response is premised on a representation by Turkish counsel.  Solely for purposes of addressing detention, the court credits the representation.  *See generally United States v. Kin-Hong*, 110 F.3d 103, 120 (1st Cir. 1997) (recognizing evidence at extradition "may consist . . . entirely of hearsay").

[16] In making this finding, the court recognizes that the factual summary regarding Tok's offenses by the public prosecutor describes Saltoğlu as Tok's employee.  (D. 11, p. 90).  The discrepancy, if any, is immaterial.

arrived, he saw T.C. in a state of shock.  (D. 11, p. 105).  A short time later, T.C., carrying a suitcase, Tok, and Cihantimur came out of the house together, according to an interrogation statement by Saltoğlu.  (D. 11, p. 101).  Saltoğlu further stated that Cihantimur saw that T.C. had a suitcase.  (D. 11, p. 101). T.C., with his backpack, got into the car driven by Cihantimur, who then drove away from the residence.  At the same time, Tok got into a separate car driven by Saltoğlu.  When Cihantimur's electric car could not continue due to a low battery, Saltoğlu picked up T.C., took the suitcase from Cihantimur, and drove T.C. and Tok to the İstanbul airport.  Subsequently, and at this point still within three hours of the accident, T.C. and Tok passed through airport security, and ultimately departed on a 3:50 a.m. flight to Cairo, from where they flew to the United States.  (D. 12, pp. 141, 96, 143-144).  Cihantimur remained in İstanbul.

**B.    Events in the United States and T.C.'s Background**

T.C. and Tok arrived in the United States on March 2.  (D. 12, pp. 143-144) (PSR).  In early May, a magistrate judge in the United States District Court in the Southern District of Florida attested to her review of two extradition complaints against T.C. and Tok, respectively, and issued warrants for their arrest.

In the meantime, T.C. and Tok stayed in Airbnb rentals during the months after their arrival  (PSR).  They did not visit T.C.'s aunt in Amesbury.  On June 14, they were arrested and brought

before this court for their initial appearances, at which time the government moved to detain T.C. pending his extradition.

T.C. began his confinement at Manson, in isolation in a medical unit for administrative purposes.[17] On June 16, his counsel visited T.C. at the facility.  Two days later, counsel filed the motion for his release.  (D. 22).  During a June 18 proceeding and in response to the court's query, T.C.'s counsel asked that probation interview TC.

On June 20, a probation officer interviewed T.C.  (PSR).  By this time, T.C. had been released from the three or four days of isolation in the medical unit.[18]  (D. 26, ¶ 11).  T.C.'s attorneys were present during the interview.  (PSR).  Crucially, T.C. reported that he had no health and no mental health concerns. (PSR).  Specific to his mental health, he reported that he had no history or current thoughts of suicide or self-harm.  He also reported participating in only two individual therapy sessions.[19] He denied concerns about substance abuse.  (PSR).

The court also conducted a detention hearing on June 20.  The parties proceeded by way of proffer and the court took the matter under advisement.  The parties thereafter filed supplemental

---

[17] The government stated, and the court accepts, that the confinement was for administrative purposes.  (D. 18).

[18] During the June 18 proceeding, T.C.'s counsel represented that T.C. was released from isolation after an initial four-day stay.  (D. 18).

[19] The sessions took place by Zoom.

materials in support of their respective positions over the next two weeks or so.  On July 3, T.C. filed a motion for a status conference arguing, in part, that his continued detention was "inconsistent with Due Process," "constitute[d] Cruel and Unusual Punishment," in "violation of the 8th Amendment to the United States Constitution, particularly as to a juvenile."  (D. 57).

As for T.C.'s background, he was born in the United States and is a dual citizen of Türkiye and the United States.  He has travelled extensively, having visited Italy, Japan, France, South Africa, Uzbekistan, Norway, Russia, and Switzerland.  (PSR).  Whereas he reported living in both the United States and Türkiye, he spent the most time (fifteen years) living in Türkiye with his parents.  (PSR).  He completed the eleventh grade at the public high school in Haverhill, Massachusetts.  He has never held a job.  He reported having a bank account but did not know the balance in the account.  (PSR).  He also reported that he has not been arrested in the past.  (PSR).

