IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN THE MATTER OF         )
THE EXTRADITION OF      )      No. 24-mj-01365-DLC
EYLEM TOK              )

**GOVERNMENT'S MEMORANDUM OF LAW
IN SUPPORT OF EXTRADITION**

The United States, through undersigned counsel, respectfully submits this memorandum of law in support of its request that this Court certify to the Secretary of State that Eylem Tok ("Tok") is extraditable to the Republic of Türkiye ("Türkiye") to stand trial on the two offenses for which Türkiye seeks her extradition.

## INTRODUCTION

Tok is accused of assisting her then 16-year-old son, "T.C.," to flee Turkey immediately after he caused a fatal car crash. T.C., who is also sought for extradition to Türkiye, allegedly killed one person and injured several others when he drove his vehicle at an excessively high rate of speed around a corner late at night on March 1, 2024. Within hours of the crash, Tok and T.C. had purchased airline tickets and fled Türkiye for the United States, via Cairo, Egypt.

Under the Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (the "Treaty"), Türkiye transmitted its request for Tok's extradition to the United States in March 2024. Türkiye seeks Tok's extradition so that she may be prosecuted on one charge of Destroying, Concealing or Altering Evidence, in violation of Article 281 of the Criminal Code of Türkiye, and one charge of Protecting an Offender, in violation of Article 283 of the Criminal Code of Türkiye. After review by the Departments of State and Justice, the extradition request was transmitted to the Southern District of Florida, where Tok was believed to be located at the time. Pursuant to a

complaint and arrest warrant issued by that court, Tok was arrested on June 14, 2024 in Boston. This Court swore out an amended complaint on July 1, 2024. Pursuant to 18 U.S.C. § 3184, this Court must now hold an extradition hearing to determine whether to certify Tok's extradition to Türkiye for the Secretary of State's surrender decision.

The Court should certify Tok's extradition to Türkiye for the Secretary of State's surrender decision because the requirements for such certification have been met: (1) this Court has subject matter jurisdiction to conduct the extradition hearing; (2) the Court has personal jurisdiction over Tok; (3) the Treaty is in full force and effect; (4) the offenses for which extradition is sought fall within the scope of the Treaty; and (5) there is probable cause to believe that Tok committed such offenses. *See* 18 U.S.C. § 3184; *see also, e.g.*, *In re Extradition of Taylor*, 484 F. Supp. 3d 13, 15 (D. Mass. 2020) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)); *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984).

## BACKGROUND

## I.      Statement of the Facts[1]

According to Turkish authorities, on the night of March 1, 2024, T.C. was driving Tok's Porsche with three passengers, one in the front, A.K., and two in the back, A.A. and B.A. Dkt. 73-3 at 5-6, 25, 27, 29, 37-38. T.C.'s friend, D.O.O., was driving another vehicle, also with passengers, directly behind T.C.'s vehicle. *Id.* According to statements provided by T.C.'s friends to Turkish authorities, around 11:20 p.m., T.C. suddenly began driving his vehicle faster after they passed a speed bump in the road. *Id.* at 5, 25, 27, 29, 38. T.C.'s vehicle approached a curve in the road, and

---

[1] The facts in this section are taken from Türkiye's Request for the Extradition of Eylem Tok ("Extradition Request"), a redacted copy of which was filed at Dkt. 73-1 through 73-4. Unredacted copies were filed at Dkt. 11 and 37-1.

according to T.C.'s friends, T.C. was driving too fast through the bend. *Id.* At the same time, there five individuals with all-terrain vehicles ("ATVs") stopped on the right side of the road just past the bend, trying to fix one of the ATVs that had broken down. *Id.* at 5-6, 25, 27-30, 38. In an attempt to avoid hitting the people on the side of the road, T.C. suddenly turned the steering wheel to the left, but the sudden turn caused the car to skid and crash into them. *Id.* at 38; *see also id.* at 5-6, 25, 27-30. T.C.'s car ended up in a water channel on the opposite side of the road. *Id.* at 5-6, 25, 27-30, 38-39. One of the individuals died from the impact with T.C.'s car; all of the others were injured. *Id.* at 5-6; Dkt. 73-4 at 16.

