# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

IN THE MATTER OF
THE EXTRADITION OF
EYLEM TOK

Docket No. 24-mj-01365-DLC

### EYLEM TOK'S MOTION FOR RELEASE
### ON BAIL PENDING EXTRADITION PROCEEDINGS

Eylem Tok respectfully moves for bail while extradition proceedings are pending. Although there is a presumption against bail in extradition cases, Tok can establish that (1) special circumstances justify release pending extradition proceedings, and (2) she is not a flight risk or a danger to the community. As such, Tok respectfully requests that this Court release her under whatever reasonable conditions the Court deems appropriate to assure her future presence in this matter and to ensure the safety of the community.

## INTRODUCTION

Tok can meet her burden to show special circumstances and that she is not a flight risk or danger to the community. First, Tok is raising substantial claims that have a high probability of success on the merits. Second, Tok can show that she has experienced a serious deterioration of health while in custody.

Tok is not a flight risk or a danger to the community. She has no criminal record. She is facing extradition because she brought her American citizen son, T.C., to the United States, after he was involved in a car accident that resulted in a fatality. Tok and T.C. left Türkiye on the

1

night of the accident and flew to Egypt.[1] Rather than remaining in Egypt, where extradition would have been unlikely or impossible, she and T.C. came to the United States, because they have close family ties in Massachusetts. Upon arrival in Massachusetts, Tok worked to settle herself and her son in the Boston area. Making no effort at concealment—openly using her name and her son's name—she took the following steps. She signed a one-year lease on an apartment in Haverhill. She obtained a learner's permit and began taking driver's education classes. She opened a bank account. She retained an immigration attorney to work towards adjusting her legal status. She registered her son with the Haverhill Public Schools and reached out to numerous local private schools, eventually submitting application materials to the British International School. In order to strengthen her son's relationship with his American aunt, uncle, and cousin, who live north of Boston, she rented an AirBnB on Plum Island. She and/or her son spent time with their local family members almost daily after they arrived in Massachusetts. Tok—who faces death threats in Türkiye[2]—seeks only to start a new life with her son in the United States.

Tok will agree to any necessary conditions for release, including posting a bond, arranging for electronic monitoring, and submitting to geographic restrictions/curfews.

In light of the clear and convincing evidence establishing special circumstances to overcome the presumption against bail and that Tok is not a flight risk or danger to the community, Tok respectfully requests that the Court release her under whatever reasonable

---

[1] Based on discussions with Turkish counsel, it is undersigned counsel's understanding that, although there is an extradition treaty between Türkiye and Egypt, there has been a moratorium on its application since approximately 2011, and the Turkish ministry of justice has de-listed the treaty.

[2] *See* Exhibit 3, Affidavit of Counsel.

conditions the Court deems appropriate to assure her future presence in this matter and to ensure the safety of the community.

**RELEVANT FACTS**

**I.      Eylem Tok is a writer and artist whose work has criticized the Turkish government**

Tok, who is 44 years old, was born in Akçaabat, Türkiye.[3] She is a writer and artist, who has published two novels, children's books, and a book of poetry; she has also worked in the visual arts, creating a short abstract art film and exhibiting her photography. She married Dr. Bülent Cihantimur in 2001. Dr. Cihantimur is a high-profile and successful plastic surgeon. During their marriage, they lived together in Bursa, Türkiye. Their son, T.C., was born in 2007. They divorced in 2011, and Tok was awarded full custody of T.C., as well as alimony and child support. Dr. Cihantimur moved to Istanbul; Tok moved there a few years later with T.C.

Tok's first novel, *Mihr*, which was published in 2013, attempted to shed light on child sexual abuse in Türkiye. Her second novel, *The Pawns of God*, was published in 2014. That novel, which was more overtly political, focused on poverty and the rights of ethnic minorities, while criticizing the government, security forces, and the media. The headline on a Turkish review at the time of the book's release was, "This book will make the Prime Minister[4] very angry."[5] According to that review, the book "questions the system that brings best friends to the

---

[3] Basic biographical details are drawn primarily from her professional website, eylemtok.com (providing limited biographical information about her professional career) and the Probation Report in this matter.

[4] Recep Tayyip Erdoğan was the Prime Minister of Türkiye until August 2014, when he assumed the presidency.

