UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN THE MATTER OF
THE EXTRADITION OF
EYLEM TOK

Docket No. 24-mj-01365-DLC

## EYLEM TOK'S MEMORANDUM OF LAW IN OPPOSITION TO EXTRADITION TO TÜRKIYE

Eylem Tok cannot be extradited to Türkiye. The two charges for which extradition is sought each fail to meet the requirements of the applicable treaty for one or more of the following reasons: Tok cannot be deprived of liberty for more than one year for the alleged offenses; on the facts alleged, the requirement of dual criminality is not met because the alleged actions would not be a felony under relevant United States law; and/or the allegations on which the government relies would not violate Turkish law. Moreover, the government has not established probable cause that Tok committed an extraditable offense. Instead, Türkiye has provided the United States, and this Court, with selective, misleading, and false information in an effort to manufacture a case for extradition. Extradition should therefore be denied and Tok should be released from custody.

### PROCEDURAL HISTORY

Pursuant to a Diplomatic Note dated April 3, 2024, the Republic of Türkiye ("Türkiye") formally requested extradition of Eylem Tok, invoking the Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Türkiye, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (hereinafter, the "Treaty"). (D. 5, at 1.) Türkiye requested extradition of Tok for prosecution on two charges: first, protecting an offender, in violation of Turkish Criminal Code Article 283; and second, destroying, concealing

1

or altering evidence in violation of Turkish Criminal Code Article 281. (D. 5-2, at 87. [1])
Specifically, Türkiye alleged that Tok "enabled [T.C.] to flee first to Egypt and then to the
United States of America in order to prevent a judicial process from being carried out against
him," and "[t]hus, it is considered that she committed the offense of 'Protecting an Offender.'"
(*Id.* at 90.) Second, Türkiye alleged that "[t]here is also substantial evidence that Eylem Tok took
and concealed a cell phone belonging to one of the victims who was injured in the accident,"
which was the basis for "an investigation" into the offense of 'Destroying, Concealing or
Altering Evidence.'" (*Id.*)

The United States initially declined to move forward on the Article 281 charge related to
the cellphone (D. 6, at 1 n.2), and sought an arrest warrant based only on the Article 283 charge
(D. 5, at 1-2 n.2 & 6). Tok was arrested on June 14, 2024.

On June 17, 2024, Tok moved to dismiss because the government had failed to
demonstrate that the Article 283 offense is covered by the provisions of the Treaty and because
Türkiye failed to comply with its Treaty obligations to provide complete information, including
"the law prescribing the punishment for the offense, and the law relating to the limitation of legal
proceedings or the enforcement of the penalty for the offense." Section II, Article 7, paragraph
(1)(e). (D. 13.) Article 283 punishes Protecting an Offender, and specifies, in section 3, that no
punishment may be imposed on a parent for a violation of this statute involving their child.
Pursuant to the Treaty, "Extraditable Offenses" are those "punishable under both the federal law
of the United States and the laws of Türkiye *by deprivation of liberty at least for a period*

---

[1] Docket number 5-2 is unavailable to counsel on PACER, but counsel understands it to be the
original exhibits to the Complaint, including the original extradition request for Tok. Citations to
D. 5-2 refer to the exhibit including the original extradition request for Tok, and pin cites
correlate to the bates-stamped pages therein, such that "D. 5-2, at 89" refers to the page stamped
"EXT-TOK-00089".

*exceeding one year or by a more severe* penalty." Section II, Article 2, paragraph (1)(a). Tok also noted that the Turkish government's extradition request included only subsection 1 of Article 283, but deliberately omitted section 3 of that same Article, which states that no punishment can be imposed on a parent under Article 283. (D. 13, at 4; *see also* D. 5-2, at 87 (providing full text of Article 281 but only truncated text of Article 283).)

After Tok filed her motion to dismiss, the government filed an amended complaint, expanding the grounds on which it was seeking Tok's extradition to include the Article 281 offense, destroying, concealing, or altering evidence. (D. 51). The amended complaint included a supplemental memorandum with "additional information and clarifications regarding the offences imputed on Eylem Tok" (D. 73-4, at 4), that suggested additional possible bases for the assertion that Tok violated Article 281. (*See generally id.* at 16-25.) No additional evidence was submitted in support of the amended complaint; the Turkish government provided no new witness statements or other investigative documents. (*Compare* D. 5-2, *with* D. 73-1 to 73-4.)

The government clarified the scope of the Article 281 charge in its Memorandum of Law in Support of Extradition. (D. 83.) Specifically, the government alleges Tok violated Article 281 by: (1) "[f]acilitat[ing] the removal of T.C. and two of his friends from the scene of the crash, thus preventing police from observing and questioning them immediately after the incident"; (2) removing T.C. from the scene, which prevented police from testing him for alcohol or drug use; and (3) taking a victim's phone from the security guards, claiming she knew the owner, and then leaving it in her driver's vehicle, where it was discovered days later. (D. 83, at 19.)

## FACTS

The original Turkish extradition request for Tok, dated March 19, 2024, includes the following information. On March 1, 2024, at around 11:20 p.m., a Porsche driven by Tok's son,

T.C., was involved in an accident that injured five individuals who were stopped by the side of the road, one of whom later died. (D. 5-2, at 89-90.) Tok had "no role in the occurrence of the traffic accident." (*Id.* at 90.) Tok and T.C. went to the airport on the night of the accident and flew first to Cairo and then to the United States. (*Id.* at 92.)

A warrant to arrest Tok for protecting an offender was issued on March 6, 2024. (*Id.* at 135-36.) That warrant identifies "the existence of concrete facts indicating the strong suspicion pointing to commission of an offence," specifically "it has been understood that the suspect left the country and that [T.C] who is the son of the suspect was also sought for the offence of reckless killing and reckless injury," and "[t]here exists facts and evidence with strong offence suspicion pointing that [T.C.] was abducted abroad by the suspect as the basis for issuing the warrant. "[t]here exists facts and evidence with strong offence suspicion pointing that [T.C.] was abducted abroad by the suspect Eylem Tok." (*Id.* at 135.) A warrant to arrest Eylem Tok for destroying, concealing or altering evidence was issued on March 13, 2024. (*Id.* at 138-40.) That warrant does not specify the grounds for the arrest or mention any evidence, suspicion, or specific basis for the charge. (*Id.*) Instead, it notes that Tok is "a suspect in the investigation for the offense of destroying, concealing or altering evidence." (*Id.* at 138.)

### A. Facts and Allegations Related to Moving Minors from the Scene of the Accident

T.C. was driving a Porsche with passengers A.K., A.A., and B.A. (Exhibit 1, Eyupsultan Police Report, at 8-9;[2] *see also* D. 5-2, at 109.) Another minor, D.O., was driving a second vehicle, a Volvo, with passengers Z.H.D., K.A., P.T.E., Y.E.A.,[3] and M.E.Y. (D. 5-2, at 90, 109.)

---

[2] This is a Turkish police report that explains, expands on and supplements the information provided in the extradition request by providing additional witness statements and surveillance footage. *See infra* Part II.

[3] Although the extradition request refers to this individual as Y.E. (*see, e.g.*, D. 5-2, at 109), that appears to be an error based on combining two separate names (that begin with E. and A.) into a

All ten minors left the scene before or around the same time as T.C., D.O.O., and A.K. (the three picked up by Tok).

Immediately after the collision, the ten minors in the Porsche and the Volvo got out of the two cars to check on the victims. (*See, e.g.*, Ex. 1, at 8-9; *see also* D. 5-2, at 109, 112, 114, 122.) One of the injured parties handed his cellphone to Z.H.D., so that Z.H.D. could use the flashlight feature on the phone to look at the injured party's head. (D. 5-2, at 112.) Z.H.D. then absentmindedly put the phone in his pocket. (*Id.*)

Z.H.D. and K.A. were the first minors to leave; they took the Volvo D.O.O. had been driving back to the Kemer County housing complex. (*Id.* at 109, 112, 114.) Z.H.D. and K.A. left *before* the fire brigade or emergency services teams arrived on the scene. (*Id.* at 112.) A BMW with bystanders arrived on the scene to help. (*Id.* at 109.) Someone called emergency services. (*Id.* at 109, 122.) T.C. called his mother and his driver. (*Id.*) "The fire brigade arrived at the scene and started to intervene." (*Id.* at 122.) The fire brigade arrived on the scene while T.C., D.O.O., and A.K. were still present. (*Id.*; *see also* Ex. 1, at 18-19.) Fire brigade crews arrived first, followed by traffic police and an ambulance. (D. 5-2, at 124.)  After the fire brigade arrived, B.A. contacted his friend, C.A., and he came to the scene and picked up B.A. and A.A. (Ex. 1, at 18-19.) T.C. was still at the scene when they left. (*Id.*)

Tok eventually picked up T.C., D.O.O., and A.K. Tok and her ex-husband's employee, Ayşe Ceren Saltoğlu,[4] were having dinner together that night. (D. 5-2, at 100-01). Tok received a

---

single name beginning with E. In the Eyupsultan District Police Department Report, there is basic biographical information for Y.E.A., including address, parentage, and registration number, and in that report his name appears as Y.E.A. (PR5.)