## C.  Manson's Conditions and Characteristics

The Connecticut Department of Correction has five "security levels for correctional facilities."  Connecticut Department of Correction, Operations and Rehabilitative Services Division, https://portal.ct.gov/doc/org/operations-division.[20]  Levels five

---

[20] "[G]overnmental websites are proper sources for judicial notice." *Cicalese v. Univ. of Tex. Med. Branch*, 456 F. Supp. 3d 859, 871 (S.D. Tex. 2020); *see Kader v. Sarepta Therapeutics, Inc.*, Civil Action No. 14-14318-ADB, 2016 WL

and four are for maximum and high security facilities, respectively. *Id.* Manson is a level four facility and therefore operates at a high level of security.[21] *See* State of Connecticut Department of Correction, Manson Youth Institution, https://portal.ct.gov/doc/facility/manson-yi. It "houses male offenders ranging in age from 14 to 21 in ten separate buildings, each with three wings containing 12 cells, a day room, counselor offices and mini kitchen." *Id.*

As noted, T.C. spent his first three or four days at Manson housed in the medical unit for administrative purposes. During that time, the lights were on throughout the day and night, and he did not have a pillow. (D. 26). While visiting T.C. on June 16, T.C.'s counsel observed prison guards in uniform as well as "children" wearing "prison clothes." (D. 26). The round-trip drive to visit him took seven hours.[22] (D. 26).

T.C. takes medication for a skin condition and, during the visit, T.C.'s counsel observed that his skin appeared red and

---

1337256, at *11 (D. Mass. Apr. 5, 2016) (taking judicial notice of FDA statement on government website); *see also U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016) (court may "consider matters of public record and facts susceptible to judicial notice"). In that vein, the court takes judicial notice of the above description of Manson on the Connective Department of Correction's website.

[21] Three Connecticut attorneys described Manson as "a maximum security adult prison run by the [Connecticut] Department of Correction." (D. 40). A more accurate description is that Manson is a high-level security prison run by the Connecticut Department of Correction with attributes of an adult prison.

[22] Although she does not identify the location of her home, the court assumes it is in the Boston area.

chafed.[23]  Although he requested the medication, he was not provided
any medical assistance.  In an effort to obtain the medication,
the government's counsel asked T.C.'s counsel for a copy of the
prescription.  As of June 25, the government had not received the
prescription.  (D. 39).  The government also confirmed that Manson
was prepared to order the medication once it received a
prescription.[24]  The government represented it would work with
Manson personnel to facilitate T.C. receiving the medication.

As indicated, Turkish media obtained a booking photograph of
T.C.'s upper body with his age and name as well as the date and
time of the booking.  (D. 29, 26-1, 26-2).

On June 25, Manson agreed to add Cihantimur's phone number to
T.C.'s call list.  (D. 40).  T.C.'s subsequent attempt to reach
Cihantimur on June 25 or 26 was nevertheless unsuccessful.  (D.
40).  Noncontact visits at Manson take place in cubicles with glass
separating the visitor and the Manson resident.  (D. 26).  The
2021 Justice Department Report concluded that Manson did "not
provide adequate mental health care to children" and its "isolation
practices harm children."  (D. 22-1, p. 6).  A November 2020 news

---

[23] Out of concern for T.C.'s health condition, the court discussed the matter
with pretrial services.  Although T.C. has a health condition and takes
medication to address it, the condition is not serious or life threatening.

[24] On June 26, T.C.'s counsel, in response, explained that obtaining a copy of
the prescription is contingent upon either obtaining a medical release from
T.C. or contacting the provider directly.  (D. 40).  Given these circumstances,
T.C.'s counsel stated that the "contingency has made a prompt response by T.C.,
his guardians, and defense counsel impossible."  (D. 40).

article published by the *Connecticut Mirror* recounts the Connecticut Department of Correction's statement "that while [Manson] does house juveniles, it is an adult correction facility . . ." (D. 40). Concomitantly, three Connecticut attorneys confirmed that "Manson is a maximum security adult prison," as stated in T.C.'s counsel affidavit.[25] (D. 40, ¶¶ 10-11).