According to witnesses, T.C. and his friends had been driving around for some time before the crash. Dkt. 73-3 at 24-25, 27, 29, 37-38. None of the passengers in T.C.'s or D.O.O.'s vehicles reported to authorities that T.C. had been intoxicated, although T.C. fled the scene before any tests could be performed. *Id.* at 6-8, 17, 38; *see also id.* at 13, 25-26, 40. There also did not appear to be any indication that T.C.'s vehicle had malfunctioned. *See generally* Dkt. 73-3. T.C. and his friends did not have driver's licenses. Dkt. 73-3 at 25.

Immediately after the crash, T.C. called his personal driver and Tok. *Id.* at 13, 17. One of Tok's employees told authorities that she and Tok then drove to the scene and took T.C. and two of his friends, D.O.O. and A.K., home. *Id.* at 17; *see also id.* at 25-26, 28, 30, 38. In doing so, Tok allegedly prevented police from observing or recording T.C.'s behavior and demeanor at the scene of the crash and from testing him for alcohol or drug usage. Dkt. 73-4 at 17-18, 21. Police were also unable to interview D.O.O. and A.K. immediately after the crash. *Id.* at 21; *see also* Dkt. 73-3 at 25-26, 28, 30, 38.

Additionally, one of the victims had handed his phone to Z.H.D., who had been in D.O.O.'s car at the time of the crash, and asked him to use the flashlight feature to examine the victim's

3

head wound. Dkt. 73-3 at 7, 28. Afterwards, Z.H.D. inadvertently put the victim's phone in his own pocket, and then left the scene in D.O.O.'s car. *Id.* When he realized he still had the victim's phone, Z.H.D. attempted to give it to K.A. who was heading back toward the scene of the crash. *Id.* at 7, 26, 28, 30. Instead, K.A. left the phone at the residential complex he and others had gathered at, where it was recovered by security guards. *Id.* While D.O.O. was telling the security guards about the accident, Tok allegedly pushed D.O.O. into a car and took the phone from the security guards, saying that she knew the owner and would give it to him. *Id.* at 7, 26, 28, 36; *see also id.* at 32. Meanwhile, D.O.O.'s mother had given her name and phone number to the security guards, to which she stated Tok reacted by questioning why she gave out her information and saying, "I wish you hadn't." *Id.* at 7, 32, 34.

Thereafter, Tok had her employee bring T.C. to her residence while she and T.C.'s driver drove back to the scene of the crash. *Id.* at 13, 17. However, Tok and the driver turned around and returned to her residence as soon as they saw a police presence. *Id.* The driver later found the victim's phone in his car. *Id.* at 14.

Tok's employee told authorities that she then took Tok and T.C. to the airport. *Id.* at 17-18; *see also id.* at 7, 14, 22. Surveillance footage from Tok's residential complex and the airport corroborate the employee's account. *Id.* at 7, 44. According to surveillance footage at the airport, Tok and T.C. arrived at the Egyptair ticket sales office around 2:35 a.m. on March 2, 2024, only three hours after the crash. *Id.* at 8, 42. Tok purchased one-way tickets to Cairo, Egypt, for herself and T.C. in cash. *Id.* at 8, 41. Tok and T.C. traveled to Cairo and continued on to the United States, landing in New York later that day. *Id.* at 8. Tok and T.C. were later observed in New York City, New York. *Id.* at 8, 47-48.

## II.     Procedural History

On March 6, 2024, Turkish authorities issued an arrest warrant for Tok for the offense of Protecting an Offender. Dkt. 73-3 at 53. On March 13, 2024, Turkish authorities issued an arrest warrant for Tok for the offense of Destroying, Concealing or Altering Evidence. *Id.* at 56. On April 3, 2024, Türkiye transmitted its Extradition Request. Dkt. 73-1 at 4. After vetting by attorneys at the Departments of State and Justice, the Southern District of Florida swore out a complaint for the extradition of Tok on the charge of Protecting an Offender, and a magistrate judge in that district issued a warrant for Tok's arrest. Dkt. 5; Dkt. 5-3. Tok was arrested in Boston on that complaint on June 14, 2024.