[5] *Bu kitap Başbakan'ı çok kızdıracak*, ODA TV, June 4, 2014, *available at* https://www.odatv.com/kultur-sanat/bu-kitap-basbakani-cok-kizdiracak-59698 (reviewed using Google translate).

point of pulling guns on each other," and "contains many indirect criticisms of today's government," describing "individuals as pawns who are victims of the system," while emphasizing "the importance of remaining a free individual." One character, who is a supporter of the Prime Minister, names his three children Recep, Tayyip, and Erdoğan; that character's wife and these three children are all killed in an attack at the end of the book. Tok's publisher ultimately withdrew the book from publication. Over the last ten years, Tok has published a number of children's books in English in the UK market while working in other artistic media.

## II.   The Original and Amended Complaints for Extradition Request

Pursuant to a Diplomatic Note dated April 3, 2024, the Republic of Türkiye ("Türkiye ") formally requested extradition of Eylem Tok, invoking the Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Türkiye, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (hereinafter, the "Treaty"). (D. 5, p. 1.) Although Türkiye requested extradition of Tok for prosecution on two charges—alleging violations of Turkish Criminal Code Articles 281 and 283 respectively—the United States initially declined to move forward on the Article 281 charge (D. 6, p. 1 n.2), and sought an arrest warrant based only on the Article 283 charge (D. 5, pp. 1-2 n.2 & p. 6). Tok was arrested on June 14, 2024, as she and her son were preparing to visit the campus of the British International School. Following her court appearance that day, she was transferred to Wyatt Detention Facility.

On June 17, 2024, Tok moved to dismiss because the government had failed to demonstrate that the Article 283 offense is covered by the provisions of the Treaty and because Türkiye failed to comply with its Treaty obligations to provide complete information, including "the law prescribing the punishment for the offense, and the law relating to the limitation of legal

proceedings or the enforcement of the penalty for the offense." Section II, Article 7, paragraph (1)(e). (D. 13). Article 283 punishes Protecting an Offender, and specifies, in subsection 3, that no punishment may be imposed on a parent for a violation of this statute involving their child. Pursuant to the Treaty, "Extraditable Offenses" are those "punishable under both the federal law of the United States and the laws of Türkiye *by deprivation of liberty at least for a period exceeding one year or by a more severe* penalty." Section II, Article 2, paragraph (1)(a). Tok also noted that the Turkish government's extradition request included only subsection 1 of Article 283, but omitted subsection 3 of that same Article, which states that no punishment can be imposed on a parent under Article 283.[6]

After Tok filed her motion to dismiss, the government filed an amended complaint, expanding the grounds on which it was seeking extradition of Tok to include the Article 281 offense, Destroying, concealing, or altering evidence. (D. 51). The amended complaint included a supplemental memorandum from the Turkish Ministry of Justice concerning the two offenses. (D. 73-4 at 16-25). The government explained in court during a hearing on July 1, 2024, that based on the Turkish supplement, it understood the scope of the Article 281 charge to be broader than originally construed, in that it pertained not just to a cellphone, but to other conduct. (Hearing on July 1, 2024). The government stated in court that the Article 281 charge encompassed taking a cellphone, removing three minors from the scene of the accident without calling the police, impeding the police from observing these three minors after the accident, and

---

[6] The omission appears deliberate. The Extradition Request from the Istanbul Chief Public Prosecutor's Office starts with a recitation of the two alleged offenses under Articles 281 and 283. The request then reproduces in its entirety all three subsections of Article 281, Destroying, concealing or altering evidence, but then reproduces *only* the first sentence or subsection of Article 283, Protecting an offender. (D. 5-2, p. 87).

impeding Turkish police from testing T.C. for alcohol after the accident. (Hearing on July 1, 2024).

### III.   Events in Türkiye

The original Turkish extradition request, dated March 19, 2024, includes the following information. On March 1, 2024, at around 11:20 p.m., a Porsche driven by T.C. was involved in an accident that injured five individuals who were stopped by the side of the road, one of whom later died. (D. 5-2, pp. 89-90[7]). T.C. was in a vehicle with A.K. Another minor, D.O., was driving a second vehicle, with passengers Z.H.D. and K.A. (D. 5-2, p. 89).