[4] The original extradition request notes that Saltoğlu "is an employee of Bülent Cihantimur, T.C.'s father." (D. 5-2, at 89.) Saltoğlu is not employed by Tok. (*See id.* at 100, 106.)

call,[5] and she and Saltoğlu drove about 15 minutes in Saltoğlu's car and picked up the three minors on a dark road. (*Id.* at 101, 109.) Saltoğlu never saw the scene of the accident, and Tok was out of the car for less than a minute retrieving the minors. (*Id.* at 101) "At that moment, [Tok] did not try to find the location of the incident." (*Id.* at 101.) When T.C. was picked up by Tok and Saltoğlu, D.O.O. could not see P.T.E. and Y.E.A. and presumed that they had already "walked away from the place." (*Id.* at 109.) "[I]n order not to be alone, [D.O.O.] ran towards the car to which [T.C.] got in and … also got in that car." (*Id.* at 109-10.)

Y.E.A., P.T.E., and M.E.Y. started walking away from the scene when T.C., D.O.O., and A.K. were picked up. (Ex. 1, at 18.) While walking down the road, M.E.Y. called his uncle, who came and picked the threesome up and dropped them off at their homes. (*Id.* at 16, 18.)

Tok and Saltoğlu dropped off D.O.O. and A.K. at the entrance to the Kemer County housing complex. (D. 5-2, 110.) Neither D.O.O. nor A.K. claimed that Tok or Saltoğlu made any effort to speak to them, let alone influence any statements they might later be asked to give. (*Id.* at 108-10 (D.O.O.), 121-22 (A.K.).) Saltoğlu seems at most to have spoken to the two boys to get directions. (*Id.* at 101 ("I kept driving, and with their descriptions, I left the two children in front of the entrance door of an apartment complex on the right side of the road.").)

After the accident, five victims were transported to area hospitals, where one victim died. (Ex. 1, at 8.)

All nine minors (other than T.C.) ultimately gave statements to the police upon learning—after one of the victims died—that they were wanted for questioning. (*See* D. 5-2, 108-14, 121-22; Ex. 1, at 11-19.) Many of the minors indicated that they first learned that they

---

[5] Saltoğlu indicated that Tok received a call around 11, a time that is clearly approximate, given that the accident happened twenty minutes later. (D. 5-2, at 101.)

were wanted for questioning around noon on March 2, 2024, and immediately made themselves available for questioning. (*See generally* Ex. 1, at 9 (indicating that A.K., A.A., B.A., D.O.O., P.T.E., Y.E.A., M.E.Y., and Z.H.D. were taken as witnesses to the Public Order Bureau); *id.* at 18-19 (B.A. learned of the fatality around noon on March 2, 2024, when police came to his house); *id.* at 17 (P.T.E., who spent the night at D.O.O.'s house, learned around noon on March 2, 2024, that there had been a fatality, and that they were wanted for questioning); *id.* at 18 (Y.E.A. learned of the fatality around noon on March 2, 2024, and went to give a statement to police); *see also id.* at 16 (Z.H.D. also spent the night at D.O.O.'s house, was picked up by family in the morning, and then learned later that the police were investigating the accident and went to give a statement).) The only minor whose statement was delayed was K.A.'s; his family told police that he had taken a flight out of the city the morning after the accident, but that he would return immediately for questioning. (*Id.* at 9; D. 5-2, at 114 (K.A. and Y.E.A. met up again that evening after the accident, then K.A. went home, and the following morning flew to Izmir; he returned from Izmir when he learned he was wanted for questioning); *see also id.* at 108-10 (D.O.O.'s statement signed at 7:34 p.m. on March 2, 2024), 121-22 (A.K.'s statement signed at 9:27 p.m. on March 2, 2024), 111-12 (Z.H.D.'s statement signed at 00:48 a.m. on March 3, 2024), 113-14 (K.A.'s statement signed at 01:33 a.m. on March 3, 2024).)

**B.  Facts and Allegations Relating to Whether Alcohol Contributed to the Accident**

There is no evidence to suggest any involvement of alcohol in the accident. None of the nine minors questioned mentioned the presence or use of alcohol. (*See* D. 5-2, 108-14, 121-22; Ex. 1, at 11-19.) Those victims who were able to give statements about the accident made no reference to any individual on the scene appearing to be under the influence of alcohol. (*Id.* at 9-11.) The bystander who provided a police statement reported multiple interactions with teenagers

at the scene and did not report that anyone appeared to be under the influence. (D. 5-2, 123-24; *see also id.* at 109, 122 (bystanders arrived on the scene while D.O.O. and A.K.—the minors who left the scene with T.C.—were still present).) There are no statements from emergency responders indicating that they saw evidence of alcohol use. No indication of alcohol was found in the Porsche or at the scene. (D. 5-3, at 99.)[6] Police reviewed surveillance footage of the four minors in the Porsche—who got out of the car while the Volvo stopped to refuel shortly before the accident—and have not suggested that the surveillance footage provides any reason to believe that T.C. was under the influence. (Ex. 1, at 25-26.)[7]

### C.  Facts and Allegations Related to the Cellphone

At the scene of the accident, one of the injured parties handed his cellphone to Z.H.D., so that Z.H.D. could use the flashlight feature on the phone to look at the injured party's head. Z.H.D. then absentmindedly pocketed the phone. (D. 5-2, at 112; *see also id.* at 109.) Z.H.D. and K.A. took D.O.O.'s Volvo and drove to Z.H.D.'s housing complex. (*Id.* at 109, 112, 114.) Tok and Saltoğlu later dropped off D.O.O. and A.K. at the entrance to the same housing complex. (*Id.* at 110, 122.) When D.O.O. and A.K. arrived at the housing complex, K.A. was preparing to take a taxi back to the scene to pick up Y.E.A. (*Id.* at 109.) Z.H.D. handed the phone to K.A., so that he could take the phone back to the scene. (*Id.* at 110.) K.A. did not want to take responsibility

---

[6] Docket number 5-3 is unavailable to counsel on PACER, but counsel understands it to be the original exhibits to the Complaint, including the original extradition request for T.C. Citations to D. 5-3 refer to the exhibit including the original extradition request for T.C., and pin cites correlate to the bates-stamped pages therein, such that "D. 5-3, at 99" refers to the page stamped "EXT-[C]-00099"

[7] As the Court is aware, T.C. takes medication for a skin condition. According to his aunt, while in Türkiye he was using Zoretanin. (D. 93-3, at 3.) Zoretanin is the Turkish market's version of isotretinoin. (https://www.fdanews.com/articles/99132-actavis-introduces-two-new-products-in-Türkiye) Isotretinoin is not compatible with alcohol. *See, e.g.,* https://www.goodrx.com/isotretinoin/alcohol-and-accutane.

for the phone, so he left it on a wall at the housing complex entrance. (*Id.* at 110; Ex. 1, at 15.) Then a security officer came and took the phone. (D. 5-2, at 110; Ex. 1, at 20.)

Witness reports are inconsistent about what happened next. According to one version of events, Tok took the phone.[8] According to another version of events, Berna Öcalgiray, D.O.O.'s mother, took the phone. This inconsistency appears on the face of the materials submitted by the Turkish government in support of its extradition request; these materials acknowledge, but minimize, evidence that Berna Öcalgiray took the phone. (D. 5-2, at 116 (noting that "the security chief, and the other security officers" reported giving the phone to Öcalgiray); D. 73-4, at 19 ("The security guards said that they gave the phone to Berna Öcalgiray" and "There is a brief moment of a phone exchange in the camera footage").) The Eyupsultan Police Report supplements the information alluded to in the Turkish extradition request: it includes the statements of the security guards and stills from the surveillance footage. (Ex. 1.)

Z.H.D.[9] reported that Tok asked the security officers to give her the phone and then took it, saying that she knew the owner and would give it to that person. (D. 5-2, at 112.) D.O.O. reported that he heard a security officer ask Tok to return the phone, and that she responded that she would give the phone to its owner. (*Id.* at 110.) D.O.O. did not report seeing any exchange, however. (*Id.*) Öcalgiray arrived at the housing complex with her husband, brother, and driver. (*Id.* at 116.) She and the head of security exchanged introductions, and she later provided him with her name and phone number on a piece of paper. (*Id.* at 116.) Öcalgiray reported that when

---

[8] The Turkish government's summaries of evidence are often inaccurate and need to be checked against the witness statements provided by Türkiye. For instance, the Turkish government says in two separate summaries that Saltoğlu, Öcalgiray, and D.O.O. reported that Tok took the phone from the security guards. (D. 5-2, 91; D. 73-4, 19.) Saltoğlu says nothing on the subject. (D. 5-2, 100-03.) Öcalgiray did not explain who took the phone; she only denied doing so herself. (*Id.* at 116.) D.O.O. does not report seeing any sort of hand-off, only hearing a conversation about the phone. (*Id.* at 110.)