## IV.   DISCUSSION

### A.   Risk of Flight

Based on the evidence and arguments presented, the court does find that T.C.'s release would pose a risk of flight. First, T.C. fled Türkiye within *hours* of the accident and thus demonstrably exhibits a risk of flight if released. *See Matter of Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *3 (N.D. Ill. Dec. 19, 2017) (noting "fact that the fugitive has evaded prosecution in his home country is indicative of his risk of flight were he to be released on bond here"). In that regard, the court is not convinced that Tok was the sole instigator of the flight from Türkiye as between her and T.C. Rather, having expressed several times that his life was over, T.C. actively took part in fleeing the scene of the accident and thereafter the country. Even if this inference arguably goes too far, the record nonetheless provides no basis to suggest that T.C. offered any resistance to

---

[25] The three Connecticut attorneys hold senior-level positions in organizations related to child protection and advocacy services. (D. 40, ¶ 10).

efforts to have him leave the scene of the accident and flee the country later that same evening.

Second, T.C. has an incentive to avoid returning to Türkiye where he faces serious charges that carry a ten-year maximum person term. *See Drumm*, 150 F. Supp. 3d at 97 (finding "seriousness of the charges pending against the defendant in Ireland provides the defendant with an incentive to flee").

Third, were he to flee, Cihantimur has the financial means to assist T.C. in relocating and thereafter fund his daily needs. Indeed, Cihantimur provided the Turkish residence for T.C. and Tok, funded T.C.'s schooling, and his company paid the salary of Tok's driver. *See Drumm*, 150 F. Supp. 3d at 97 (Drumm's "presumed substantial assets provide him with the ability to flee.").

To be sure, T.C. argues that he is not a flight risk because, simply, he "has no place to go," but this argument fails to persuade in light of the foregoing.  Moreover, as a United States citizen with an extensive background of visiting other countries and having lived in the United States (PSR), "flight within the United States would not pose insuperable problems and is quite logical, as is borne out by a host of cases involving flight." *Noeller*, 2017 WL 6462358, at *6.

T.C. also argues that any flight risk could be adequately mitigated by the imposition of conditions, including strict home confinement with his aunt as a third-party custodian, continued

inability to access his passport or apply for a new one, a secured bond, and any other conditions the court might deem appropriate. The court will assume arguendo "without deciding the issue that it would be possible to fashion a set of conditions to adequately mitigate the risk of flight," *Drumm*, 150 F. Supp. at 97, and accordingly turn to the issue of special circumstances.

B.  **Special Circumstances**

As previously explained, "[t]here is a presumption against bail in" international extradition proceedings "and only 'special circumstances' justify release on bail." *Kin-Hong*, 83 F.3d at 524 (citing *Wright*, 190 U.S. at 63).  T.C.'s primary argument is that his age and the lack of suitable conditions at Manson establish special circumstances.  (D. 22, p. 5) ("Amongst the most compelling "special circumstances" warranting release is the juvenile status of the detainee and lack of suitable detention facilities.").  Although the government has indicated that it intends to move T.C. from Manson to "another juvenile facility," the court will nevertheless consider T.C.'s argument where no transfer has yet occurred at the time of the issuance of this order.

T.C. cites to legal precedent in support of his argument, including the Second Circuit's decision in *Hu Yau-Leung*, 649 F.2d at 920.  There, the court upheld the district court's finding of "special circumstances" based on the relator's age (sixteen years) "and background along with the lack of any suitable facility" to

hold him.  *Id*.  However, this court, after examining the allegedly deficient conditions identified by T.C. noted above, finds that he has not met his burden of showing special circumstances warranting release.