Thereafter, Türkiye supplemented its extradition request on June 25, 2024. Dkt. 73-4. Attorneys at the Departments of State and Justice further vetted this supplement, and an amended complaint for the extradition of Tok on the charges of Protecting an Offender and Destroying, Concealing or Altering evidence was sworn out on July 1, 2024. Dkt. 54.

## III.    Legal Background

"Extradition is largely a concern of the Executive Branch" with a limited role carved out for the judiciary pursuant to the federal extradition statute, 18 U.S.C. § 3184. *Drumm v. McDonald*, No. 15-cv-14221, 2016 WL 111411, at *4 (D. Mass. Jan. 11, 2016). Pursuant to Section 3184, the extradition court must conduct an extradition hearing and make a probable cause determination under "the same . . . standard used in federal preliminary hearings." *Noeller v. Wojdylo*, 922 F.3d 797, 803 (7th Cir. 2019) (quoting *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006)). However, the country seeking extradition is not otherwise "required to try its case in a United States court." *Id.* at 804. That is because "an extradition hearing is not a criminal prosecution" and "the order of extraditability expresses no judgment on [Tok's] guilt or innocence." *Austin v. Healey*, 5 F.3d 598,

603 (2d Cir. 1993).

At the extradition hearing, the Court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification—as defined in the Treaty, statutes, and case law—have been established. *See Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)); *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 815 (S.D. Tex. 2011). If any evidence is offered by the fugitive, the Court should rule on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense as to which extradition is sought. *See Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). If the Court finds that the requirements for certification are satisfied, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and it must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184; *see Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828-29 (11th Cir. 1993). The Secretary will then decide whether to surrender the fugitive to the requesting country. 18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs."). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997).

In fulfilling its function under Section 3184, the judicial officer should construe liberally

the applicable extradition treaty in order to effect its purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed."); *In re Extradition of Nezirovic*, No. CIV.A. 7:12MC39, 2013 WL 5202420, at *5 (W.D. Va. Sept. 16, 2013) ("Treaties are construed liberally to favor the obligation to surrender fugitives.") (citation omitted).

An extradition hearing is not a criminal proceeding. Its purpose is to decide the sufficiency of the charges under the treaty, not to determine the fugitive's guilt or innocence; that is for the foreign court. *See, e.g.*, *Collins v. Loisel*, 259 U.S. 309, 316 (2022); *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Benson v. McMahon*, 127 U.S. 457, 463 (1888). Because of the limited nature of the hearing, special procedural and evidentiary rules apply.

For example, the rights available to a defendant in a criminal trial do not attach to a fugitive in international extradition proceedings. *See Neely*, 180 U.S. at 122 (rights available to one charged with criminal offense in this country not applicable to offenses committed outside the United States against the laws of another country); *accord Charlton*, 229 U.S. at 461; *Martin*, 993 F.2d at 829. The purpose of an extradition hearing is not to try the underlying charge; that is for the foreign court. *Neely*, 180 U.S. at 123.

Accordingly, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *Balzan v. United States*, 702 F.3d 220, 224 (5th Cir. 2012). Moreover, the fugitive has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005), *cert. denied*, 546 U.S. 1171 (2006); *Messina v. United States*, 728

F.2d 77, 80 (2d Cir. 1984).

The fugitive's right to present evidence is severely constrained, and her Constitutional rights are limited. For example, the fugitive has no right to cross-examine witnesses who might testify at the hearing or confront his accusers, *see Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Ordinola v. Hackman*, 478 F.3d 588, 608 (4th Cir.), *cert. denied*, 128 S. Ct. 373 (2007); and no Sixth Amendment right to a speedy extradition, *see McDonald v. Burrows*, 731 F.2d 294, 297 (5th Cir. 1984); *Martin*, 993 F.2d at 829; *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978). The exclusionary rule is inapplicable, *see Simmons v. Braun*, 627 F.2d 635, 636–37 (2d Cir. 1980); and the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see Collins*, 262 U.S. at 429; *In re Extradition of McMullen*, 989 F.2d 603, 612–13 (2d Cir. 1993), *cert. denied*, 510 U.S. 913 (1993).