Ms. Tok had "no role in the occurrence of the traffic accident." (D. 5-2, p. 90). However, she is alleged to have "enabled [T.C.] to flee first to Egypt and then to the United States of America in order to prevent a judicial process from being carried out against him," which is the basis of the charge for Protecting an Offender. (D. 5-2, p. 90) According to the materials submitted with the extradition request, "There is also substantial evidence that Eylem Tok took and concealed a cell phone belonging to one of the victims who was injured in the accident," as a result of which "an investigation is being conducted for the offense of 'Destroying, Concealing or Altering Evidence.'" (D. 5-2, p. 90)

At the scene, one of the injured parties handed his cellphone to Z.H.D., so that Z.H.D. could use the flashlight feature on the phone to look at the injured party's head. Z.H.D. then "absentmindedly put the phone in his pocket." (D. 5-2, p. 91) Z.H.D. and K.A. took one car and left the scene. (D. 5-2, pp. 109, 112, 114) T.C. remained on the scene, while a passerby called

---

[7] Docket number 5-2 is unavailable to counsel on PACER, but counsel understands it to be the original exhibits to the Complaint, including the original exhibition request. Citations to D. 5-2 refer to the exhibit including the original extradition request, and pin cites correlate to the bates-stamped pages therein, such that "D. 5-2, p. 89" refers to the page stamped "EXT-TOK-00089").

emergency services. (D. 5-2, pp. 109, 124) A.K. (who eventually left the scene with Tok, T.C., and D.O.O.) heard someone call emergency services while he was still present on the scene. (D. 5-2, p. 122). The fire brigade arrived on the scene while T.C. and A.K. were still present. (D. 5-2, p. 122). Fire brigade crews arrived first, followed by traffic police and an ambulance. (D. 5-2, p. 124) The bystander's statement suggests that the minors left only after emergency services arrived. (*Id.*)

Tok and her ex-husband's employee, Ayşe Ceren Saltoğlu[8], had dinner on the night of the accident, as they were working on logistics related to one of Tok's art exhibits. (D. 5-2, pp. 100-01). Tok received a call,[9] and she and Saltoğlu drove about 15 minutes in Saltoğlu's car and picked up three minors on a dark road. (D. 5-2, p. 101). Saltoğlu never saw the scene of the accident, and Tok was out of the car for less than a minute when they met with the children. (*Id.*)

When Z.H.D. (who, along with K.A., was the first of the minors to leave the scene) returned home to his housing complex, he handed the phone to K.A., who in turn gave it to the security guards at the housing complex. (D. 5-2, p. 91). A security officer at the gated compound indicated that D.O.O.'s mother had taken custody of the phone. (*See* D. 5-2, 116[10]). D.O.O.'s mother denied taking custody of the phone. (D. 5-2, p. 116). D.O.O.'s mother's younger sister denied that her sister took possession of the phone. (D. 5-2, p. 118). D.O.O.'s family driver denied that his employer took possession of the phone. (D. 5-2, p. 120).

---

[8] The original extradition request notes that Saltoğlu "is an employee of Bûlent Cihantimur, T.C.'s father." (D. 5-2, p. 89). Saltoğlu is not employed by Ms. Tok. (*See* D. 5-2, pp. 100, 106).

[9] Saltoğlu indicated that Tok received a call around 11, a time that is clearly approximate, given that the accident happened twenty minutes later. (D. 5-2, p. 101.)

[10] A security guard's statement is alluded to in the interview of D.O.O.'s mother, but does not appear in any of the materials presented by Türkiye in support of the extradition request. (*See* D. 5-2, p. 116).

According to the extradition request, Tok took the phone from the security guards, claiming that she knew the owner and would give it to him. (D. 5-2, p. 91). The cellphone was later provided to the police (D. 5-2, p. 92), and there is no suggestion that anyone took action to alter the contents of the (presumably encrypted) cellphone. The extradition request also alleges that Tok "did not provide assistance to the injured people even though she went to the crime scene and only took the perpetrator and his friends and left the crime scene," and likewise that she enabled T.C. to escape law enforcement by taking him abroad. (D. 5-2, p. 92).

Tok and T.C. went to the airport that night and flew first to Cairo and then to the United States. (D. 5-2, p. 92).