[9] As noted above, Z.H.D. spent the night after the accident at D.O.O.'s house. (Ex. 1, at 16.)

she provided her contact information, Tok said something to the effect of "I wish you haven't written." (*Id.*) Öcalgiray did not explain what happened to the phone. (*Id.*) When questioned directly about reports that she took the phone, Öcalgiray denied taking the phone and alluded to the fact that her husband was right next to her the entire time she was speaking to the security chief. (*Id.*) Öcalgiray's brother denied that his sister was given a phone (*Id.* at 118.) Öcalgiray's driver reported that Tok's driver asked for the phone from the security guards and they refused to give it to him. (*Id.* at 120.) Öcalgiray's driver reported that Tok herself then took the phone, and went over to talk to Öcalgiray with the phone "either in her hand or pocket," and he never saw Tok give the phone to Öcalgiray. (*Id.*) He likewise did not report seeing Öcalgiray receive the phone from the security guards. (*Id.*)[10]

However, four security guards, including the head of security, were interviewed before Öcalgiray gave her statement to police. (*See id.* at 116.) Each of them stated unequivocally that Öcalgiray took possession of the phone. (Ex. 1, at 19-23.) The head of security reported speaking with multiple individuals, including the woman later identified as Öcalgiray. (*Id.* at 18.) When the head of security advised the group of individuals to take the phone to the police, a male party with Öcalgiray stated, "Don't involve the police for now." (*Id.*) The group of individuals identified the phone as belonging to a person named "D."[11] (*Id.*) Then Öcalgiray said that she knew "D." and his mother and would give the phone to her. (*Id.*) The security guard gave the phone to Öcalgiray; he identified her after he retrieved and reviewed surveillance footage. (*Id.* at 18-19.) "The person who took the phone from me is not Eylem TOK. The person who took the phone from me is the person driving" a car that he identified by its license plate. (*Id.* at 19.)

_____

[10] Berna Öcalgiray, her brother Selim Abra, and her driver, Ibrahim Boz, all signed their statements on the evening of March 9, 2024. (*See generally* D. 5-2, 115-20.)
[11] D.O.O.'s first name and "D." are the same name. (Ex. 1 at 19.)

Three other members of the security team confirmed that the various adults present at the security booth confirmed that they would give the phone back to its owner, and that the phone was turned over to Öcalgiray, and not Tok. (*Id.* at 20-22.)

T.C.'s driver eventually turned the phone in to the police and gave a statement on March 12, 2024. (D. 5-2, at 96-99.) T.C.'s driver stated that Öcalgiray and Tok both spoke to security, and the security officers gave Tok a phone, indicating that she needed to sign for delivery. (*Id.* at 97.) Tok went to the security cabin to sign, although the driver had no knowledge of whether Tok ultimately signed. (*Id.*) None of the security officers reported anyone signing for the phone. (Ex. 1, at 19-23.) T.C.'s driver then drove away with Tok in the Volvo in which he typically drove T.C. (not to be confused with D.O.O.'s Volvo), and Tok "had the phone."[12] (D. 5-2, at 97.) Days later, he went to clean the Volvo and found an iPhone beneath the rear right seat with a low battery indicator. (*Id.* at 98.) He informed his employer and delivered the phone to the Eyupsultan Public Order Bureau. (*Id.*)

There is no evidence that Tok did anything with or to the iPhone, or even had the ability to access information on a device that is generally encrypted.[13] *Cf. In re Order Requiring Apple Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, 149 F. Supp. 3d 341, 346-347 (E.D.N.Y. 2016) (E.D.N.Y. Feb. 29, 2016) (detailing federal government's inability to access contents of iPhone).

---

[12] It is not clear whether this refers to the cellphone from the scene or another phone.

[13] The Turkish government suggests that Tok "check[ed] the phone for evidence that could be used against her." (D. 73-4, at 20.) There are no statements alleging that she examined the phone and it is not clear how she would have been able to do so. This suggestion also makes no sense: it is unclear how a phone belonging to the victim at the scene of an accident she was not involved with would have evidence against her.

**ARGUMENT**

**I.**     **The Court Must Deny Extradition Because the Asserted Charges Are Not Extraditable Under the Treaty**

This Court may only certify an individual for extradition for "crimes provided for by [the relevant] treaty or convention." 18 U.S.C. § 3184. The Treaty defines "[e]xtraditable [o]ffenses" as "(a) Offenses, regardless of whether listed in the Appendix to this Treaty or Not, which are punishable under both the federal law of the United States and the laws of Türkiye by deprivation of liberty at least for a period exceeding one year or by a more severe penalty. (b) Offenses listed in the Appendix to this Treaty which are punishable under both the laws of the Requesting Party and the Requested Party for at least a period exceeding one year or by a more severe penalty." Section II, Article 2, paragraph (1)(a)-(b). The government has failed to establish that either alleged offense meets the criteria under the Treaty.

In support of her opposition, Tok submits the Affidavit on *Verba Legis* and Application of Turkish Criminal Law of Dr. Aras Türay, a law professor at Özyeğin University Faculty of Law, Department of Criminal and Criminal Procedure Law. (Exhibit 2, Affidavit of Dr. Aras Türay.) Tok submits Dr. Türay's affidavit to address and clarify issues of Turkish law that have not been addressed by the Turkish government's submissions and/or are relevant to the determination of whether the government has alleged, or established probable cause for, extraditable offenses. *See infra* Part II. Although there is reason for the Court to tread carefully when interpreting foreign law, the Court does have the obligation under federal law and the Treaty to decide whether the government has established probable cause for one or more extraditable offenses, and other courts have referred to similar affidavits and other materials in order to assess those questions. *See, e.g., Sidali v. I.N.S.*, 107 F.3d 191, 197-99 (3d Cir. 1997) (considering materials submitted by the parties to "decide issues of Turkish criminal law and

procedure," and applying Fed. R. Civ. P. 44.1 which allows a court to consider materials from any source to decide questions of foreign law); *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1369-70 (S.D. Fla. 1999) (relying on expert affidavit to find lack of dual criminality under Bolivian law); *In re Lukes*, No. 2:02-MC-23-FTM, 2003 WL 23892681, at \*2-3 & n.3 (M.D. Fla. May 8, 2003) (relying in part on "statements from Czech legal experts" to determine government had not alleged extraditable offense); *cf. Skaftouros v. United States*, 667 F.3d 144, 158-59, 161 (2d Cir. 2011) (judge in an extradition proceeding "is [not] expected to wield a rubber stamp" and it is proper to consider certain questions of foreign law "[b]ecause the Treaty itself requires an examination" of those questions).

### A. As a Matter of Turkish Law, Tok Cannot Be Deprived of Liberty at all Under Article 283, and Therefore the Charge Does Not Meet the Treaty Requirement That She Be Subject to Punishment By Deprivation of Liberty For More Than One Year.

Article 283(3) unambiguously states that the direct ancestor or descendant of an alleged offender cannot be punished under Turkish law for Protecting an Offender. All filings in this Court assert that Tok is the mother of T.C. and is alleged to have assisted her son, T.C., in alleged violation of this Turkish statute. (*See, e.g.* D. 5, at 2, ¶ 5(a); D. 5-2 (referring repeatedly to Tok as T.C.'s "Mother"); D. 37-1, at 13 (identifying T.C. as "the son of Eylem Tok"); D. 73.) The arrest warrant issued for Tok for this offense identifies her as T.C.'s mother. (*See* D. 5-2, at 135 (identifying T.C. as Tok's son).) There can be no serious question that, if Tok were brought to Türkiye and tried for Protecting an Offender, she could not under any circumstances be punished by imprisonment for any term, let alone imprisonment for more than a year.

The government's suggestion that Tok should be extradited under Article 283 despite the fact that she faces no punishment ignores the plain language of the Treaty, which repeatedly makes clear that the scope of available punishment is central to extradition. Extraditable offenses

are those that are "*punishable* … by deprivation of liberty at least for a period exceeding one

year" or "*punishable* … for at least a period exceeding one year." Section II, Article 2, paragraph

(1)(a)-(b) (emphasis added). Moreover, the Treaty specifically requires that an extradition

request contain all statutory information concerning limitations on punishment. It must include

"[t]he text of the applicable laws of the Requesting Party, including the law defining the offense,

the law prescribing the punishment for the offense, *and the law relating to the limitation of legal*

*proceedings of the enforcement of the penalty for the offense*." Section II, Article 7, paragraph

(1)(e) (emphasis added).[14] Indeed, at least one court has considered statute-specific punishment

provisions when applying this Treaty. In *United States v. Houmane*, 898 F. Supp. 2d 153, 169-70

(D.D.C. 2012), the court concluded that Turkish statutory sentencing provisions specific to the

facts of the offense as alleged—as opposed to the general offense as a whole—were relevant in

determining whether an offense was extraditable. In that case, the court determined that while the

basic offense charged might not be extraditable, the specific allegations in question would be,

based on a fact-specific statutory sentencing enhancement. *See id*; *see also Joseph v. Hoover*,

254 F. Supp. 2d 595, 599-600 (D.V.I. 2003) (although charged offense was punishable only by

one year under British Virgin Islands law, defendant's criminal history as a "rogue and a

vagabond" permitted him to be punished by more than one year); *In re Yordanov*, No. CV 16-

170-CAS(E), 2017 WL 216693, at *12 (C.D. Cal. Jan. 18, 2017) (applying sentencing

enhancement to California law that would otherwise have had a maximum penalty of one year).