To begin, T'C.'s isolation in Manson's medical unit lasted only three or four days at the outset of his time there and was for administrative purposes.  Although T.C. experienced the discomfort of a facility with lights turned on both day and night, and the lack of a pillow, the time-period was brief and the conditions can be viewed more broadly as an unwelcome but not uncommon part of the discomfort inherent in jail.  *See United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979) ("[T]he discomfiture of jail" is "not [a] special circumstance[].");  *Drumm*, 150 F. Supp. 3d at 100 (citing *Williams*, 611 F.2d at 915).  The same is true as to the other purportedly deficient conditions at Manson, including uniformed guards and minors dressed in prison clothing, cubicles separated by glass for noncontact visits, and housing charged and convicted youthful offenders in the same housing unit.  Although unpleasant, they are not so sufficiently grave and atypical as to warrant bail.

As for the effects of the isolation itself, the limitation to one telephone call every eight hours during this brief isolation could potentially be concerning if it were to continue, but T.C. is no longer experiencing this isolation and he subsequently

reported to the interviewing probation officer that his mental condition was not affected. Notwithstanding the concerns encapsulated in the Justice Department Report, which described the use of isolation at Manson in late 2021, nothing in the record suggests that T.C. suffered any harm from his brief isolation. Given that, and because T.C. does not face any further period of isolation, this is not a special circumstance.

Next, T.C. maintains that his inability or delay in obtaining prescribed medication to treat his skin condition constitutes a special circumstance, but it does not. From conversations with the probation officer, the court has an understanding of the nature of the condition and the medication at issue. While the court sympathizes with T.C. in light of this condition, it is not life threatening or debilitating. *See Noeller*, 2017 WL 6462358, at *4 (extraditee's epileptic condition was not "life threatening or so serious and exigent that his medical needs [could not] be accommodated . . . while in custody."); *Matter of Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1217 (D. Nev. 1993) (denying bail to extraditee who had only one kidney and required special diet because "his condition is not debilitating, and is apparently easily controlled"); *see also Kin-Hong*, 83 F.3d at 524 (noting courts have found special circumstances in context of "serious deterioration in the relator's health"); *Pappas*, 2023 WL 7220053, at *4 ("COVID-19 was not a special circumstance." (citing *United*

20

*States v. Howells*, 2020 WL 6822980, at *3 (N.D. Ill. Nov. 20, 2020))).  Similarly, the condition also does not pose "a *serious* health threat" to T.C. "while detained."  *Castaneda-Castillo*, 739 F. Supp. 2d at 56 (emphasis added) (citations omitted).

In any event, the government has represented that it is working to facilitate T.C.'s ability to obtain the prescribed medication and has consulted with health officials at Manson in that regard.  (D. 39).  There is no reason to expect that the government, having made these statements, will not assist in the efforts to obtain the medication.  *See Hilton v. Kerry*, 754 F.3d 79, 88 (1st Cir. 2014).  The decision in *Hilton* is instructive. The First Circuit rejected the argument "that the Government cannot comply with its obligation to address [Hilton's] high risk of suicide if he is detained and . . . pre-extradition detention would [therefore] result in 'deliberate indifference' to that risk on the part of United States officials."  *Id.*; *see also id.* 88 n.8 (assuming without deciding that "'deliberate indifference' standard applies in the context of pre-extradition detention"). In rejecting the argument, the court cited the government's statement at the detention hearing that "it would locate a third-party inpatient facility at which Hilton's medical needs could be met."  Pertinent to the circumstances here, the *Hilton* court commented that there was "no reason to expect that the Government,

having now been made acutely aware of Hilton's mental health
conditions, will be insensitive to that issue going forward." *Id*.

Proceeding, T.C. asserts that posting his name and date of
birth as well as his location and inmate number on the Connecticut
Department of Correction's website violates state law and a United
Nations resolution.  The government explained the oversight and
informed all that Manson removed the information once notified.
Specifically, Manson did not:

> receive a flag that T.C. was under 18 years of age, which
> normally accompanies the mittimus received from the
> Connecticut Juvenile Court.  As a federal detainee, T.C.
> does not have a mittimus from the Connecticut Juvenile
> Court.  As a result, his date of birth, inmate number, and
> dates of detention were inadvertently made publicly
> available on the Connecticut State Department of
> Correction's website to those who knew his full name (which
> had been widely published in the Turkish media prior to the
> initiation of extradition proceedings).  Upon being
> notified of this error, Manson officials promptly removed
> T.C.'s information from the [Connecticut State Department
> of Correction's] website.