Extradition treaties do not require, or even anticipate, live witness testimony at the hearing because to do so "would defeat the whole object of the treaty." *Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *see also Bingham*, 241 U.S. at 517. Thus, hearsay evidence is admissible at extradition hearings and may properly support a court's findings leading to a certification under Section 3184. *See Collins*, 259 U.S. at 317; *Bingham*, 241 U.S. at 517 (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses); *Hoxha*, 465 F.3d at 562; *Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008) ("[C]ourts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context. Unsworn statements can be sufficient to support a probable cause determination.") (citations omitted); *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977) (citing cases). Nothing more is required, and typically, nothing more is provided. *See, e.g.*, *Bovio v. United States*, 989

F.2d 255, 259 (7th Cir. 1993); *Zanazanian*, 729 F.2d at 626-27 (unsworn written statements may properly form the basis for certification).

Accordingly, a finding of extraditability may be, and typically is, based entirely on the four corners of the authenticated documentary evidence and information the requesting government has provided. *See, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1162-63, 1166 (11th Cir. 2005) (upholding probable cause determination based on unsworn 106-page bill of indictment prepared by a foreign investigator describing witness statements and other hearsay evidence); *Manta v. Chertoff*, 518 F.3d 1134, 1139-40, 1145-47 (9th Cir. 2008) (upholding probable cause determination based on investigation report written by prosecutor); *Bovio*, 989 F.2d at 259-61 (Swedish investigator's statement sufficient to establish probable cause); *O'Brien*, 554 F.2d at 783; *Shapiro*, 478 F.2d at 902-03; *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-34 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd*, 28 F.3d 115 (11th Cir. 1994). The finding may rest upon written statements from a foreign prosecutor, judge, or officer summarizing the evidence. *Rice v. Ames*, 180 U.S. 371, 375-76 (1901); *Jean v. Mattos*, No. CIV. 13-5346 KSH, 2014 WL 885058, at *5 (D.N.J. Mar. 5, 2014) at *5 ("That some evidence is 'alluded to' rather than 'reproduced' – for example, the police reports from which witness statements were presumably extracted are not in the record – does not diminish the validity of what is satisfactorily described."); *accord Glucksman v. Henkel*, 221 U.S. 508, 513–14 (1911); *Garcia*, 825 F. Supp. 2d at 830 ("[E]xtradition can be predicated entirely on the 'unsworn statements of absent witnesses.'") (quoting *Collins*, 259 U.S. at 317).

Due to the nature and limited purpose of an extradition hearing under Section 3184 and the importance of the United States' fulfilling its obligations under an extradition treaty, a fugitive's opportunity to challenge the evidence introduced against him is heavily circumscribed. A fugitive

may not introduce evidence that contradicts the evidence the government submits on behalf of the requesting country, but may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 457-58; *Hoxha*, 465 F.3d at 561 ("Courts have traditionally distinguished between inadmissible 'contradictory evidence,' which merely conflicts with the government's evidence, and admissible 'explanatory evidence,' which entirely eliminates probable cause."). *Ordinola*, 478 F.3d at 608.[2] "The accused is not entitled to introduce evidence which merely goes to his defense but may offer limited evidence to explain elements in the case against him, since the extradition proceeding is not a trial of the guilt or innocence but of the character of a preliminary examination held before a committing magistrate to determine whether the accused shall be held for trial in another tribunal." *Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962); *see also Hooker*, 573 F.2d at 1368 ("[T]he extraditing court properly may exclude evidence of alibi, of facts contradicting the government's proof, or of a defense such as insanity . . . . Because of the limited function of an extradition proceeding and the limited participation permitted of the fugitive, the order of the court does not reflect a consideration of all the merits of the case.").

Accordingly, the First Circuit has emphasized that the purpose of permitting explanatory evidence is to afford the relator "the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause," recognizing that "extradition proceedings are not to be converted into a dress rehearsal trial." *Koskotas*, 931 F.2d at 175 (1st Cir. 1991) (internal quotation marks and citations omitted).