**ARGUMENT**

## I.   Legal Standard for Bail in Extradition Proceedings

"[I]t is within the power of the district court to grant bail to a person facing extradition proceedings." *Beaulieu v. Hartigan*, 430 F. Supp. 915 (D. Mass. 1977), *rev'd on other grounds by* 554 F.2d 1 (1st Cir. 1997). However, in contrast to a domestic criminal case, "[t]here is a presumption against bail in extradition cases and only 'special circumstances' justify release on bail." *United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996) (quoting *Wright v. Henkel*, 190 U.S. 40, 63 (1903)). "The rationale behind the presumption against bail is that 'extradition cases involve an overriding national interest in complying with treaty obligations.'" *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 56 (D. Mass. 2010) (quoting *United States v. Taitz*, 130 F.R.D. 442, 444 (S.D. Cal. 1990)). "Accordingly, the burden of establishing special circumstances for release rests with the defendant facing extradition." *Id.*

"[A] person subject to international extradition may overcome the presumption against bail by presenting clear and convincing evidence[11] demonstrating 'special circumstances' justifying release pending extradition proceedings." *In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1215 (D. Nev. 1993). The defendant must also "show by clear and convincing evidence that [he is] neither a risk of flight nor a danger to any person or the community." *United States v. Ramnath*, 533 F. Supp. 2d 662, 665 & n.3 (E.D. Tex. 2008). Since both "risk of flight and danger" and "special circumstances" are prerequisites, "a court logically can address either prong first." *Id.*

### a.   Special Circumstances Warrant Bail Here

"'Special Circumstances' are limited to situations in which 'the justification [for release in an extradition case] is pressing as well as plain.'" *Kin-Hong*, 83 F.3d at 524 (quoting *United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979)). It is within the court's discretion to decide what constitutes special circumstances, and "the list of potential 'special circumstances' is not limited to those previously recognized in published decisions." *In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 736 (W.D. La.1999) (citing *Beaulieu*, 554 F.2d at 1). Courts have held that special circumstances are present where the relator has (1) raised substantial claims which have a high probability of success on the merits; or (2) shown that the detainee may suffer from a serious health threat while in custody. *See In re Extradition of Nacif–Borge*, 829 F. Supp. at

---

[11] Though many courts have adopted the clear and convincing standard, the First Circuit has not done so. This Court could evaluate special circumstances under a preponderance of the evidence standard, adopted in several District Court opinions. *See In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1036 n. 4 (C.D. Cal. 2006); *In re Extradition of Gonzalez*, No. 09-MJ-70576-DMR-1, 2015 WL 1409327, at *5 (N.D. Cal. Mar. 27, 2015); *United States v. Santoyo*, No. 2:21-MJ-125-KJN, 2022 WL 2133797, at *2 (E.D. Cal. June 14, 2022)

1216-19; *Taitz,* 130 F.R.D. at 446. This Court need not determine that a single factor constitutes special circumstances; rather, "the cumulation of several factors may constitute special circumstances that justify bail pending extradition proceedings." *In re Extradition of Nacif-Borge*, 829 F. Supp. at 1216. Nonetheless, there is clear and convincing evidence of each of the foregoing factors to establish special circumstances in this case.

### i.     Tok Has Substantial Claims that Have a High Probability of Success on the Merits

Tok has substantial defenses to extradition. First, Tok cannot be extradited to face charges under Article 283, because Article 283 plainly states that no punishment can be imposed upon a parent for a violation of this statute involving their child. As such, this offense is not punishable for more than a year and is not covered by the terms of the Treaty. Second, the Article 281 charges against Tok rely entirely on an incomplete, inconsistent, and misleadingly selective presentation of facts by the Turkish authorities, and Tok therefore has a high probability of success on the merits of the extradition hearing on this claim.[12]

### 1.     Article 283

"Extraditable Offenses" under the Treaty are "(a) Offenses, regardless of whether listed in the Appendix to this Treaty or Not, which are punishable under both the federal law of the United States and the laws of Türkiye by deprivation of liberty at least for a period exceeding

---

[12] The Turkish government has also failed to provide any evidence that Tok has actually been indicted or charged. It is "the government [that] bears the burden of demonstrating extraditability," including pending criminal charges in the requesting state. *In re Extradition of Santos*, 473 F. Supp. 2d at 1037 (C.D. Cal. 2006). Absent a formal indictment or charge, it is not clear that the extradition request satisfies the requirements of Article 1 and 7 of the Treaty. Courts regularly dismiss extradition complaints where the requesting state fails to formally indict or charge. *See Aguasvivas v. Pompeo*, 984 F.3d 1047, 1057 (1st Cir. 2021) (extradition request insufficient absent an indictment or formal charge); *In re Extradition of Chapman*, No. CIV07-00365SOM/BMK, 2007 WL 3254880, at *3 (D. Haw. Nov. 5, 2007) (dismissing extradition request from Mexico following a dismissal of charges by Mexican court).

one year or by a more severe penalty. (b) Offenses listed in the Appendix to this Treaty which are punishable under both the laws of the Requesting Party and the Requested Party for at least a period exceeding one year or by a more severe penalty." Section II, Article 2, paragraph (1)(a)-(b).