*Cf. Spatola v. United States*, 741 F. Supp. 362, 372 (E.D.N.Y. 1990), *aff'd*, 925 F.2d 615 (2d Cir.

1991) (noting that in analyzing dual criminality a court "must examine the underlying conduct"

---

[14] Türkiye notably failed to comply with this requirement in its initial submission. (D. 5-2, at 87;
*see* D. 37, at 4 n.3 (conceding the original omission).)

for which the individual is charged, because "[a]n offense is extraditable only if the acts charged are criminal by the laws of both countries," and " the court should not limit its inquiry to the name of the charge, but should inquire into the criminal conduct and the crime to which it gave rise" (citations omitted)). The Treaty's provision that extradition for enforcement of an established sentence is only permissible if at least 6 months are left to be served also demonstrates the parties' concern with whether a significant penalty is both available *and* enforceable against the specific individual. *See* Treaty, Section I, Article 2, paragraph 2.

The supplemental memorandum explicitly states that Tok's personal exemption as a mother is such that she cannot be punished: "Likewise, the reasons for the personal exemption from punishment do not eliminate the unjust content of the act; *they cause the person not to be punished*, even if his/her act constitutes an injustice." (D. 73-4, at 24 (emphasis added).) Indeed, nowhere in the supplemental memorandum does the Turkish government allege that Tok is actually punishable by more than a year. Rather, the Turkish government insists on its right to proceed on a charge that it explicitly and implicitly concedes will not lead to punishment. The Turkish government memorandum asserts that nothing prevents "the filing of a public lawsuit and … trial against Eylem Tok." (*Id.*) Rather, the Turkish government insists on its right to conduct legal proceedings that will not result in punishment exceeding a year. "[I]t is the expectation of the entire public opinion that the truth will be revealed as a result of a fair trial by hearing of the witnesses and the defendant." (*Id.*) The Turkish government insists that "the presence of the defendant in court is also important in terms of the 'Face to Face Principle,'" and that therefore, "no matter which decision is rendered at the end of the trial, and no matter what kind of penalty is given[,] it is a necessity that the trial be held before an independent court with all its elements, including the defendant, in order to restore the public order, which the defendant

has disrupted with the offence committed by [her]." (*Id.*) Moreover, her status as a mother "is no obstacle to the imposition of security measures." (*Id.*) Whatever the value—to public opinion or the public order—of a trial charging with Tok with this offense, and whatever the desire of the Turkish government to impose unnamed "security measures" on Tok, none of these arguments go to the question at extradition, which is whether Tok's offense is *punishable* by more than a year. All parties now agree that it is not.

Contrary to the government's argument, Turkish law does not treat determination of Tok's status as T.C.'s mother as an affirmative defense. Tok does not bear any burden to show the undisputed fact that she is T.C.'s mother; instead, that fact is conclusively established by reference to an authoritative government database, from which the relevant extract was included with the extradition request. (*See* Ex. 2, at 7-8; D. 5-2, at 141.) Nor does the Turkish supplemental memorandum suggest that she bears any such burden or refer to her parent status as an affirmative defense. (D. 73-4, at 24 (referring to parent status as "personal exemption" rather than affirmative defense, and not discussing burden to show qualification).) *Cf.* 2 McCormick on Evid. § 346 (8th ed.) ("The term affirmative defense is traditionally used to describe the allocation of a burden, either of production or of persuasion, or both, to the defendant in a criminal case.); *Patterson v. New York*, 432 U.S. 197, 210-211 (1977) (discussing defendant's burden to prove affirmative defenses).

Indeed, the Turkish supplemental memorandum explicitly distinguishes the statutory provision exempting Tok from punishment as T.C.'s mother from "a decision of acquittal"—the result of proving an affirmative defense—and instead refers to it as a "consequence of personal exemption"—more akin to a self-operating statutory provision. (D. 73-4, at 24.) Under Turkish criminal procedure, "no need to inflict punishment" is a potential case outcome and is a separate

category from acquittal; acquittals result from circumstances correlating to affirmative defenses. *Id.* (acquittals result when "although the imputed offense was committed by the defendant, there is a reason of lawfulness in the incident") (citing Article 223(2)(d) of Turkish Criminal Procedure). In contrast, Article 223(4)(b) of Turkish Criminal Procedure states that when there are grounds for personal exemption, "a judgment related to 'no need to inflict punishment' *shall* be rendered."[15] (Exhibit 3, Article 223 of Turkish Criminal Procedure (emphasis added).) In any event, the question under the Treaty is not whether Tok would have to be acquitted, but whether she could be punished by more than one year of imprisonment. The plain statutory language states that she cannot, because of her personal exemption. This is confirmed by Dr. Türay, who notes that a prosecutor may choose to indict an individual with a personal impunity like Tok, but she cannot be convicted or punished for the offense: "a criminal case may be filed against the person, but… it is not possible to punish or convict the person as a result of this case." (Ex. 2, at 6-8.)

Finally, even were this Court to consider Tok's motherhood as an affirmative defense, it may nonetheless consider that fact where it is undisputed here. Extradition courts do not consider affirmative defenses where doing so would result in a replacement of the trial proceeding and consideration of conflicting evidence, but they are not wholly barred from considering undisputed facts related to affirmative defenses. *E.g.*, *Charlton v. Kelly*, 229 U.S. 447, 460 (1913) (cautioning against trial-type hearings resulting from considering defenses); *Hooker v.*

---

[15] The Turkish government misrepresents this provision of Article 223(4) in the supplemental memorandum, by summarizing rather than quoting the statutory language, changing the mandatory term "shall" to "may," and adding commentary, not included in the text of the Article, or consistent with its text, that the judge has discretion over these decisions. (*Compare* D. 73-4, at 24 ("In the paragraph 4 of [Article 223] … in cases where the perpetrator is not sentenced, it is stipulated that a decision of not to impose a penalty *may* be rendered") (emphasis added), *with* Ex. 3, Article 223(4) ("In the following cases, a judgment related to 'no need to inflict punishment' *shall* be rendered") (emphasis added).

*Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (extraditing court "may" exclude evidence of defense); *In re Extradition of Bravo*, No. 19-23851-MC, 2023 WL 6462456, at *7 (S.D. Fla. Oct. 3, 2023) (affirmative defenses not considered "for the most part"). That is not the case here, where it is undisputed by both the United States and Turkish governments that Tok is T.C.'s mother. The Turkish government has provided extracts of Tok's vital record that confirm her status as T.C.'s mother, the same evidence that would be used in a trial on this question. (D. 5-2, at 141; *see also* Ex. 2, at 7-8.) Where there is and can be no genuine question to be resolved regarding the existence of facts justifying or applicability of the statutory exemption from punishment, the rationale for not considering the undisputed fact of Tok's motherhood, which would undeniably exempt her from any imprisonment, does not apply.

### B.   As a Matter of Turkish Law, Tok Is Not Subject to a Deprivation of Liberty for More Than One Year Under Article 281 for Allegedly Concealing a Cellphone.

Even assuming the government could meet its burden to show probable cause that Tok could be indicted for unlawfully concealing a cellphone in violation of Article 281, *but see infra* Part II(B)(iii), Tok is not subject to a deprivation of liberty for more than one year under Article 281 for allegedly concealing a cellphone and therefore not extraditable for that alleged offense.

An intentional violation of Article 281 is punishable by "imprisonment for a term of six months to five years." Article 281(1). (D. 5-2, at 87.) However, "[w]here a person submits evidence of an offence, which had been concealed by him, before judgment is passed regarding such offence, the penalty to be imposed according to this Article *shall* be reduced by four-fifths." Article 281(3). (*Id.* (emphasis added).)

The Turkish government alleges that Tok concealed a cellphone belonging to one of the accident victims by taking it from security guards and leaving it in a vehicle driven by T.C.'s

driver, and that the driver then located the cellphone and handed it over to police. (D. 73-4, 20.) The Turkish supplemental memorandum alleges that T.C.'s driver was Tok's agent in turning the cellphone over to the police: "Their drivers are the people, who work under them and carry out their orders and instructions; *there is no difference between something being in the possession of TOK and being in the possession of someone working under her*." (*Id.* (emphasis added).)

Because the government alleges that Tok's agent turned the cellphone over to police days after the accident and before any judgment was passed against Tok, the statutory penalty *must* be reduced by four-fifths, and Tok is punishable, if at all, by 4.8 months to a year. As such, she is not eligible for extradition for having allegedly concealed a cellphone. *See, e.g.*, *United States v. Houmane*, 898 F. Supp. 2d 153, 169-70 (D.D.C. 2012) (applying fact-specific Turkish statutory sentencing provisions to determine whether an offense exceeded the threshold for extradition).