(D. 39).  T.C. acknowledges the removal of the identifying
information from the website.  (D. 40, ¶ 12).  Given the
circumstances, the brief and inadvertent posting of this
information on the website followed by its removal is far afield
of a special circumstance.

Somewhat similarly, T.C. objects to the dissemination of his
booking photograph in prison clothes with his name and other
identifying information.  (D. 29, ¶ 10).  He maintains that the
release of these purportedly confidential records violates his

22

right to privacy as well as a Connecticut statute.  (D. 29, ¶ 5) (D. 53, ¶ 8).  Case law generally does not afford an individual's arrest records and booking photographs a constitutional right to privacy.  *See Guirlando v. Union Cnty. Jail*, Civil No. 1:21-cv-01013, 2021 WL 4823478, at *10 (W.D. Ark. July 28, 2021) ("Plaintiff has no right to privacy in his arrest records--including an arrest or booking photograph") (citing *Paul v. Davis*, 424 U.S. 693, (1976))(additional citation omitted); *Lancaster v. Bd. of Educ. of Baltimore Cnty.*, Civil Action No. GLR-20-3685 2021 WL 4148459, at *12 (D. Md. Sept. 13, 2021) (citing *Paul*, 424 U.S. at 712-713, as rejecting argument that dissemination of "booking photograph and arrest information to local retail stores violated [plaintiff's] right to privacy); *Hinson v. Arbuckle*, Case No. 5:17-CV-00260 2023 WL 1495402, at *12 (W.D. La. Jan. 17, 2023) (stating right to privacy does not apply to "mere booking photos and information"); *Tramaglini v. Martin*, Civ. No. 19-11915, 2019 WL 4254467, at *6 n.2 (D.N.J. Sept. 9, 2019) (collecting cases rejecting right to privacy for arrest and booking mugshots) (unpublished).  Specific to juvenile court records, "courts have found statutes expressly prohibiting the release of juvenile criminal records do not confer constitutional privacy rights on individuals." *Tucker v. Decker*, No. 1:14-cv-163-jgm, 2014 WL 7236989, at *6 (D. Vt. Dec. 17, 2014) (citing *Doe v. Town of Madison*, No. 3:09 CV 2005, 2010 WL 3829186, at *7 (D. Conn. Sept.

22, 2010)).   T.C. fails to cite any case that applies a
constitutional or state statutory right to privacy for minors in
their arrest records or booking photos to an extradition detention
decision.   Given this failure and the foregoing case law, T.C.
fails to meet his burden to show that the dissemination of the
booking photograph along with the identifying information amounts
to a special circumstance.

T.C. next submits that the question posed by the Manson
corrections officer asking T.C. whether he had actually committed
the underlying charged crime violates his right against self-
incrimination, his right to counsel, and his right to due process.
The argument is misplaced.   (D. 29, ¶ 7).   To state the obvious,
the United States has not charged T.C. with a crime.   Moreover,
"the text 'any criminal case' under the Fifth Amendment's Self-
Incrimination Clause does not generally include criminal cases in
foreign jurisdictions." *Nowakowski v. New York*, 835 F.3d 210, 241
(2d Cir. 2016) (summarizing holding in *United States v. Balsys*,
524 U.S. 666, 673 (1998)).   As to the right to counsel, it applies
"in criminal cases." *Romeo v. Roache*, 820 F.2d 540, 543–44 (1st
Cir. 1987).   As earlier indicated, "[e]xtradition proceedings . .
. are generally not considered criminal prosecutions." *Id*.
Lastly, although the questions about the facts of the alleged crime
and whether T.C. committed the crime are troubling, they do not

24

rise to the level of special circumstances.[26]  *See generally*
*Williams*, 611 F.2d at 915.