---

[2] The extent to which a fugitive may offer explanatory proof is largely within the court's discretion. *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991); *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir.), *cert. denied*, 439 U.S. 932 (1978); *In re Extradition of Singh*, 124 F.R.D. 571, 572-73 (D.N.J. Nov. 2, 1987) (citing cases); *United States ex rel Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963), *cert. denied*, 376 U.S. 952 (1964) (citing cases).

That "explanatory evidence" is permitted but "contradictory evidence" is prohibited flows from the rule than an extradition judge may not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn*, 783 F.2d at 815. "Testimony that merely gives the opposite version of the facts does not destroy the probability of guilt" and thus is inadmissible. *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1361 (S.D. Fla. 1999). Similarly, evidence (or argument) regarding the credibility of the requesting country's witnesses must be disregarded. *See, e.g.*, *Bovio*, 989 F.2d at 259 (rejecting evidence that major witness lied during the investigation because "issues of credibility are to be determined at trial"); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 344022, at *8 (S.D. Fla. May 28, 2015) ("[Fugitive] has consistently attempted to contradict the case brought against him in [the requesting country] . . . . This [he] cannot do."); *In re Extradition of Cervantes Valles*, 268 F. Supp. 2d 758,772 (S.D. Tex. 2003) ("Explanatory evidence, then, is taken to mean evidence that provides an innocent explanation for the matters which the government contends point toward guilt.").

In concert with this limited scope of "explanatory" evidence, an extradition magistrate is bound to view submissions of the requesting country as true. *See, e.g.*, *In re Solis*, 402 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005) ("Because [the fugitive's] argument does not accept Mexico's evidence as true, it is contradictory rather than explanatory within the meaning of extradition law."); *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1294 (S.D. Fla. 2011) (fugitive's claim that his shooting was accidental contradicted requesting country's autopsy report, and therefore, could not "be thought to merely 'explain' the Government's evidence"); *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997) (stating that the court "must accept as true all of the statements and offers of proof by the demanding state,' even if they contain

hearsay.") (quotation omitted); *Desautels v. United States*, 782 F. Supp. 942, 944 n.2 (D. Vt. 1991); *Ahmad v. Wigen*, 726 F. Supp. 389, 399-400 (E.D.N.Y. 1989); *In re Extradition of Atta*, 706 F. Supp. 1032, 1050–51 (E.D.N.Y. 1989) ("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for the purposes of this determination.") (citing *Collins*, 259 U.S. at 315-16).

Other than the sufficiency of the evidence, all matters that a fugitive may raise as defenses to extradition are to be considered by the Secretary of State, not by the court. *See* 18 U.S.C. §§ 3184, 3186. In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali v. INS*, 107 F.3d 191, 195 n.7 (3d Cir. 1997). The Secretary considers humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country. *See Escobedo*, 623 F.2d at 1105. This is consistent with the long-held understanding that deciding whether to surrender a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's powers to conduct foreign affairs. *In re Kaine*, 55 U.S. 103, 110 (1852).

Similarly, a fugitive's contention that the extradition request is politically motivated or that the requesting state's justice system is unfair should be addressed by the Secretary of State, not the court. *See Koskotas*, 931 F.2d at 173-74 (noting that requesting state's motives are for executive branch to consider); *Kin-Hong*, 110 F.3d at 110 ("It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed"); *see also Prasoprat*, 421 F.3d at 1016;

*Blaxland v. Commonwealth Director*, 323 F.3d 1198, 1208 (9th Cir. 2003); *In re Extradition of Singh*, 123 F.R.D. 127, 130 (D.N.J. Nov. 2, 1987).

## ARGUMENT

The Court should certify Tok's extradition to Türkiye for the Secretary of State's surrender decision because the requirements for such certification have been met. *See* 18 U.S.C. § 3184; *see also, e.g.*, *Taylor*, 484 F. Supp. 3d at 15.

### I.     The Court Has Subject Matter Jurisdiction to Conduct These Extradition Proceedings

This Court has subject matter jurisdiction to conduct these extradition proceedings under the extradition statute, 18 U.S.C. § 3184, and Rule 1(e) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts ("MJ Rules"). *See* 18 U.S.C. § 3184 (extradition proceedings may be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States"); MJ Rule 1(e) ("Each United States Magistrate Judge appointed by this court is authorized to . . . [c]onduct extradition proceedings, in accordance with 18 U.S.C. Section 3184[.]").