Article 283(3) unambiguously states that the direct ancestor or descendant of an alleged offender cannot be punished under Turkish law for Protecting an Offender. All filings in this Court assert that Tok is the mother of T.C. and is alleged to have assisted her son, T.C., in alleged violation of this Turkish statute. (*See, e.g.* D. 5, p. 2,  ¶ 5(a); D. 5-2 (referring repeatedly to Tok as T.C.'s "Mother"); D. 37-1, p. 13 (identifying T.C. as "the son of Eylem Tok")).

Thus Tok has presented "reasonably clear-cut proof which would … have some reasonable chance of negating a showing of probable cause." *See Kostkotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) (quoting *Matter of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978)); *see also In re Extradition of Martinelli Berrocal*, 2017 WL 3776953, *9 (S.D. Fla. Aug 31, 2017) (quoting *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005) ("evidence that explains away or completely obliterates probable cause" may be heard to defeat extradition). In order for Ms. Tok's extradition to be authorized by statute, the government must produce "evidence sufficient to sustain the charge under the provisions of the proper treaty." 18 U.S.C. § 3184. Here, the government's own evidence conclusively establishes the lack of probable cause for an extraditable offense. There can be no serious question that, if Tok were brought to Türkiye and tried for Protecting an Offender, she could not under any circumstances be punished by imprisonment for any term, let alone imprisonment for more than a year.

The government's suggestion that Tok should be extradited under Article 283 despite the fact that she faces no punishment ignores the plain language of the Treaty, which repeatedly

makes clear that the scope of available punishment is central to extradition. For example, the Treaty specifies that an extradition request must contain all information concerning limitations on punishment. It must include "(a) The text of the applicable laws of the Requesting Party, including the law defining the offense, *the law prescribing the punishment for the offense, and the law relating to the limitation of legal proceedings of the enforcement of the penalty for the offense*." Section II, Article 7, paragraph (1)(e) (emphasis added).[13] Moreover, "[e]xtradition shall not be granted… [i]f the offense for which extradition is requested *has been or is subject to amnesty or pardon*." Treaty Article 3(1), 3(1)(f) (emphasis added).

The Turkish government draws a distinction between an acquittal and a decision not to impose a penalty due to a personal exemption from punishment (D. 37-1, pp. 19-21), but that is not material where the question before the Court is not whether Tok would be acquitted, but whether her offense is punishable by more than a year in prison. The Turkish government's contentions that this Court should compel Tok to answer the charge in Türkiye "face to face" (D. 37-1, p. 19), that Turkish law permits an arrest warrant for the charge (D. 37-1, p. 22), or that unspecified "security measures" could be taken even if a penalty were not imposed (D. 37-1 p. 20), are all irrelevant to the Court's determination of whether the charged offense meets the requirements of the Treaty.

While the parties will brief this issue fully as part of this extradition proceeding, the question at this stage—for bail purposes—is not whether Tok is ultimately extraditable, but whether she has presented something more than a "conceivable possibility of success." *In re Extradition of Nacif-Borge*, 829 F. Supp. at 1216. *See In re Extradition of Maniero*, 950 F. Supp.

---

[13] Türkiye notably failed to comply with this requirement in its initial submission. (D.73-3, p. 3; *see* D. 37 at 4 n.3 (conceding the original omission).)

290, 293 (S.D. Cal. 1996) (concluding petitioner has "high probability of success" on a dual criminality issue where "no evidence" that offense punishable in the United States). Because Tok cannot be punished at all under Article 283, she has raised substantial claims with respect to this charge that have a high probability of success on the merits of extradition.[14]

### 2.   Article 281

Tok can also show a high probability of success on the merits for the Article 281 charge, because the Turkish government has provided incomplete and misleading information in support of the extradition request pertaining to this charge, and in particular, has omitted substantial evidence that negates probable cause. According to the government, the Article 281 charge is based on allegations that Tok took a cellphone, removed three minors from the scene of the accident without calling the police, impeded the police from observing these three minors after the accident, and impeded Turkish police from testing T.C. for alcohol after the accident. (Hearing on July 1, 2024). Those charges depend on incomplete and misleading information and cannot be sustained. Tok did not take the cellphone from the security guards; emergency services arrived at the scene before T.C. (and the other minors who left with Tok) left; and there is no evidence to suggest any involvement of alcohol in T.C.'s car accident. As such, where there is conclusive evidence that precludes a finding of probable cause, Tok has met her burden to show a high probability of success on the merits. *See In re Extradition of Martinelli Berrocal*, 2017 WL 3776953 at *9 (quoting *Barapind*, 400 F.3d at 749) ("evidence that explains away or completely obliterates probable cause" may be heard to defeat extradition).[15]