### C.  Under Turkish Law, Tok's Alleged Actions Would Not Violate Article 281.

The government cannot establish an offense under Article 281 because moving a person does not constitute concealing evidence as a matter of law; because helping T.C. leave the scene would if anything be covered by Article 283, which exempts Tok from punishment; and because there is no allegation that the cellphone is or contains evidence of T.C.'s alleged offense. The object of an Article 281 violation is the destruction, alteration, or concealment of "evidence." As Dr. Türay notes, a "[w]itness statement is evidence, but the witness is a source of evidence." (Ex. 2, at 5.) Temporarily concealing a witness, assuming that would be a reasonable characterization of what Tok allegedly did, simply does not equate to concealing a witness statement. Hiding or altering an affidavit or written statement, which is not alleged here, could violate Article 281. The Turkish government's suggestion that "a statement, taken in the heat of the moment, may be different from a statement, taken after the incident has cooled down" (D. 73-4, at 21) is

unmoored from how witness statements are taken in a criminal investigation in Türkiye. As explained by Dr. Türay, a witness statement, particularly from a minor, cannot be taken by a police officer at the scene or at the police station, but can only be taken by a prosecutor or at the prosecutor's direction after the prosecutor learns of a possible offense and authorizes an investigation. (Ex. 2, at 3-5 & n.11.) If the minor is a suspect, then the statement has to be taken personally by the prosecutor and in the presence of defense counsel. (*Id.* at 3.) Moving a witness and thereby potentially delaying their provision of a witness statement by a few hours or days does not constitute altering or concealing evidence, and taking a child home, specifically, is no crime as a matter of law. (*Id.* at 5.)

To the extent that Türkiye has alleged that Tok helped T.C. escape from authorities in violation of Article 283, it cannot convert the same action into a violation of Article 281 by theorizing that an alcohol or drug test could have generated evidence. Even if T.C. had taken drugs or alcohol (which is unsupported by any evidence), Tok did not take any action to alter evidence of drug or alcohol use, which is the core of an Article 281 offense. Turkish courts have found that hiding a perpetrator so they can avoid investigation or allowing them to escape by misreporting the location of an incident constitutes an offense under Article 283, not Article 281. (Ex. 2, at 3 & n.7, 6 & n.17.) A prosecutor may not circumvent the exemption from punishment under Article 283 by recasting a parent's actions under Article 281. (*Id.* at 6-7.)

Finally, as more fully discussed *infra* Part II(B)(iii) Türkiye has not alleged that the cellphone Tok allegedly took was "evidence" subject to Article 281. It has provided vague suggestions that the phone might contain evidence or could have been altered, but no actual allegation that the phone *does* contain evidence or *has* been altered. "[I]f an object does not have any function in proving the offence or the person who committed the offence, it will be

concluded that it does not have the status of evidence, and this object will not be subject to the offence under Article 281." (Ex. 2, at 6.) Without any allegation on this essential element of an offense under Article 281 relating to the cellphone, the government has not alleged a violation of Article 281.

### D.  The Alleged Violations of Article 281 Would Not Be Punishable as Felonies Under Relevant United States Law.

The Treaty's definition of an extraditable offense incorporates the principle of dual criminality, requiring that an offender could be punished by more than a year's imprisonment for the alleged conduct if the offense were committed in either the requesting or requested country. "The principle of dual criminality dictates that, as a general rule, an extraditable offense must be a serious crime (rather than a mere peccadillo) punishable under the criminal laws of both the surrendering and the requesting state." *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995). The crimes need not be identical, but the Court must examine the law and the evidence to determine whether "the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 316 (1922). The government has alleged that the dual criminality requirement is met by "18 U.S.C. § 1512(b)(3), 18 U.S.C. § 1512(c)(2), M.G.L. c. 268, § 13B, and M.G.L. c. 268, § 13E." (D. 83, at 16; *see also* D. 83-1.)

### i.  The Facts Alleged Would Not Violate 18 U.S.C. § 1512(b)(3).

The facts alleged would not make out a charge of witness intimidation under 18 U.S.C. § 1512(b)(3) because there is no evidence that Tok threatened or intimidated anyone, engaged in corrupt persuasion, or engaged in misleading conduct towards anyone. The allegations that Tok took T.C. and juvenile witnesses away from a dangerous, remote, and poorly-lit road to their home or their parents, respectively, do not satisfy the elements of this offense. *Compare United States v. Byrne*, 435 F.3d 16, 26 (1st Cir. 2006) (defendant attempted to persuade witnesses to lie

21

to federal investigators); *United States v. Baldyga*, 233 F.3d 674, 678 (1st Cir. 2000) (defendant instructed victim not to talk and pointed gun at him). Courts have required that "misleading conduct" under this provision relate to "the substance of [a witness's] testimony." *See United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991); *United States v. King*, 762 F.2d 232, 237 (2nd Cir. 1985). The witnesses spoke to police the next day, and neither of them gave any indication that Tok tried to dissuade them from doing so. There is also no allegation that the cellphone contained any information that Tok was trying to keep from authorities, or that she threatened, intimidated, or misled anyone in relation to the phone. Therefore, Section 1512(b)(3) would not apply to Tok's alleged conduct.

### ii. As Recently Interpreted By the Supreme Court, 18 U.S.C. § 1512(c)(2) Would Not Criminalize the Alleged Conduct.

Although the government appears to rely on a broadly-worded statute that, on its face, imposes criminal liability on anyone who "obstructs, influences, or impedes any official proceeding," 18 U.S.C. § 1512(c)(2), the Supreme Court just a few months ago limited its scope so that it does not cover the conduct alleged. In that case, the Court concluded that, "[t]o prove a violation of Section 1512(c)(2), the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or… other things used in the proceeding…." *Fischer v. United States*, 144 S. Ct. 2176, 2190 (2024). The Court in *Fischer* found it critical that Section 1512(c) was enacted as part of the Sarbanes-Oxley Act (SOX) to ensure that those who destroyed corporate documents or other evidence could be held liable for misconduct like that involved in the Enron scandal. *See id.* at 2186. In the context of the preceding subsection, which punishes altering or destroying "a record, document, or other object, with the intent to impair the object's integrity or availability for use in an official proceeding," 18 U.S.C. § 1512(c)(1), Section 1512(c)(2), which penalizes anyone who

"otherwise obstructs, influence, or impedes any official proceeding," is limited by the preceding provision to obstruction similar to, but not specifically listed in, that preceding provision. *Fischer*, 144 S. Ct. at 2183-86. Thus, creating false evidence (as opposed to altering existing evidence) would violate Section 1512(c)(2) but not Section 1512(c)(1). *Id.* at 2186.

The government's theory based on Tok's alleged concealment of the cellphone does not match up with the statute's requirements as explained in *Fischer*. Although there are vague allusions to the possibility of altering the contents of the phone, there is *no* evidence at all that Tok actually did so. And even if there is evidence that Tok had the phone in her possession, which she does not concede, the Turkish government has contended that T.C.'s driver was her employee and "there is no difference between being in the possession of TOK and being in the possession of someone working under her," and the driver provided the phone to police. (D. 73-4 at 20.) Under the government's own theory, Tok did not impair the availability of the phone to police, but instead ensured that they got it.

Moving a person (which is the basis for two of the three alleged violations of Article 281, moving T.C. and moving two of his friends) could not violate Section 1512(c)(2) because a person is not a "document" or "object" or anything similar. *Cf. Yates v. United States*, 574 U.S. 528, 532 (2015) (plurality opinion) (a fish is not a "tangible object" in the context of SOX); *id.* at 549-50 (Alito, J., concurring in the judgment) (agreeing that "tangible object" under SOX "should refer to something similar to records or documents"). Although impairing the integrity or availability of "witness testimony" could theoretically be a Section 1512(c)(2) violation, the example cited in *Fischer* indicates that this is not that case. The Court cited *United States v. Mintmire*, 507 F.3d 1273, 1290 (11th Cir. 2007), in which the defendant falsified documents, hired a lawyer to represent a grand jury witness, and used that lawyer to "coach" the witness by

feeding him false testimony in an effort to obstruct the grand jury. In contrast, there is no evidence that Tok caused anyone to give false testimony, nor that she impeded the availability of witness testimony. All of the witnesses gave statements to investigators (except T.C., who would not have been required to speak with authorities based on self-incrimination principles).[16] Tok has found no case where causing a witness to give a statement to police a day later, rather than on the scene, gave rise to liability under Section 1512(c)(2).

> ### iii. Because the Alleged Offense Under Article 281 Is Not Listed In the Appendix To the Treaty, the Government Cannot Rely on State Law.

The Treaty creates two categories of potentially extraditable offenses: one, of crimes listed in the Appendix to the Treaty, for which the analysis of dual criminality refers generally to "the laws of the Requesting Party and the Requested Party" (Section II, Article 2, Section 1(b)), and the other, of crimes not listed in the Appendix, for which the American offense must specifically be "under… the federal law of the United States" (Section II, Article 2, Section 1(a)). If an offense is listed in the Appendix, then the Court may look to federal or state law. *See In re Extradition of Manzi*, 888 F.2d 204, 207-08 (1st Cir. 1989) (treaty referring generally to "the laws of both Contracting Parties"). However, if the offense is not listed in the Appendix, then the Treaty unambiguously specifies that only federal law applies. Thus, unless the government can establish that the alleged offense is a named offense in the Appendix, provisions of Massachusetts law are irrelevant to this proceeding.