T.C. additionally takes issue with the distance between
Manson and his counsel and aunt in Amesbury.  While the court
sympathizes with counsel's need (on at least one occasion) to
expend seven hours round-trip to meet with T.C., and acknowledges
that the distance between them and the challenges it creates are
suboptimal, it is nonetheless well established that the need to
assist in preparing a defense with counsel in an extradition
proceeding, while important, is typically not a special
circumstance.  *See Koskotas v. Roche*, 931 F.2d 169 (1st Cir. 1991);
*Drumm*, 150 F. Supp. 3d at 100 ("[N]eed to assist in defending
against the extradition proceeding itself is not a special
circumstance.") (citations omitted); *Matter of Extradition of*
*Smyth*, 976 F.2d 1535, 1535-1536 (9th Cir. 1992) (reversing district
court's special circumstances finding, noting that the need to
consult with counsel, while important, is also not a special
circumstance).  Even "[t]he need to consult extensively with an
attorney over complex and important legal matters does not measure
up to a 'special circumstance.'" *Matter of Extradition of Sidali*,
868 F. Supp. 656, 657 (D.N.J. 1994) (citing *In re Russell*, 805

---

[26] T.C. does not adequately explain or develop the purported violation of his
right to due process premised, or so he contends, "on the interrogation of a
represented juvenile outside the presence of his lawyer."  (D. 29, ¶ 7).  The
due process argument is waived.

F.2d 1215 (5th Cir. 1986)).  While this court is not prepared to hold that a counsel's inability to meet with their client could never amount to a specific circumstance, it finds that the limited challenges T.C. and his counsel have had to navigate thus far do not rise to that level.

The distance between T.C. at Manson and his aunt in Amesbury also does not amount to a special circumstance on the facts of this case, particularly where the record does not reflect T.C. and his aunt share a special relationship other than that they are related.  T.C. and Tok entered the United States on March 2. Between that time and their June 14 arrest, they apparently did not visit T.C.'s aunt.  In fact, they resided in an Airbnb in the area of Plum Island for three weeks, yet there is no indication that they made the relatively short trip from there to visit T.C.'s aunt.  Drawing reasonable inferences, T.C. does not appear to have a close relationship with his aunt.

Next, and somewhat separately, T.C. contends that the Boston Police Department ("BPD"), purportedly "by agreement with [the] United States Marshals" Service, released body camera footage of T.C.'s arrest "pursuant to a Freedom of Information Act . . . request by the Turkish press."  (D. 50, ¶ 3).  The BPD released the video footage from a body camera worn by a BPD officer who transported T.C. from the site of his arrest to the John Joseph Moakley United States Courthouse.  T.C.'s counsel describes the

26

video as a pat down search of T.C.'s legs and buttocks while clothed. (D. 50, ¶ 4). The released video blurred or redacted T.C.'s face. (D. 39) (D. 53, ¶ 5). T.C. nonetheless maintains that the release to the Turkish press amounts to "an extreme invasion of T.C.'s privacy as a juvenile." (D. 50, ¶ 5).

The government responds that the BPD released the video to the Turkish press under the Massachusetts Public Records law, M.G.L. c. 66, § 10. Regardless, as aptly pointed out by the government, the BPD's release of the video footage is not connected to Manson and the purportedly deficient conditions at that facility.

Finally, although the court has examined and discussed the various conditions at Manson and other arguments raised by T.C. in a compartmentalized fashion in determining that no factor or condition standing alone rises to the level of a special circumstance, it notes that it also does not find the case to present special circumstances even considering all those factors together. It is true that Manson has some concerning attributes similar to an adult prison but the more concerning aspects of T.C.'s detention at Manson have had to do with short-lived restrictions related to his orientation. That said, the court would be prepared to revisit this issue should conditions going forward raise true, substantive concerns akin to some of those

raised here or new (equally substantive) concerns based on conditions at whatever facility T.C. is being held.

**V.**   **CONCLUSION**

In accordance with the foregoing discussion, the government's motion (D. 7) is **ALLOWED** and T.C.'s motion (D. 22) is **DENIED**.


            /s/ Donald L. Cabell
            DONALD L. CABELL, Chief U.S.M.J.

DATED:  July 9, 2024