### II.    The Court Has Personal Jurisdiction over Tok

This Court has personal jurisdiction over Tok pursuant to 18 U.S.C. § 3184 because she was found and arrested in the District of Massachusetts. *See* 18 U.S.C. § 3184 (the magistrate judge "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue his warrant for the apprehension of the person so charged"); *see also, e.g.*, *Pettit v. Walshe*, 194 U.S. 205, 219 (1904) ("The commissioner or judicial officer here referred to is necessarily one acting as such within the state in which the accused was arrested and found.").

### III.   The Applicable Extradition Treaty Is in Full Force and Effect

Section 3184 provides for extradition in instances in which a treaty or convention is in

force between the requesting state and the United States. Courts defer to the Executive Branch on the question of whether a treaty is in force. *See, e.g.*, *Terlinden v. Ames*, 184 U.S. 270, 288-89 (1902). Here, the United States has submitted the Declaration of Tom Heinemann, an Attorney Adviser in the Office of the Legal Adviser for the Department of State, attesting to the fact that the Treaty is in full force and effect between the United States and Türkiye. *See* Dkt. 73-1 at 2-3 (Heinemann Declaration ¶ 2).

## IV. The Extradition Treaty Encompasses the Offenses for Which Extradition Is Requested

The Treaty is what is known as a "hybrid" treaty because it contains elements of both a list and the more modern dual criminality requirement. In particular, Articles 1 and 2 of the Treaty provide for the extradition of fugitives who have been charged with (1) "Offenses, regardless of whether listed in the Appendix to this Treaty or not, which are punishable under both the federal laws of the United States and the laws of Turkey by deprivation of liberty at least for a period exceeding one year or by a more severe penalty"; or (2) "Offenses listed in the Appendix to this Treaty which are punishable under both the laws of the Requesting Party and the Requested Party for at least a period exceeding one year or by a more severe penalty." Article 2(4) of the Treaty further provides, "When a request for extradition comprises several separate offenses and extradition has been granted for one of the extraditable offenses, it shall also be granted for other extraditable offenses which could not otherwise fulfill the requirements of paragraphs (1) and (2) above as related to the deprivation of liberty to be served . . . ." As provided below, the charges for which Türkiye seeks Tok's extradition are both extraditable offenses under the Treaty.

As a preliminary matter, both offenses for which extradition is sought—Destroying, Concealing or Altering Evidence under Article 281 and Protecting an Offender under Article 283—are listed in the Appendix to the Treaty. Specifically, the Appendix lists, at item #19,

"Unlawful obstruction of judicial proceedings or proceedings before government bodies or interference with an investigation of a violation of a criminal statute, by influencing, bribing, impeding, threatening, or injuring by any means any officer of the court, juror, witness, or duly authorized criminal investigator" as an extraditable offense.

In determining whether an offense is punishable under the laws of both countries, extradition courts properly look to the underlying acts to determine whether, if they had been committed in the United States, they would violate United States federal law, the law of the state in which the hearing is held, or the law of the preponderance of the states. *See Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981); *In re Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989). Because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902); *see Factor*, 290 U.S. at 303, a court should "approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("The point of an extradition treaty after all is to facilitate extradition . . . ."), *cert. denied*, 137 S. Ct. 243 (2016).

The Turkish offenses need not be identical to ours. Indeed, the Supreme Court held that dual criminality exists "if the particular act charged is criminal in both jurisdictions," even if the name of the offense or the scope of the liability differs in the two countries. *Collins*, 259 U.S. at 312; *see United States v. Riviere*, 924 F.2d 1289, 1302 (3d Cir. 1991) ("[T]he rule of double criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours."); *see also* Dkt. 73-1 at 10 (Treaty, Article 2(1)(b)). As the First Circuit has explained, "[t]he purpose of the dual criminality requirement is simply to ensure that extradition is granted only for crimes that are regarded as serious in both countries." *Kin-Hong*, 110 F.3d at

114 (citing *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995)).