---

[14] Though the Treaty permits extradition of otherwise non-extraditable charges in conjunction with an extraditable charge, that provision is not relevant where, as here, neither charge satisfies the extradition requirements. *See* Treaty, Article 2(4).

[15] Tok also intends to raise additional challenges to the Article 281 and 283 offenses in

### A.   The Turkish government has failed to provide complete information about custody of the cellphone

In a supplemental memorandum dated June 25, 2024, the Turkish government states that "It was proven by the witness statements that Eylem Tok took the cell phone." (D. 37-1, p. 13). However, a May 3, 2024, Istanbul Chief Public Prosecutor's Office report in T.C.'s case appears to have reached a different conclusion after interviewing the four security guards present at the gated compound to which the minors returned after the incident and reviewing security camera footage from the compound. All four security personnel confirmed that the driver of a specific vehicle, later identified as Berna Öcalgiray, took possession of the phone. (Exhibit 1, May 3, 2024, Investigation Document 81304023-17509\2024/223 (hereinafter "May Report"), pp. 53-55, 62-66).[16] T.C.'s father later tracked down the phone and provided it to the police. (D. 5-2, p. 98).

The Turkish government has consistently failed to provide the security guards' testimony in connection with this extradition request. At the time of the original extradition request, at least one security guard's statement was available and appears to have been deliberately omitted from the police reports submitted in connection with the extradition request. Berna Öcalgiray was questioned in her initial interview about a security guard's statement that she took the cellphone (which she and her family members denied), and her statement—which *was* provided to the U.S. government by Türkiye—indicated that the security guard had already been interviewed and

---

connection with extradition proceedings in this matter, including arguments based on additional supporting information not yet received from Türkiye.

[16] In the interest of expediting the motion, the Exhibit includes a machine translation of the May Report from Turkish to English. Counsel will provide a certified translation once received. Page number citations refer to the page of compiled exhibit, not the internal page numbers on the translation.

given his statement by the time Öcalgiray was interviewed. (D. 5-2, p. 116). No statement from a security guard, however, was provided with the extradition request.

By the time the amended complaint was submitted in this case, interviews with four security guards and surveillance footage was available to show that Öcalgiray took the cellphone. (May Report, pp. 53-55, 62-66). The security guard statements and surveillance footage supporting their statements were not included in the supplemental information provided by Türkiye. (*See generally* D. 37-1). Instead, the supplemental Turkish information notes in passing that although "[t]he security guards said that they gave the phone to Berna Öcalgiray" and "[t]here is a brief moment of a phone exchange [between the guards and Öcalgiray] in the camera footage," those witnesses who contradict not only the security guards' own statements but also footage of someone other than Tok taking the phone must be believed for reasons that are not explained. (D. 37-1, pp. 16-17). Article 7(1)(c) of the Treaty obligates Türkiye in this instance to provide evidence that, if an offense had been committed in the United States, "would justify arrest and committal for trial" of Tok under American law. In the United States, an arrest warrant may not be obtained based on false information or by knowingly withholding exculpatory evidence that would negate probable cause. *See United States v. Barbosa*, 896 F.3d 60, 67-69 (1st Cir. 2018); *Franks v. Delaware*, 438 U.S. 154 (1978). Therefore, Türkiye has failed to satisfy its treaty obligations to justify extradition.

Moreover, there is no assertion that anything happened to the cellphone that affected the police investigation or the state of the evidence. Indeed, it is worth remembering that when the U.S. government understood the cellphone allegation to be the only basis for the Article 281 charge, the government declined to pursue extradition on this basis. (D. 6, p. 1 n.2).