The government is incorrect that the alleged offenses are within the scope of Item 19 of the Appendix, which is the only category asserted to apply. (D. 83, at 14-15.) Item 19, in its

---

[16] *See* Constitution of the Republic of Türkiye, Article 38/5, *available at* https://www.anayasa.gov.tr/media/7258/anayasa_eng.pdf ("No one shall be compelled to make a statement that would incriminate himself/herself or his/her legal next of kin, or to present such incriminating evidence.").

entirety, states, "Unlawful obstruction of judicial proceedings or proceedings before governmental bodies or interference with an investigation of a violation of a criminal statute, by influencing, bribing, impeding, threatening, or injuring by any means any officer of the court, juror, witness, or duly authorized criminal investigator." (D. 73-1, at 43.) "In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992). Although the parties to the Treaty could have included merely "interference with an investigation of a violation of a criminal statute" as a category of extraditable offenses, they did not. This Court must consider the entire provision to determine whether the alleged offenses satisfy each part of this definition, or else the remainder would be surplusage. "In interpreting both statutes and treaties, courts seek to avoid readings that render statutory language surplusage or redundant. But where the language of a treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty." *Yoo v. United States*, 43 F.4th 64, 71-72 (2d Cir. 2022) (quotation marks and citations omitted). Item 19 covers not obstruction in general, but intimidating or misleading a witness in particular, because the obstruction of proceedings or interference with an investigation must be "by influencing, bribing, impeding," etc., an "officer of the court, juror, witness," or investigator. Article 281 does not have any of this as an element of the offense; it only covers destroying, altering, or concealing evidence of a crime. Bribing or threatening a witness, at the core of what Item 19 covers, would not violate Article 281 (though Türkiye has other laws that would prohibit that conduct). (Ex. 2, at 5.) That mismatch by itself disqualifies Article 281 as an offense listed in the Appendix. *See Aguasvivas v. Pompeo*, 984 F.3d 1047, 1058 (1st Cir. 2021) ("[I]f the textual meaning [of an extradition treaty] is plain and cannot reasonably bear the government's construction, then we must reject that construction.").

Reviewing the specific allegations of violations of Article 281, the government fares no better. The allegations do not identify any investigator, officer of the court, or witness who has allegedly been bribed, influenced, or impeded. Failing to turn a cellphone over to the police for a few days, when no investigator had requested it, would not be within the scope of Item 19. There is no evidence that any investigator or officer of the court asked for a breath or blood sample from T.C., or asked any of the minors for a statement, such that Tok could arguably be said to have impeded that investigator by allowing them to leave the scene of the accident. The two minors whom Tok picked up from the scene gave witness statements to the police the next day. There is no evidence that Tok influenced the witnesses in their testimony or encouraged them to lie or not cooperate with police. For all these reasons, the alleged offenses are not listed in the Appendix to the Treaty, and the Court may not consider state law to establish dual criminality.

### iv.   Even If State Law Is Relevant, the Alleged Conduct Would Not Be a Violation of Mass. Gen. Laws c. 268, § 13B.

Massachusetts General Laws Chapter 268, § 13B, is a witness intimidation statute closely analogous to 18 U.S.C. § 1512(b)(3). Tok's alleged conduct would not violate this statute for similar reasons to its federal counterpart. It is unclear on what theory the government believes this statute would apply, but it is not alleged that Tok "(1) willfully; (2) misle[]d, intimidate[d], or harass[ed]; (3) a witness or potential witness…" in order to (4) impede or interfere with a criminal investigation. *See Commonwealth v. Nordstrom*, 179 N.E.3d 593, 100 Mass. App. Ct. 493, 499-500 (2021). To the extent that the government asserts Tok somehow impeded a police investigation, Massachusetts courts require that even false statements must be able to "reasonably… lead investigators to pursue a course of investigation materially different from the course they otherwise would have pursued" in order to qualify as "misleading" under § 13B. *See Commonwealth v. Paquette*, 62 N.E.3d 12, 475 Mass. 793, 801 (2016); *Commonwealth v.*

*Condon*, 162 N.E.3d 76, 99 Mass. App. Ct. 27, 38-40 (2020). Nothing Tok allegedly did meaningfully impacted the police investigation of the accident; delaying by a matter of hours the taking of witness statements did not lead investigators on anything approaching a "wild goose chase." *See Paquette*, 62 N.E.3d at 18. Even destroying evidence to prevent police from obtaining it does not violate § 13B. *See Commonwealth v. Tejeda*, 73 N.E.3d 290, 476 Mass. 817, 820-21 (2017). Moving T.C. and thereby rendering an alcohol test unavailable would not violate this statute as construed by the Supreme Judicial Court in *Tejeda*, where the defendant's action of rendering a bag of supposed heroin unavailable for testing by swallowing it was found insufficient to support a charge under § 13B. *See id.*

### v. The Conduct Alleged Also Would Not Violate Mass. Gen. Laws c. 268, § 13E.

General Laws Chapter 268, § 13E, punishes one who "alters, destroys, mutilates, or conceals *a record, document, or other object*… with the intent to impair the record, document or object's integrity or availability for use in an official proceeding." (emphasis added). Like 18 U.S.C. § 1512(c), this statute applies only to documents or objects, and not to people. Moving T.C. and the other children therefore could not violate § 13E. As described above with reference to § 1512(c), there is no allegation that Tok altered the contents of the cellphone, and the driver ensured that it was made available to police. *Contrast Commonwealth v. Martinez*, 158 N.E.3d 63, 98 Mass. App. Ct. 545, 546 (2020) (defendant asked coworker to throw evidence in the river). For much the same reasons as the federal cognate, Tok's alleged conduct would not violate Mass. Gen. Laws c. 268, § 13E.

### E. Tok Is Not Extraditable Because Türkiye Is Not Prosecuting Her and She Has Not Been Charged With Any Offense

The Treaty authorizes extradition only of persons who (as relevant here) "are being

27

prosecuted for or have been charged with an offense." Treaty, Section I, Article 1, paragraph 1.

Under the plain language of the Treaty, an uncharged suspect, as to whom no decision of

prosecution has been taken, is not subject to extradition.[17] *See Aguasvivas v. Pompeo*, 984 F.3d

1047, 1057-61 (1st Cir. 2021) (denying extradition because foreign prosecutor had obtained

arrest warrant but had not sought an indictment). There appears to be no question that Tok has

not been indicted; in response to T.C.'s argument that an indictment was required, the

government has argued not that an indictment exists but that it is unnecessary. (D. 114, at 17.)

The documentation provided by the Turkish government, when read carefully, shows that Tok

has not been charged and no prosecution is pending. Türkiye has provided arrest warrants, but "a

warrant, unlike an indictment, fails to indicate that the subject is wanted for prosecution."

*Aguasvivas*, 984 F.3d at 1059. Like the arrest warrant in *Aguasvivas*, the warrants for Tok and

even the extradition request indicate only that she is a suspect wanted for questioning. *See id.* at

1057 & n.13. The extradition request signed by the Public Prosecutor requests "that the *suspect…*

be extradited to Türkiye so that *the investigation against her could be completed*." (D. 5-2, at 94

(emphasis added).) The arrest warrants and related court decisions seek her presence in Türkiye

for interrogation by authorities, not for prosecution. The arrest warrant for protecting an offender

calls for "arrest of the suspect for interrogation." (*Id.* at 137 (capitalization altered).) The court

decision issuing that warrant indicates: "When the suspect is arrested, she [shall] be brought

before Istanbul Chief Public Prosecutor's Office…. in order for the statement of the suspect [to]

be taken and she be referred to an inquiry for detention." (*Id.* at 135-36 (capitalization altered).)

The decision to issue a warrant for concealing evidence states: "When the suspect is captured,

her statement shall be taken by the relevant law enforcement unit and Istanbul Chief Public

---

[17] Tok additionally incorporates by reference the arguments made by T.C. based on the Turkish version of the Treaty. (D. 87, at 1.)

Prosecutor's Office shall be contacted for deciding on whether to arrest the suspect without releasing her." (*Id.* at 138.) The warrant for concealing evidence provides: "When the suspect is captured, her statement shall be taken…. After her statement is taken, as it is evaluated whether she will be arrested, it shall be contacted with Istanbul Chief Public Prosecutor's Office." (*Id.* at 140.) Because any prosecution of Tok is speculative at this juncture, it would be contrary to the text and purpose of the Treaty to order her extradition.

## II.     The Evidence Presented Does Not Establish Probable Cause For an Extraditable Offense Under Article 281

The evidence presented does not establish probable cause that Tok destroyed, concealed, or altered evidence in violation of Article 281. In examining probable cause in an extradition matter, the Court asks "if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused." *In re Extradition of Taylor*, 484 F. Supp. 3d 13, 17 (D. Mass. 2020) (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). Tok may offer "explanatory evidence relating to the charges against" her, although "contradictory evidence properly may be excluded." *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991). Explanatory evidence includes "reasonably clear cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause." *Id.* (citation omitted). On the other hand, this Court "cannot ignore the implausibilities and inconsistencies in the [evidence] *submitted by the [Turkish] government.*" *In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1133 (E.D. Cal. 2003) (emphasis in original).