In accordance with the above-referenced terms of the Treaty, the Court must determine whether the alleged misconduct would constitute a felony in the United States if it had been committed here under similar circumstances. In the United States, if an individual removed evidence from a crime scene or otherwise impeded a criminal investigation, such conduct would be punishable under U.S. and Massachusetts law. In particular, based on the conduct alleged in the extradition request, Tok could, for example, be charged under 18 U.S.C. § 1512(b)(3), 18 U.S.C. § 1512(c)(2), M.G.L. c. 268, § 13B, and M.G.L. c. 268, § 13E.[3]  Likewise, if an individual helps an offender flee in the manner in which Tok aided T.C., such conduct could, for example, be punishable under 18 U.S.C. §§ 2, 1073 and 18 U.S.C. § 3.[4]  As reflected in the respective statutes, the foregoing offenses all carry maximum punishments of more than one year imprisonment and therefore satisfy the dual criminality requirement of Article 2(1) of the Treaty.

The punishments established by the Turkish statutes under which Tok is charged likewise satisfy the Treaty. According to the Extradition Request, the offense of Destroying, Concealing or Altering Evidence under Article 281 of the Turkish Criminal Code carries a maximum penalty of five years' imprisonment. That penalty is more than sufficient to satisfy the penalty provisions in Articles 2(1). Additionally, the offense of Protecting an Offender under Article 283 likewise carries a maximum penalty of five years' imprisonment according to Turkish authorities.

Tok previously contended that she is not subject to any imprisonment, let alone for more than a year, on the charge of Protecting an Offender because Article 283(3) of the Turkish Criminal

---

[3] *See* Appendix filed herewith.

[4] *Id.*

Code does not permit the imposition of any penalty for offenders who seek to protect direct-ascendants or direct-descendants (such as a mother protecting her son) from a search, detention, arrest, or enforcement of a judgment.[5]  However, Article 283(3) provides an affirmative defense to the primary charge set forth in Article 283(1). As Türkiye explained in its supplement, "The decision of not to impose a penalty, which is regulated in the law as a consequence of personal exemption from punishment, is not considered as an obstacle to investigation and prosecution and is not regulated as a decision of 'acquittal' by the court." Dkt. 73-4 at 24. Rather, "Eylem Tok's status as a mother must be established and certified before the court," *id.* at 22, and to the extent proof of that fact may alter the penalty, "[o]nly the court can make such a decision as a result of the trial." *Id.* at 23. Longstanding case law confirms that affirmative defenses fall outside the scope of an extradition court's review. *See, e.g., In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL 3776953, at *27 (S.D. Fla. Aug. 31, 2017) (collecting cases).

In any event, even if the Court were to agree with Tok, Article 2(4) of the Treaty confirms that Tok remains extraditable for the offense of Protecting an Offender. Pursuant to Article 2(4) of the Treaty, the Court may certify extradition for an offense that does not carry a penalty that deprives the person of liberty for a period exceeding one year, as required in Article 2(1), so long as the Court also certifies extradition on a separate offense that does carry such a penalty. Accordingly, if the Court were to certify Tok's extradition on the charge of Destroying, Concealing or Altering Evidence, which undoubtedly carries a maximum penalty that satisfies Article 2(1) of the Treaty, Article 2(4) of the Treaty permits the Court to certify extradition on both charges, regardless whether Article 283(3) precludes a sentence of imprisonment.

---

[5] That provision states, "Where the offence [specified in Article 283(1)] is committed by a direct-ascendant, direct-descendant, spouse, sibling or an accomplice to the offence, no penalty shall be imposed." Dkt. 73-4 at 22.

For these reasons, both offenses for which Türkiye seeks Tok's extradition constitute extraditable offenses under the Treaty.

## V.      There Is Probable Cause to Believe Tok Committed the Alleged Offenses

The standard of proof to find the evidence "sufficient to sustain the charge" under 18 U.S.C. § 3184 is the familiar domestic requirement of probable cause. *See, e.g.*, *Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); *Benson*, 127 U.S. at 463 (extradition hearings are akin to "preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused"). Probable cause is established if there are "facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted).