**B.    Tok did not remove minors from the scene of the accident before emergency services were called**

The government has also asserted that another basis for the Article 281 charge is that Tok removed minors from the scene of an accident without calling emergency services. (Hearing on July 1, 2024). But even the witness statements provided in the original extradition request make clear that emergency services were called while T.C. and the two minors who eventually left the scene with him and Tok were still present at the scene. (D. 5-2, p. 109 (T.C. remained on the scene while a passerby called emergency services); D. 5-2, p. 122 (A.K., who eventually left the scene with Tok, T.C., and D.O.O., heard someone call emergency services while he was still present at the scene); D. 5-2, p. 122 (fire brigade arrived on the scene while T.C. and A.K. were still present); *see also* D. 5-2, p. 124 (fire brigade crews arrived first, followed by traffic police and an ambulance)).

The extradition request omits other relevant information about these allegations. First, the emergency alert system in T.C.'s car called emergency services within a minute of the accident. (Exhibit 2, Emergency Services Log, p. 20). The Gendarmerie (or police) arrived on the scene at approximately 11:37 p.m. (*Id.*, p. 18). Surveillance footage shows that as of 11:31 p.m.,[17] Tok was just leaving her dinner with Saltoğlu, at a café approximately 15 minutes drive from the scene of the accident. (May Report, p. 75). She thus arrived near the scene well after various first responders, including fire and police.

---

[17] Specifically, the surveillance footage shows Tok leaving the café at 11:34 p.m., and the Istanbul Prosecutor's Office concluded that the time stamp on the relevant video cameras was three minutes fast. (May Report, p. 75).

### C.   Tok did not impede Turkish police from testing T.C. for alcohol and there is no evidence that alcohol was involved in the offense

The Complaint in this matter indicates that no witnesses reported that T.C. had been drinking (D. 5, p. 3) and evidence submitted by the Turkish government in support of the extradition does not include any indication that witnesses reported any alcohol involvement or that alcohol bottles were discovered at the scene. (*See generally*, D. 5-2). None of the individuals in the vehicle with T.C., the passersby, or the injured parties, made observations suggesting that T.C. had used alcohol. There is no report that emergency responders or bystanders that arrived at the scene before T.C. left suggested the use of alcohol. There is no report that alcohol was purchased by the minors leading up to the events. (There are reports that they stopped at a gas station to buy fuel and at a liquor store to buy cigarettes.) Turkish police have reviewed surveillance footage of the vehicles and their occupants leading up to the offense, and there is no suggestion in the May investigation report or elsewhere that any alcohol was used or that any observations were made that were consistent with the use of alcohol.[18] (D. 59, p. 12) (noting T.C.'s PSR did not include substance abuse concerns).

### ii.   Tok's Declining Physical and Mental Health Are Another Special Consideration for Bail

Another important factor in the determination of whether there are special circumstances warranting the granting of bail in an extradition case is whether the detainee's health has seriously deteriorated or is threatened while in custody.  In *United States v. Taitz*, a federal magistrate concluded that a detainee's health difficulties as the result of allergic reactions to food

---

[18] As the Court is aware, T.C. takes medication for a skin condition. According to his aunt, while in Türkiye he was using Zoretanin. (Exhibit 3, Aff. of Counsel). Zoretanin is the Turkish market's version of isotretinoin. (https://www.fdanews.com/articles/99132-actavis-introduces-two-new-products-in-Türkiye) Isotretinoin is not compatible with alcohol. *See, e.g.*, https://www.goodrx.com/isotretinoin/alcohol-and-accutane.

17

and other items in the detention facility constituted a special circumstance which, considered with other factors such as lack of flight risk and diplomatic necessity, was sufficient to entitle him to bail in an extradition case. 130 F.R.D. at 446.  This case involves more serious health consequences.

Tok, who has no previous history of mental health diagnoses (*see* Probation Report), has struggled since her incarceration. (Exhibit 3, Affidavit of Jennifer M. Herrmann, hereinafter "Aff. of Counsel"). She has struggled to eat or sleep, has difficulty keeping down what food she can eat, and has lost substantial weight. (*Id.*) She now has regular panic attacks. (*Id.*) In addition, Tok began suffering from epilepsy four years ago. (*Id.*) Prior to her arrest, her epilepsy had been controlled, and several years had passed without her having a seizure. (*Id.*) Since her incarceration, she has had at least two seizures, and has not been provided with any medication or care specific to her epilepsy. (*Id.*) Finally, prior to her arrest, Tok had three intensive surgeries to address issues with her back, and had discussed an additional surgery with a doctor. (*Id.*) Since incarceration, she has experienced increasing pain and numbness, which interferes with daily activities. (*Id.*) These health issues are likely to continue to seriously deteriorate if Tok remains incarcerated without proper care for her medical conditions.