The probable cause determination requirement "is not 'toothless;'" it requires this court to weigh the evidence and determine "whether the United States, on behalf of the requesting government, has produced sufficient evidence to hold the person for trial." *In re Extradition of Gambino*, 421 F. Supp. 2d 283, 315-16 (D. Mass. 2006) (finding lack of probable cause for

failure to properly connect allegations to the accused) (citing *United States v. Kin-Hong*, 110 F.3d 103, 120 (1st Cir. 1997)). That includes an assessment of the reliability of the evidence presented, including explanatory evidence that "explains away or completely obliterates probable cause" or that "explain[s] ambiguities or doubtful elements" in the materials presented by the government. *Santos v. Thomas*, 830 F.3d 987, 993 (9th Cir. 2016); *see Koskotas*, 931 F.2d at 175; *Gambino*, 321 F. Supp. 2d at 316 ("Inherent in the probable cause standard is the necessity of a determination that the evidence is both sufficiently reliable and of sufficient weight").

The Eyupsultan Police Report included by Tok is explanatory, in that it expands on evidence contained in Türkiye's original submission.[18] It includes information about the security guard statements alluded to, but not included, in the Turkish government submissions. (*See* D. 5-2, at 116; D. 73-4, at 19.) It includes the victim statements alluded to, but not included, in the Turkish government submissions. (*See* D. 5-2, at 91.) It includes the statements of the other minors present at or in the immediate aftermath of the accident, statements that do not contradict the Turkish government narrative, but provide additional explanatory details, such as information about the movement of the minors on the day in question. It may therefore be properly considered as explanatory evidence. *E.g.*, *Santos*, 830 F.3d at 993; *see Koskotas*, 931 F.2d at 175.

### A. Türkiye Cannot Establish Probable Cause Based On False Evidence Or By Knowingly Omitting Evidence That Would Negate Probable Cause

Article 7(1)(c) of the Treaty obligates Türkiye in this instance to provide evidence that, if an offense had been committed in the United States, "would justify arrest and committal for trial" of Tok under American law. In the United States, an arrest warrant may not be obtained

---

[18] The government objected in its response to Tok's Bail Motion to the inclusion of such evidence, citing numerous cases about the fact that foreign governments are not required to provide discovery. (*See generally* D. 101, at 7-9.) Tok is not seeking discovery, and as such, the government's objections do not go to the proper scope of probable cause evidence at extradition.

based on false information or by knowingly withholding exculpatory evidence that would negate probable cause. *See United States v. Barbosa*, 896 F.3d 60, 67-69 (1st Cir. 2018); *Franks v. Delaware*, 438 U.S. 154 (1978). Türkiye chose to omit, in its extradition request, the full text of Article 283 as well as the witness statements of the security guards who, supported by surveillance video, identified another woman, not Tok, as the individual who took the cellphone. (Ex. 1, at 19-23.) Turkish authorities had this information, as the security guards' statements are referenced in the extradition request. (D. 5-2, at 116.) This Court should not reward this misleading government conduct, because the Supreme Court has instructed that "[extradition] treaties should be faithfully observed… *without sacrificing the legal or constitutional rights of the accused*." *Grin v. Shine*, 187 U.S. 181, 184 (1902) (emphasis added).

The Court must therefore consider all the available evidence, including the explanatory evidence offered by Tok, to determine whether the government has established probable cause.

### B.  The Record Evidence Does Not Establish Probable Cause

#### i      The Record Evidence Does Not Establish Probable Cause that Tok Acted Unlawfully in Taking Minors Home After the Accident.

While it is undisputed that Tok took T.C. and two other the minors home from the scene, nothing in the record supports the allegation that in doing so she violated Article 281 by "destroy[ing], eras[ing], alter[ing], conceal[ing], or damag[ing] evidence of an offence in order to prevent the emergence of the truth." Article 281. (D. 5-2, at 87.) Even assuming that taking minors who cannot be interviewed without counsel present home from the scene of an accident could constitute a violation of Article 281, *but see supra* Part I(C), nothing in the record supports the allegation that Tok acted deliberately in order to influence their statements to authorities. First, nothing in the record indicates that at the time she picked the minors up at the accident scene, they were not free to leave. Second, nothing indicates that she made any effort to

31

influence their statements. This allegation appears to have been concocted *after* the motion to dismiss the original extradition complaint in this matter, and is unsupported by the evidence.

Nothing in the original extradition request suggests that transporting minors from the scene of the accident was of legal concern. (*See generally id.*) Nothing in the Eyupsultan Police Report raises any concern about the departure of any of the ten minors from the scene of the accident. (Ex. 1). All ten minors left the scene before or around the same time as T.C., D.O.O, and A.K. (the three picked up by Tok). *See supra*, Facts, Part A. Those minors who were present after the fire brigade arrived—that is, all but Z.H.D. and K.A.—did not indicate that emergency responders sought to speak to them at the scene or keep them there for questioning. (D. 5-2, 108-10, 121-22; Ex. 1, at 11-19.) None were questioned about why they had not spoken to authorities earlier or stayed at the scene. (*See* D. 5-2, 108-14, 121-22; Ex. 1, at 9, 11-19.) Indeed, all minors—and the friends and family members who picked them up—seemed to share the understanding that they were free to leave. It was only after a victim died later in a hospital (Ex. 1, at 8) that the nine minors remaining in Türkiye (those other than T.C.) understood that they were wanted for questioning and duly made themselves available for police questioning. (*See* D. 5-2, 108-14, 121-22; Ex. 1, at 9, 11-19.)

Second, there is no evidence that Tok made any effort to influence the statements by D.O. or A.K. The claim by the Turkish government that Tok "guided the witnesses in terms of the statements they were to give" is entirely unsupported by any evidence. (*See* D. 73-4, 21.)[19]

---

[19] The Turkish supplemental memorandum also claims that Tok "went to the accident scene with her employee Ayşe Ceren Saltoğlu and took T.C., D.O.O., and A.K. away to their homes." (D. 73-4, at 18-19.) This is not an accurate summary of the witness statements. Saltoğlu is not Tok's employee. (D. 5-2, at 100, 105.) Moreover, Saltoğlu stated that she never saw the scene of the accident, but rather that they picked up the three minors near the scene of the accident. (D. 5-2, at 101 ("We stopped in a dark area to the left side of the main street. The kids were in the middle of the road. This was the only place I saw. I did not see the scene of the accident. … Eylem got off

Neither D.O.O. nor A.K. claim that Tok or Saltoğlu made any effort to speak to them, let alone influence any statements they might later give. (D. 5-2, at 108-10 (D.O.O.), 121-22 (A.K.).) Saltoğlu may have been given directions to their housing complex, although it is not clear whether these came from D.O.O. and A.K. or someone else. (*Id.* at 101.) There simply is no basis, therefore, to infer that Tok—by engaging in the same conduct as friends and family of the other minors and picking them up from the scene of an accident late at night—intended to do anything other than what she did: provide them transport to their housing complex. Notably, D.O.O. reported that *he* was the one who made the decision to leave with Tok: not seeing P.T.E. and Y.E.A., "in order not to be alone, I ran towards the car to which [T.C.] got in and I also got in that car." (*Id.* at 109-10.)[20]

Türkiye's expressed view that Tok "should be asked in Turkish Courts why she did this" (that is, picked up the minors near the accident scene) (D. 73-4, at 21) does not substitute for probable cause. A desire to investigate and rank speculation do not substitute for evidence. Given the absence of evidence to support probable cause that Tok violated Article 281 by taking three minors home after an accident, this Court should conclude that this allegation does not support Türkiye's extradition request. *See, e.g.*, *United States v. Peterka*, 307 F. Supp. 2d 1344, 1350 (M.D. Fla. 2003) (denying extradition request based on absence of evidence of culpable conduct); *Gambino*, 421 F. Supp. 2d at 316 (no probable cause to support extradition where the source of information tying the accused to the allegations identified only as "'inquiries carries

---

the car and returned with the kids not even a minute later. She did not go anywhere else. At that moment, she did not try to find the location of the incident.").)

[20] Again, the Turkish government supplemental memorandum misstates the underlying evidence, suggesting that Tok took actions "to ensure that [her] son *and the driver of the other vehicle* escape from the scene of the incident." (D. 74-4, at 17 (emphasis added).) There is no evidence that Tok took any action to ensure that D.O.O., the driver of the other vehicle, left the scene; rather, his statement makes clear that he chose to leave with T.C. (D. 5-2, at 109-10.)

out by…police' or 'thanks to this proceeding'").