To certify Tok's extraditability to Türkiye, the Court must conclude that there is probable cause to believe that the crimes charged were committed and that the person before the Court committed them. *See Hoxha*, 465 F.3d at 561. Here, the evidence Türkiye submitted in support of its extradition request, including sworn statements from multiple witnesses and surveillance images, amply supports a finding of probable cause to believe that Tok committed the offenses for which Türkiye seeks her extradition: Destroying, Concealing or Altering Evidence and Protecting an Offender under Sections 281 and 283, respectively, of the Turkish Criminal Code.

In particular, the code provision criminalizing the destruction, concealment or altering of evidence to protect an offender, Section 281, provides that "Any person who destroys, erases,

alters, conceals, or damages evidence of an offense in order to prevent the emergence of the truth shall be sentenced to a penalty of imprisonment for a term of six months to five years. No penalty shall be imposed where a person conducts such an act in relation to an offense he has committed or participated in." Dkt. 73-4 at 16. Türkiye's extradition request provides several means by which Tok violated this statute. First, the evidence shows that Tok facilitated the removal of T.C. and two of his friends from the scene of the crash, thus preventing police from observing and questioning them immediately after the incident. As reflected in Türkiye's request, a witness statement provided in the heat of the moment may be different from a statement that is taken at a later date, after the witnesses has a chance to reflect on the events and potentially consult with others. Tok deprived Turkish authorities of the opportunity to gather such critical evidence at the scene. Second, Tok's removal of T.C. from the scene also prevented police from testing T.C. for alcohol and drug use. Such testing would have been highly relevant to Türkiye's investigation because driving while intoxicated carries a more severe criminal penalty. *See* Dkt. 73-4 at 18. Third, the evidence shows that Tok took the victim's phone from the security guards, claiming she knew the owner, but instead left it in her driver's vehicle where it was not discovered until a week later. Tok's intent to conceal any evidence potentially on the phone was evident from her insistence on keeping the phone after the security guards tried to get it back and her contemporary statements that she did not want D.O.O.'s mother to even give her name to the security guards. Accordingly, there is sufficient evidence to support a finding of probable cause that Tok committed the offense of Destroying, Concealing or Altering Evidence under Section 281 of the Turkish Criminal Code.

Ample evidence also establishes probable cause that Tok committed the offense of Protecting an Offender in violation of Section 283 of the Turkish Criminal Code. Section 283 provides that "Any person who provides an offender with the opportunity to avoid a search, his

detention or arrest, or the enforcement of a judgment against him shall be subject to a penalty of imprisonment for a term of six months to five years." Dkt. 73-4 at 22. Here, eyewitness statements and surveillance footage demonstrate that, after seeing a police presence at the crash scene, Tok directed her employee to drive herself and T.C. to the airport. Within three hours of the crash, before T.C. could even be interviewed or examined by Turkish authorities, she bought one-way plane tickets, with cash, for her and T.C. to leave the country. Tok and T.C. left Türkiye immediately thereafter and arrived in the United States the next day. Within a week of the crash, Turkish authorities issued warrants for both Tok's and T.C.'s arrests, demonstrating their intent to arrest and detain both fugitives. Tok's facilitation of T.C.'s flight immediately after the crash not only frustrated Türkiye's ability to fully investigate the crash but also frustrated Türkiye's ability to execute the warrants. For these reasons, Türkiye's extradition request provides sufficient evidence to warrant a finding of probable cause on the charge of Protecting an Offender.

Accordingly, there is ample evidence to support a finding of probable cause to believe Tok committed both offenses for which Türkiye seeks her extradition.

## CONCLUSION

For the foregoing reasons, the United States requests that the Court certify to the Secretary of State that Eylem Tok is extraditable to Türkiye on both offenses for which her extradition is requested.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:     /s/ Kristen A. Kearney
         KRISTEN A. KEARNEY
Date:  July 24, 2024                Assistant U.S. Attorney

20

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Kristen A. Kearney*
KRISTEN A. KEARNEY
Assistant U.S. Attorney