### iii.    Tok Does Not Pose a Danger to the Community or a Risk of Flight

Before her arrest in this matter, Tok was making every effort to establish herself and T.C. in the Boston area. Using their real names, with no effort at concealment, Tok took efforts to establish a new life in the United States. Tok and T.C. took up temporary residence in an AirBnb in Newburyport, so that T.C. could be closer to his American relatives in Massachusetts. (Aff. of Counsel; Probation Report) On May 1, Tok signed a 12-month lease on an apartment in Haverhill, MA, listing her son, T.C., as the only other member of her household. (Aff. of

Counsel). Tok and T.C. signed up at Moriarty's Driving School and attended driving lessons. (Exhibit 4, Driving School Records). Tok obtained a driver's permit, while T.C. applied for a Massachusetts identification card. (Aff. of Counsel). She also made arrangements for T.C. to get orthodontic treatment in Massachusetts, which would require regular visits to the same local provider for 2-3 years. (*Id.*)

Tok worked to enroll T.C. at Haverhill High School. (Aff. of Counsel). She also reached out to local private schools to find out if it was possible to enroll T.C. for fall 2024 admission (despite being well past the standard admission deadline). Among others, she emailed the British International School, Commonwealth School, Deerfield Academy, and Phillips Academy Andover, several of which responded that the deadline for fall 2024 enrollment had elapsed and they would not be accepting late applicants. (Exhibit 5, Emails re: Enrollment). However, the British International School indicated some willingness to work with Tok and T.C., and as such, Tok and T.C. submitted additional application materials, and made plans to tour the school on June 14, 2024, the day they were ultimately arrested. (*Id.*, Exhibit 6, Application Submission).

Tok also took steps to adjust her immigration status. Tok entered the country on a visitor visa valid until April 2025. (Exhibit 7, Visitor Visa). As a visitor, Tok could have requested an extension on her visitor visa. *See* 8 CFR 214.1(c)(2). She retained immigration counsel, Stephen Roth, to discuss various routes to adjust her status such that she could stay in the United States and not fall out of status when her visitor visa expired. (Exhibit 7, Affidavit of Stephen A. Roth, Esq.).  Applying to adjust her status would have permitted her to remain in the United States lawfully while her application was pending. (*Id.*) Tok was scheduled to have a further meeting with Attorney Roth on June 14, the day of her arrest. (*Id.*)

While Tok was focused on her son, she had begun looking at possibilities for her future. Once her son's schooling was established, Tok intended to sign up for English classes, with an eye to possibly attending film school to further her artistic career. (Aff. of Counsel). Eventually, she hoped to open a gallery here. (*Id.*)

Tok is not a risk of flight. She left Türkiye only to protect her son by bringing him to the country of which he is a citizen. Notably, Tok and T.C. traveled through Egypt (*see supra*, n. 1, regarding lack of extradition between Türkiye and Egypt), but made no efforts to stay there and avoid legal proceedings. Allegations that Tok was preparing to flee to Cuba (D. 6, p. 4) appear to be wholly fabricated by the Turkish government; on the contrary, she took steps to establish herself and her son in Massachusetts. Tok is not a danger to the community. She has no criminal record and the allegations against Tok do not suggest any danger to third parties. *See In re Extradition of Ernst*, No. 97CRIMMISC1PG22(HBP), 1998 WL 30283, at *12 (S.D.N.Y. Jan. 27, 1998) (concluding low risk of flight based on family stability, community ties, lack of criminal record, and charges not involving crime of violence).

## CONCLUSION

In sum, there are multiple special circumstances that overcome the presumption against bail in extradition cases, and Tok is not a flight risk or a danger to the community. Thus, Tok respectfully urges the Court to release her under whatever reasonable conditions the Court deems appropriate to assure her future presence in this matter. Tok requests a hearing on this motion.

Respectfully submitted,
EYLEM TOK,
By her attorneys,

/s/ Jennifer M. Herrmann
Emma Quinn-Judge (BBO #664798)
David A. Russcol (BBO #670768)
Jennifer M. Herrmann (BBO # 708231)
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020
equinn-judge@zalkindlaw.com
drusscol@zalkindlaw.com
jherrmann@zalkindlaw.com

Dated: August 1, 2024

## CERTIFICATE OF SERVICE

I, Jennifer M. Herrmann, hereby certify that this document was sent by email to the registered attorney for the U.S.A. on August 1, 2024, and that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jennifer M. Herrmann
Jennifer M. Herrmann