> ii      **The Record Evidence Does Not Support Probable Cause that Tok Unlawfully Deprived the Turkish Government of an Opportunity to Test T.C. for Alcohol or Drugs.**

The government cannot meet its burden to show that there is probable cause that Tok concealed, destroyed, or altered evidence by preventing the Turkish authorities from testing her son for drug or alcohol use. There is no evidence in the extensive investigation in this case that drugs or alcohol were a factor. *See supra*, Facts, Part B. The Turkish government's conclusory statement—in the supplemental memorandum prepared after Tok filed her motion to dismiss— that "there are signs that the perpetrator was under the influence of alcohol" (D. 73-4, at 17) is entirely unsupported by the record.[21] There are no "signs" that T.C. was under the influence of alcohol (or drugs), either in the excerpts of the Turkish investigation provided in support of the extradition request for Tok (D. 5-2; D. 73) or in the Eyupsultan Police Report (Ex. 1).

While the government contends that alcohol testing would be highly relevant due to the more severe penalty associated with such crime (D. 83, at 19), the relevance of such evidence has to be more than theoretical. Article 281 is about concealing evidence "in order to prevent the emergence of the truth." A concealment that has no impact on "the emergence of the truth" thus necessarily would not fall within the scope of this statute. Notably, there was no suggestion in the original extradition request for Tok that Tok interfered with the government's ability to test T.C. for alcohol. That assertion was added—without new evidence—only after Tok filed her motion to dismiss and the Turkish government sought to find new bases to justify its request.

---

[21] Similar conclusory statements in the supplemental Turkish memorandum also lack evidentiary support: "It is clear that Eylem Tok's attempt to escape with her son since the beginning of the accident was not only aimed at eliminating the perpetrator of the incident, but also to prevent other determinations such as alcohol examination etc. which would affect the fault status of T.C." (D. 73-4, at 21.) There is no evidence that Tok's intent was to prevent alcohol testing.

Tok is not—as the government has claimed (D. 101, at 9-10)—raising an argument about her ultimate guilt or innocence on this point. The question is whether the government has established the minimum threshold required to allege an offense—that is, whether the government has established probable cause. The absence of any evidence that alcohol testing was necessary vitiates probable cause. It is not enough to simply claim that a forensic test could have been conducted had Tok not removed T.C. The theoretical availability of a forensic test does not render it relevant in a given case: testing for gunpowder residue would be irrelevant in a violent crime involving a stabbing, absent some threshold determination that there was a basis to test for gunpowder residue. Here, the total lack of evidence of alcohol or drug use means that the government cannot meet its burden to show probable cause.

### iii    The Record Evidence Does Not Support Probable Cause that Tok Unlawfully Concealed or Altered Cellphone Evidence.

The government cannot meet its burden to establish probable cause that Tok concealed the cellphone and in doing so, violated Article 281. First, there is no evidence that the cellphone is in fact evidentiary. Second, assuming she took the cellphone, there is no evidence that Tok intended to conceal such evidence. Third, there is not probable cause to conclude that Tok took the cellphone in the first place.

First, the Turkish government does not claim that the cellphone is in fact evidentiary, but only that it may contain evidence. (*See, e.g.*, D. 5-2, at 92; *see also* D. 73-4, at 16 ("this phone, which could be in the nature of evidence"); *id.* at 19 ("may contain photographs and videos of the accident scene"); *id.* at 20 ("which could be in the nature of evidence").) In fact, the Turkish government is clear that it has not concluded that the phone contains relevant evidence: "the examination of whether there is any determination regarding the occurrence of the accident or whether there is any messaging regarding the suspect's fault status on the cell phone is ongoing."

(D. 73-4, 21.) The individual to whom the phone belonged said nothing to suggest that his phone would contain evidence related to the accident; he simply noted that it was "lost at the scene." (D. 5-2, at 92 (identifying owner of phone); Ex. 1, at 11 (police statement by phone owner)).) Moreover, the phone is not included among the evidence in the docket in T.C.'s criminal matter in Türkiye. (Exhibit 4, Affidavit of Dilan Şabanoğlu Çakmak.) If the phone is not in fact evidence, its concealment cannot violate Article 281 by the plain language of the statute, which only penalizes concealing "*evidence* of an offence in order to prevent the emergence of the truth" (emphasis added). (*See also* Ex. 2, at 6 ("Destruction, concealment or alteration of a thing that does not constitute evidence shall not constitute an offence.").)

Second, even assuming that Tok took the cellphone, there is insufficient evidence that she intended to conceal it or hide evidence. The Turkish government alleges that evidence of Tok's general intent to conceal evidence includes the fact that she and her driver attempted to return to the scene of the accident after retrieving her son and two other minors. (*See* D. 73-4, at 19.) Specifically, the supplemental memorandum alleges that "It is understood that she went to the scene of the incident … in order to determine the evidence, which could be against her son, at the scene of the incident and, if necessary, to hide and conceal them by intervening in them. However, when she saw the police officers, she immediately returned to her residence. At this point, there is a much stronger suspicion than the suspicion, which is sufficient or investigation and prosecution." (*Id.* at 19.) This claim both misstates the underlying evidence and defies basic logic. The only statements regarding Tok's brief return trip to the scene are from T.C.'s driver and Saltoğlu, who both stated that Tok planned to go see the scene of the accident. (D. 5-2, at 97, 101; Ex. 1, at 41.) T.C.'s driver explained that when they got to the scene, police officers warned them to slow down. (D. 5-2, 97.) Neither statement suggests that Tok left to avoid or evade

police. Notably, the authorities were already on the scene when T.C. left with his mother. (*See, e.g.*, D. 5-2, at 122.) Their presence on the scene thus would hardly have been a surprise to Tok. The scene was one with emergency responders, bystanders, and multiple victims. Ten minors had seen the scene or its immediate aftermath. T.C.'s car had allegedly hit some ATVs, mounted a hill on the left side of the road, and then entered a water channel. (D. 5-2, at 99.) The idea that Tok returned to a large and busy accident scene to which authorities had already responded somehow intending to tamper with or destroy evidence—rather than for some other rational reason, such as to check on the well-being of the parties at the scene or render assistance—is implausible and preposterous. No rational person would have imagined that they could conceal evidence of this accident or T.C.'s role. The government's assertion about Tok's intent is thus neither substantiated by the underlying evidence nor a logical inference from the available facts.

Third, there is insufficient evidence to establish probable cause that Tok even took the cellphone. All four security guards—including the head of security, who reviewed the underlying surveillance tapes—unequivocally stated that they gave the cellphone to Berna Öcalgiray. (*Id.* at 116; Ex. 1, at 19-23; *see also* Ex. 1, at 32.) Öcalgiray does not claim that she took the phone and then gave it to Tok: she simply denies ever taking the phone, and her denials—issued more than a week later—are supported by coordinated denials by her brother and her driver. (D. 5-2, at 115-20.) Days after the collective Öcalgiray denials, T.C.'s driver turned a cellphone in, claiming to have found it in the car he had driven on the night of the accident. (*Id.* at 99.) But his statement, like the Öcalgiray denials, fails to explain why the only parties with no personal stake in the matter all state clearly that Öcalgiray took the phone—and did so after one of the men with her urged people not to involve the police and she herself misrepresented her own identity and ownership of the phone, telling the security guards that she knew "D." and his mother, and

would give the phone to his mother. (Ex. 1, at 20.) And none of the statements explain how to reconcile the Turkish government's acknowledgement that "There is a brief moment of a phone exchange in the camera footage" where, it is implied, Öcalgiray takes the phone (D. 73-4, at 19) with the narratives that Öcalgiray *never* took the phone and Tok at some point did.

The government's evidence on its own fails to meet the probable cause standard; it includes no evidence at all that the cellphone is evidentiary or that Tok had the intent to conceal it. Tok has also—as she is permitted—submitted "reasonably clear-cut proof" that negates the claim that Tok took the cellphone in the first place, and that explains the ambiguities in the initial Turkish filings, which intentionally excluded the details of the consistent statements by all disinterested parties that Öcalgiray—not Tok—took the cellphone. *Koskotas*, 931 F.2d at 175. The evidence before this court, properly weighed and assessed for reliability, cannot support probable cause. *See Gambino*, 321 F. Supp. 2d at 316 (court must make weight and reliability assessments).

## CONCLUSION

Despite its misleading presentation of law and fact in an attempt to secure Tok's extradition, Türkiye has failed to meet the standard for extradition under the treaty. Tok cannot be punished under Article 283. Article 281, on the facts alleged, does not have a cognate crime under United States law that satisfies the requirement of dual criminality, and Tok could not be punished by more than one year for concealing the cellphone in Türkiye. The alleged violations of Article 281 are factually unsupported and legally unsound, and the evidence does not establish probable cause for them. For all these reasons, extradition should be denied and Tok should be discharged.

Respectfully submitted,
EYLEM TOK,
By her attorneys,

/s/ Emma Quinn-Judge
Emma Quinn-Judge (BBO #664798)
David A. Russcol (BBO #670768)
Jennifer M. Herrmann (BBO # 708231)
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020
equinn-judge@zalkindlaw.com
drusscol@zalkindlaw.com
jherrmann@zalkindlaw.com

Dated: September 24, 2024

## CERTIFICATE OF SERVICE

I, Emma Quinn-Judge, hereby certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Emma Quinn-Judge
Emma Quinn-Judge