**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

IN THE MATTER OF
EXTRADITION OF EYLEM TOK

No. 24-MJ-01365-DLC

**ORDER ON RELATOR'S EXTRADITION, MOTION TO DISMISS,
AND MOTION FOR RELEASE FROM CUSTODY**

CABELL, Chief U.S.M.J.

The United States has filed an amended complaint seeking to extradite relator Eylem Tok ("Tok") to the Republic of Türkiye ("Türkiye") for the crimes of destroying, concealing or altering evidence under article 281 of the Turkish Criminal Code ("article 281") and protecting an offender, specifically her son ("T.C."), under article 283 of the Turkish Criminal Code ("article 283"), in accordance with an extradition treaty between the United States and Türkiye.[1]  Tok opposes her extradition, moves to dismiss the complaint, and seeks a release from custody during the extradition proceedings.  (D. 13, 97, 143).

---

[1] Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 ("the Treaty").

Having conducted an extradition hearing under 18 U.S.C. § 3184 ("section 3184"), the court denies the motion to dismiss, denies the motion for release, and will certify the relator's extradition to the Secretary of State.

## I.  SUMMARY OF THE PARTIES' EXTRADITION ARGUMENTS

The amended extradition complaint alleges that T.C. was driving at a high rate of speed, struck several bystanders, and caused the death of one of them, "O.M.A."[2]  The charges against Tok arise from her response to the accident.

Her arguments include the following:  (1) the article 281 offense regarding concealment of the cellphone and the article 283 offense are not punishable for a period exceeding one year under Turkish law as required under the Treaty; (2) the cellphone is not "evidence" within the meaning of article 281 absent an indication that it contains evidence or has been altered; (3) Tok's conduct of removing T.C. and two of his friends from the scene is not "evidence" within the meaning of article 281, as opposed to, for example, the witnesses' statements; (4) the government cannot circumvent Tok's personal exemption under article 283 as T.C.'s mother by recasting the same conduct as an article 281 offense;[3]

---

[2] The parties refer to the decedent and the other individuals at the scene by their initials presumably to protect their identities.  The court follows suit.

[3] Tok identifies the same conduct as facilitating T.C.'s escape to avoid an alcohol or drug test that could have generated evidence.  (D. 143, p. 20).  She

(5) there is no dual criminality present because Tok's conduct would not violate the federal and Massachusetts statutes the government identifies and, as to the Massachusetts statutes, they are not listed in the appendix, as required by the Treaty; (6) Tok is not being prosecuted for and has not been charged with an offense under the Treaty; and (7) there is no probable cause for the article 281 offense against Tok for: (a) removing T.C. and his two friends (D.O.O. and A.K.) from the scene because Tok did not act deliberately or make any effort to influence their statements; (b) removing T.C. and thereby preventing Turkish law enforcement officials from testing him for drugs or alcohol because there is no evidence that drugs or alcohol contributed to the accident; (c) concealing or altering the cellphone because Türkiye's official response states only that the phone *may* contain evidence or *could* be in the nature of evidence; (d) intending to conceal the cellphone or tamper with evidence when, as described in the factual background below, she returned to the accident scene

---

also refers to hiding T.C. or allowing him to escape by misreporting the location of the incident. (D. 143, p. 20). She does not mention the cellphone, let alone its concealment. Accordingly, she fails to develop and therefore waives an argument regarding her alleged conduct of taking the cellphone as circumventing her exemption from punishment as T.C.'s mother under article 283. *See Duval v. United States Dept. of Veterans Affairs*, 69 F.4th 37, 45 n.5 (1st Cir. 2023) (deeming "argument waived for lack of development").

in her vehicle but turned around when she saw police;[4] and (e) taking the cellphone because the evidence shows that another woman (Berna Öcalgiray) took the phone.

Separately, Tok seeks to have the court consider purportedly explanatory evidence outside the official extradition record, namely, an Eyupsultan Police Report ("the police report") of the accident and an affidavit by Dr. Aras Türay consisting of numerous opinions about Turkish law. To a large extent, Tok relies on Dr. Türay's affidavit to support her arguments.

In response to Tok's first argument, the government submits that both offenses are punishable by more than one year. Relatedly, the government maintains that even if the article 283 offense is not punishable by more than one year, the Treaty permits Tok's extradition on both charges if the court certifies her extradition on the article 281 offense.[5] Pertinent to the second

---

[4] To further articulate the above argument in 7(d), Tok takes issue with the following excerpt in Türkiye's official statement:

> It is understood that [Tok] went [back] to the scene of the incident . . . in order to determine the evidence, which could be against her son, at the scene of the incident and, if necessary, to *hide and conceal* them by intervening in them. However, when she saw the police officers, she immediately returned to her residence. *At this point, there is a much stronger suspicion* than the suspicion, which is sufficient for investigation and prosecution.

(D. 73-4, p. 19) (emphasis added).

[5] The government raises this same argument to counter other arguments by Tok.

through fourth arguments, the government contends that Türkiye has twice stated that Tok's conduct violates article 281.[6]  (D. 144, p. 3).  The government also reasons that Türkiye's interpretation of its own laws is entitled to deference.  As to dual criminality, the government asserts that the appendix lists both the article 281 and 283 offenses at item number 19 and, as to federal and state law, Tok's conduct is proscribed under 18 U.S.C. § 1512(b)(3), 18 U.S.C. § 1512(c)(2), M.G.L. c. 268, § 13B, and M.G.L. c. 268, § 13E.  Tok's sixth argument fails, or so the government contends, because the Treaty's plain language does not require formal charges, and the supporting documentation does not list a charging document.  To that end, the government points to the arguments it made in response to T.C.'s similar argument.  Lastly, the government argues that the record provides probable cause to establish both offenses.

## II.  <u>PROCEDURAL BACKGROUND</u>

In a diplomatic note dated April 3, 2024, Türkiye requested Tok's extradition on the article 283 offense (protecting the offender) and the article 281 offense (destroying, concealing, or

---

[6] The extradition documents support the government's contention.  (D. 73-1, p. 3) (declaration stating, "[O]ffenses for which extradition is sought are covered by Article 2 of the Treaty"); (D. 73-4, p. 22) ("[I]t is certain that [Tok] committed the offences of concealing, altering and destroying the evidence of the offence and protecting the offender.").

altering evidence).  Initially, the Secretary of State chose not to proceed on the article 281 offense.  (D. 5, p. 2) (D. 11, p. 2).  In due course, an Assistant United States Attorney (AUSA) filed a sworn complaint in the Southern District of Florida setting out the facts supporting the article 283 offense and requesting Tok's arrest.  In early May, the presiding magistrate judge in Florida attested to her review of the complaint against Tok and issued an arrest warrant.  The complaint states that, "According to information provided by the government of Türkiye, Tok is wanted for *prosecution on a charge* of Protecting an Offender, in violation of and punishable by Article 283/1 of the Criminal Code of Türkiye."  (D. 5-1) (emphasis added).

On June 14, Tok and T.C. were arrested near Boston and appeared before this court.  She has been detained since that time.

Three days after her arrest, Tok filed the motion to dismiss. In a twofold argument, Tok first asserts that section three of article 283 states that no penalty shall be imposed for a parent of the offender, i.e., Tok.  Second, she argues that the government failed to comply with the Treaty's documentation requirement to include the entire text of the applicable law, namely, section three of article 283.  Specifically, the Turkish prosecutor's submission dated March 19 did not set out section three of the

offense.[7]  On July 1, the AUSA filed the amended complaint in the Florida court adding the article 281 offense to the extradition request.

## III.  **LEGAL STANDARD**

Section 3184 "establishes a two-step procedure which divides responsibility for extradition between a judicial officer," including an authorized magistrate judge, "and the Secretary of State." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997).  Based on a complaint initiated by "the Department of Justice in response to [a] foreign government's request," the judicial officer issues an arrest warrant for the targeted individual. *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1050 (1st Cir. 2021); 18 U.S.C. § 3184.  Thereafter, the judicial officer "conducts a hearing to consider whether the extradition request complies with the relevant treaty's documentation requirements, and whether 'the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty.'" *Aguasvivas*, 984 F.3d at 1050 (citation omitted).  Certification of the matter by the judicial officer to the Secretary of State is in order when:

(1)  the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and

---

[7] Tok's second argument fails summarily; the government aptly points out that Türkiye's more recent supplementation sets out the entire law, including section three.

effect; (4) the crime(s) for which surrender is requested is/are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.

*Taylor*, 484 F. Supp. 3d at 15 (citing *Fernandez v. Phillips,* 268 U.S. 311, 312 (1925)); *accord Matter of Extradition of Koželuh*, 610 F. Supp. 3d 1066, 1075-76 (E.D. Tenn. 2022); 18 U.S.C. § 3184.

## IV.  **FACTUAL BACKGROUND**

On the evening on March 1, 2024, D.O.O., driving his father's Volvo, arrived outside the residence of his friend, T.C., at a housing complex ("Kemer County complex") where they both resided. (D. 11, p. 108).  Along with other passengers, all minors, T.C. in a Porsche and D.O.O. in the Volvo drove to a liquor store.  One of the passengers went into the liquor store to buy cigarettes.  There is no mention that any alcohol was purchased.  (D. 11, p. 108).

Shortly before midnight, the Porsche driven by T.C. with three passengers (A.K., A.A., and B.A.) and the Volvo driven by D.O.O. with five passengers (P.T.E., Z.H.D., K.A., Y.E., and M.E.Y.) entered the road where the accident occurred.  (D. 11, pp. 89, 108-109, 111, 113, 121) (D. 92-1, pp. 41, 43, 49, 59).  Traveling at an excessive rate of speed with the Volvo following him, T.C. rounded a curve in the road and hit five individuals who were stopped on the side of the road due to a breakdown of one of their

three ATV vehicles.[8]  (D. 11, pp. 89, 122) (D. 92-1, p. 38).  All five of the ATV riders were taken to various hospitals.  One of the individuals (O.M.A.) "was in [a] life threatening condition" and died by the time law enforcement officers arrived at the hospital.  T.C. "caused the accident" and was deemed primarily negligent.  (D. 11, p. 90) (D. 92-1, p. 38).  "Tok had no role in the occurrence of the traffic accident."  (D. 11, p. 90) (D. 73-4, p. 16).

Immediately after the accident, everyone got out of their vehicles.  (D. 11, pp. 109, 112, 114, 122).  Z.H.D. went over to one of the injured individuals (I.G.), who gave his cellphone to Z.H.D. to use as a flashlight to check a wound on I.G.'s head.  (D. 11, p. 112) (D. 73-4, p. 19).  As he assisted I.G., Z.H.D. absentmindedly put the cellphone in his pocket.  (D. 11, pp. 91, 112) (D. 73-4, p. 19).

Shortly thereafter, Z.H.D. took the keys to the Volvo from D.O.O. and drove it, with K.A. as a passenger, to the Kemer County complex.  (D. 11, p. 110, 112).  When they arrived at the entrance, there were at least two security officers.  (D. 92-1, p. 55).  Z.H.D. and K.A. proceeded to get out of the Volvo, whereupon Z.H.D. realized he still had the cellphone.  He then gave the phone to

---

[8] T.C. also hit the three ATV vehicles.  (D. 92-1, p. 38).

K.A., who was going to return to the accident scene in a taxi where he could give the cellphone back to the victim, I.G.  (D. 11, pp. 110, 112, 114).  Not wanting to accept responsibility for the cellphone, however, K.A. gave the phone directly to the security officers and thereafter left in the taxi.  (D. 11, p. 91) (D. 73-4, p. 19) (D. 92-1, p. 43).[9]

In the meantime, immediately after the accident, T.C. telephoned his driver (Adem Kiziltepe) and Tok and told them he had gotten into an accident.  (D. 11, pp. 90, 97, 109, 122) (D. 73-4, pp. 18-19).  When T.C. called Tok, she was having dinner with Ayşe Ceren Saltoğlu.  (D. 11, p. 101).  Saltoğlu then drove Tok to the accident scene in Saltoğlu's car.  (D. 11, p. 90) (T.C. called Tok, who "first went to the scene of the accident with [Saltoğlu]."); (D. 11, p. 101) (Saltoğlu stating, "[W]e got in my vehicle.").  When they arrived, Tok got out of the car and quickly returned with T.C., D.O.O., and A.K.  (D. 11, p. 101).  The group then left the scene in Saltoğlu's car, whereupon T.C., D.O.O., and A.K. were taken to their homes.  (D. 11, pp. 90, 101).[10]  More

---

[9] Alternatively, K.A. left the phone on a wall at the entrance to the complex and departed the complex in the taxi.  (D. 73-3, p. 26) (D. 11, pp. 110, 112, 114).  Security officer(s) then retrieved the phone from the wall on the assumption it was lost.  (D. 73-3, p. 26) (D. 11, pp. 110, 112, 114).  Either way, the security officers took possession of the cellphone.

[10] As noted in a detailed report by the Turkish prosecutor ("Turkish prosecutor's report"), T.C., D.O.O., and A.K. thereby "left the scene without reporting [the] accident to law enforcement units or paramedics."  (D. 11, p. 90).  As similarly

specifically, Saltoğlu dropped D.O.O. and A.K. at the entrance to the Kemer County complex. (D. 11, pp. 90, 101, 110, 114, 122) (D. 73-4, p. 19). At some point, Kiziltepe also arrived at the entrance in a Mercedes.[11] (D. 11, pp. 97, 101, 119). By the time he arrived, Tok, D.O.O., four or five other individuals, and security officers were in that vicinity. (D. 11, p. 97).

The security officers' administrative supervisor also became part of the group, as did Öcalgiray, D.O.O.'s mother. (D. 92-1, pp. 53-54) (D. 11, pp. 89, 97, 115-116). The security officers and their administrator *all* stated that they handed the cellphone to Öcalgiray. (D. 92-1, p. 55) (D. 73-4, p. 19); *accord* (D. 92-1, p. 66).

In comparison, Z.H.D. stated that Tok took the phone from a security officer, saying she would give it to the owner. (D. 11, p. 112) (D. 73-4, p. 19) (D. 92-1, p. 49). Bolstering this statement, Kiziltepe reported that Tok took the phone from the security officers, saying that she "knew the owner and would give it to him." (D. 11, p. 97) (D. 73-4, pp. 19-20). Similarly,

---

stated in Türkiye's official response, Tok took these minors to their homes and the minors therefore left the accident scene without reporting the accident to law enforcement. (D. 73-4, pp. 18-19). Regarding T.C., the official response additionally states that Tok's escape with T.C. prevented an alcohol examination to assess his fault. (D. 73-4, p. 21).

[11] Kiziltepe left his Mercedes at the complex.

D.O.O. stated that he heard Tok inform a security officer that she knew the phone's owner and "will give the phone back" to him. (D. 92-1, p. 45). Likewise, Saltoğlu stated that Tok took the phone from the security officials and said that she "knew the owner and would give it to him." (D. 73-4, pp. 19-20). Öcalgiray denied taking or even touching the cellphone. (D. 11, p. 116) (D. 73-4, p. 19).

After setting out this discrepancy, Türkiye's official response states, "As it can be understood from this, it is clearly stated, within the scope of the investigation, that Eylem Tok took evidence, which may contain many photographs and videos of the accidence scene." (D. 73-4, pp. 19-20). Not only did Tok state she knew the owner, but when the security administrator or a security officer handed Öcalgiray a pen and paper to write down her name and contact information, Tok reacted by asking Öcalgiray, "[W]hy are you giving your name and number, I wish you hadn't." (D. 11, p. 91); (D. 11, p. 118) (Öcalgiray's brother stating, "[W]hile my sister was writing down her contact details . . . Tok . . .came storming up to us and asked my sister why she was giving her contact details."); (D. 11, p. 116) (Öcalgiray stating, while writing down contact information, Tok said, "I wish you haven't written".). The official response described this subsequent

statement by Tok to Öcalgiray as "almost an expression of the intention" by Tok.[12]  (D. 73-4, p. 20).

Shortly thereafter, Saltoğlu drove Tok and T.C. to their residence.  (D. 11, p. 101).  Tok then told Saltoğlu to stay with T.C. at the residence and that "she would take a look at the place of the incident."  (D. 11, p. 101).  Accordingly, Tok along with Kiziltepe returned to the scene.  (D. 11, p. 90) ("Tok took Adem Kiziltepe and went to the scene of the accident."); (D. 73-4, p. 19).  They turned around, however, when Tok saw police officers or the officers warned them to slow down.[13]  (D. 73-4, p. 19) (D. 11,

---

[12] The above adds to the existence of probable cause that Tok intended to conceal the evidence.

[13] As more fully stated in Türkiye's official response:

> Tok picked up Adem Kiziltepe and went back to the scene of the accident. It is understood that she went to the scene of the incident . . . to determine the evidence which could be used against her son, at the scene of the incident and, if necessary, to hide and conceal them by intervening in them.  However, when she saw the police officers, she immediately returned to her residence.  At this point, there is much *stronger suspicion* than the suspicion, which is sufficient for investigation and *prosecution*.

(D. 73-4, p. 19) (emphasis added).  Tok contends this assertion defies basic logic, misstates the evidence, and is implausible.  She reasons that, in the context of a busy accident scene, "[n]o rational person would have imagined that [he or she] could conceal evidence of this accident or T.C.'s role."  (D. 143, pp. 36-37).  Consequently, there is insufficient evidence that she intended to conceal the cellphone or hide evidence, per Tok's argument.  (D. 143, p. 36).

As explained elsewhere, however, there is probable cause that Tok intended to conceal the evidence.  For starters, as stated in the Turkish prosecutor's report, Tok took the cellphone "with the consideration that there might be evidence in relation to the accident *in the phone* and in order to hide the evidence."  (D. 11, p. 92) (emphasis added).  Türkiye's official response

p. 97).  Of note, Kiziltepe stated that he drove Tok to the accident scene in the Volvo XC90 (plate 34 FPA 695)[14] and that she had the cellphone with her in that vehicle.  (D. 11, p. 97).

By the time Kiziltepe and Tok returned to the residence, T.C., Saltoğlu, and Bülent Cihantimur, T.C.'s father, were there as well. (D. 11, pp. 97, 101).  While Saltoğlu and Kiziltepe stayed outside, T.C., Cihantimur, and Tok went into the house.  After 20 or 25 minutes, T.C., Cihantimur, and Tok emerged from the house with a suitcase.  (D. 11, p. 101).  With T.C., the suitcase, and Cihantimur in one vehicle and Saltoğlu and Tok in another vehicle, the two cars left the residence.  (D. 11, p. 101) (D. 73-3, p. 7). Due to a low battery in Cihantimur's electric vehicle, the vehicles pulled to the side of the road, and T.C. got into the vehicle driven by Saltoğlu.  (D. 73-3, p. 7) (D. 11, pp. 101-102).  The suitcase came with him.  (D. 11, p. 102).  Tok then told Saltoğlu to drive to the airport.  (D. 11, p. 102); *accord* (D. 73-3, p. 7) (Tok and T.C. went to the airport with the vehicle driven by Saltoğlu); (D. 73-3, p. 44) (image of vehicle with Saltoğlu, T.C., and Tok captured at airport entrance).  Within three hours of the accident, photographs show Tok and T.C. passing through airport

---

similarly notes that Tok took the phone "which may contain many photographs and videos of the accident scene."  (D. 73-4, p. 20).

[14] This vehicle is not the previously referenced Volvo driven by D.O.O.

security and a passport control point.  (D. 73-3, pp. 44-45).  Tok
purchased one-way tickets for herself and T.C. for Cairo and, from
there, they flew to the United States.  (D. 11, p. 92).

A few days later, Kiziltepe was cleaning the Volvo (plate 34
FPA 695) and discovered the cellphone under the rear back seat.
He apprised Cihantimur's brother, who then explained the situation
to Cihantimur's attorney.  Kiziltepe thereafter delivered the
cellphone to the police accompanied by Cihantimur's attorney.  (D.
11, p. 98).

## V.   DISCUSSION

As noted, the government requests that the court certify to
the Secretary of State that Tok is extraditable to Türkiye on the
article 281 and 283 offenses.  Accordingly, the court examines
whether each of the five elements to certify Tok's extradition is
satisfied.  *See Taylor*, 484 F. Supp. 3d at 15.

## A.   Authority of the Court

The parties agree, and the court so finds, that the court has
authority over this extradition dispute.  The undersigned is a
federal magistrate judge and section 3184 permits "any magistrate
judge authorized to do so by a court of the United States" to hear
and consider the evidence of the fugitive's criminality.  18 U.S.C.
§ 3184.  Rule 1(e) of the Rules for United States Magistrate Judges
in the United States District Court for the District of

Massachusetts empowers magistrate judges in this district to "[c]onduct extradition proceedings, in accordance with [section 3184]." D. Mass. Local Magistrate Judge Rule 1(e). Further, under 28 U.S.C. § 636(a)(1), a magistrate judge has "all powers and duties conferred or imposed upon United States commissioners by law." 28 U.S.C. § 636(a)(1). Prior to the enactment of this statute, United States commissioners conducted extradition proceedings. *Austin v. Healey*, 5 F.3d 598, 602 (2d Cir. 1993); *accord Matter of Extradition of D'Monte*, Case. No. 22-mj-230(MDM), 2023 WL 7402921, at *9 (D.P.R. Nov. 9, 2023) (finding it "well-settled that . . . magistrate judges . . . may render a certification under § 3184") (citing *Austin*, 5 F.3d at 601-602). Hence, the court is authorized to preside over the present matter.

**B.   Jurisdiction Over Tok**

The parties also agree, and the court so finds, that the court has jurisdiction over Tok where she was arrested in this district. Undeniably, a court has jurisdiction over a fugitive who is located and arrested in the court's district. *See Matter of Extradition of Lalama Gomez*, 24-MJ-458(LKE), 2024 WL 4646959, at *4 (E.D.N.Y. Nov. 1, 2024); *Matter of Extradition of Smyth*, 24-mc-00084-JCN, 2024 WL 2093460, at *2 (D. Me. May 9, 2024) (noting Smyth's arrest in District of Maine and "Court may conduct extradition proceedings for any person found within the Court's jurisdiction") (citing

section 3184); *accord Pettit v. Walshe*, 194 U.S. 205, 219 (1904) ("[C]ommissioner or judicial officer here referred to is necessarily one acting as such within the state in which the accused was arrested and found.") (interpreting predecessor statute to section 3184 with similar language). Here, Tok was located and arrested near Boston on June 14. As such, the court has personal jurisdiction over her.

## C.   <u>Treaty in Full Force and Effect</u>

The parties agree that the Treaty between the United States and Türkiye was in full force and effect at all relevant times. By declaration, Tom Heinemann, an attorney advisor in the Office of Legal Advisor for the United States Department of State, attests that the Treaty is in full force and effect. Consistent with this declaration, the court finds that the Treaty was and remains in full force and effect for purposes of the extradition proceeding.

## D.   <u>Offenses Covered by the Treaty</u>

The Treaty defines extraditable offenses covered by the Treaty as:

(a) Offenses, regardless of whether listed in the Appendix to this Treaty or not, which are punishable under *both* the federal laws of the United States and the laws of Turkey by deprivation of liberty *at least for a period exceeding one year* or by a more severe penalty.

(b) Offenses listed in the Appendix to this Treaty which are punishable under *both* the laws of the Requesting Party

17

and the Requested Party for *at least a period exceeding one year* or by a more severe penalty.

(Treaty, Arts. 2(1)(a), 2(1)(b)) (emphasis added); *see, e.g., D'Monte*, 2023 WL 7402921, at *10 (examining offenses for which extradition sought based on whether fugitive's conduct punishable by more than one year under laws of both countries).

## 1. <u>Offenses 283 and 281 as Punishable by More Than One Year</u>

Tok initially argues that the charged offenses do not meet the Treaty's requirement of offenses that are punishable by more than one year under Turkish law. Indeed, she submits that, as T.C.'s mother, she is not subject to any punishment under article 283, let alone imprisonment for more than one year.[15] In addition to other arguments, the government asserts that even if the article 283 offense is not punishable by more than one year as it relates to Tok, the Treaty permits Tok's extradition on both charges if the court certifies her extradition on the article 281 offense. (D. 37). Thus, so the government argues, if the article 281 offense satisfies the deprivation of liberty exceeding one year penalty requirement, it is irrelevant if the article 283 offense does not carry such a penalty.

---

[15] While section (1) of Article 283 provides that offenders are subject to a penalty of imprisonment for a "term of six months to five years," section (3) provides that "no penalty shall be imposed" "[w]here the offence is committed by a direct-ascendant. . ."

The Treaty supports this argument. It provides that if one offense is extraditable, the other offense is extraditable even if it does not satisfy the above-quoted deprivation of liberty requirements. (Treaty, Art. 2(4)). The applicable provision unequivocally states that:

> When a request for extradition comprises several separate offenses and extradition has been granted for one of the extraditable offenses, it shall also be granted for other extraditable offenses which could not otherwise fulfill the requirements of paragraphs 1 and 2 above[16] as related to the deprivation of liberty to be served . . . .

(Treaty, Art. 2(4)). Given the court's conclusion that the Article 281 offense satisfies the Treaty's requirement of a deprivation of liberty that exceeds one year, it bypasses without deciding the issue of whether the article 283 offense also does or does not satisfy the punishment requirement where Tok is T.C.'s mother.[17]

Anent the one-year deprivation of liberty requirement, Tok asserts she is not subject to punishment for more than one year under article 281 because a reduced penalty makes her punishable

---

[16] "Paragraphs 1 and 2 above" refer to Articles 2(a)(1)(a) and 2(1)(b) quoted above as well as Article 2(2). Article 2(2) is not germane because it addresses the "duration of a penalty or prison sentence . . . *still* to be served . . . ." (Treaty, Art. 2(2)) (emphasis added).

[17] It bears noting that although Article 283(3) might appear on its face to foreclose the possibility of prison should Tok be tried and convicted, Türkiye's official response explains that a Turkish court would first need to establish and certify her status as T.C.'s mother, but only after a trial, and that the exemption provision in the meantime would not be an obstacle to her prosecution. (D. 73-4, pp. 23-24).

for 4.8 months to one year.[18]  This is so, Tok claims, because she left the cellphone in the Volvo and T.C.'s driver (Kiziltepe), *as Tok's agent*, handed the cellphone over to the police.  Further, because Türkiye's official response (D. 73-4, p. 20) alleges that Kiziltepe was Tok's agent when he turned the cellphone over to the police, the statutory penalty must be reduced by four-fifths, according to Tok.

But Tok is mistaken.  Türkiye's official response (D. 73-4, p. 20) does not make a definitive allegation in this regard.  To explain, Tok bases the allegation on a statement in Türkiye's official response that "*there is no difference between something being in the possession of TOK and being in possession of someone working under her.*"  (D. 143, p. 19) (quoting official response with emphasis added).  Türkiye's official response, however, merely states that "*T.C.'s* driver Adem Kiziltepe" found the cellphone and handed it over to law enforcement officials.[19]  (D.

---

[18] The plain language of article 281(3) reduces the six month to five year penalty by four-fifths "[w]here a person submits [the] evidence of an offence, which had been concealed by him, before judgment is passed . . . ."  (D. 73-4, p. 17).

[19] The full passage reads as follows:

> [A] few days after the incident, the cell phone was found by *T.C.'s driver* Adem Kiziltepe and handed over to the law enforcement officers through him.  Their *drivers are the people, who work under them and carry out their orders and instructions; there is no difference between being in possession of TOK and being in possession of someone working under her.* As a matter of fact, when the incident is evaluated as a whole; TOK acted

73-4, p. 20) (emphasis added).  Second, in the same paragraph, Türkiye's official response states that, "The difference between being in possession of TOK and being in possession of one of her subordinates will only emerge *as a result of the trial*."  (D. 73-4, p. 20) (emphasis added).  Viewed in the context of the entire paragraph, Türkiye's official response does *not* state that Kiziltepe was Tok's agent.  Rather, it presents this allegation as a disputed issue to be resolved at trial.[20]  (D. 73-4, p. 20).

Correspondingly, the extradition file as a whole presents Kiziltepe's agency as a disputed matter.  One set of facts depicts Kiziltepe as Tok's agent.  For instance, Tok was in the Volvo that he drove to the accident scene.  She also had the cellphone at that time and left it in that vehicle.  It is therefore reasonable or plausible to find that she left the cellphone with Kiziltepe as her agent.  By extension, he then turned the phone over to the police still acting as her agent.

A competing version of the facts depicts Kiziltepe as Cihantimur's agent.  This is because Cihantimur's attorney told

_____

together with her subordinates in general, and their behaviors facilitated her actions and decision-making.

(D. 73-4, p. 20) (emphasis added).

[20] The government agrees.  (D. 144) ("[W]hether [Adem] Kiziltepe acted as Tok's agent, both as a factual and legal matter under Turkish law, is a question for trial.").

Kiziltepe (as well as Cihantimur's brother) to deliver the cellphone to the police. Kiziltepe, accompanied by the attorney, then turned the cellphone over to the police.[21]

Per the foregoing, the agency status of Kiziltepe is a matter for trial in Türkiye. *See Matter of Extradition of Acevedo*, NO. ED CV 16-1766-R (KS), 2017 WL 3491749, at *11 (C.D. Cal. Aug. 11, 2017) (Given "two clearly disputed versions of facts," court "cannot determine the credibility of the evidence offered by Acevedo against the evidence offered by the Mexican government," which "is a matter for trial in Mexico."); *Freedman v. United States*, 437 F. Supp. 1252, 1266 (D.C. Ga. 1977) (stating, in habeas petition challenging extradition, "presentation of witnesses who testify as to an opposite version of facts will not" eliminate probable cause, and "resolution of such conflicts . . . must await a trial on the merits").

More, the differing factual versions are impactful. Tok would be punishable under article 281(1) for a period exceeding one year, namely, up to five years if it is determined at trial that Kiziltepe was not acting as her agent when he turned the phone into the police. This is so because, as stated in article 281(3),

---

[21] On a separate issue, the first version decidedly supports that Tok concealed evidence (the cellphone), bolstering the existence of probable cause for the article 281 offense. The probable cause standard is elucidated below.

the four-fifths penalty reduction applies only "[w]here a person," such as Tok or Kiziltepe acting as her agent, "submits evidence of [the] offence, which has been concealed by him [or her], before judgment . . . ."  (D. 73-4, p. 17).

## 2.  <u>Cellphone as Evidence</u>

Next, Tok submits that her conduct does not violate article 281 because the cellphone is not "evidence" within the meaning of the article 281 offense.  Rather, the evidence consists of what the cellphone contains.  In so arguing, Tok relies exclusively on one of Dr. Türay's opinions.  The opinion states that, "[I]f an object does not have any function in proving the offence or the person who committed the offence, it will be concluded that it does *not* have the status of *evidence*, and this object will not be subject to the offence under Article 281."[22]  (D. 143, pp. 20-21) (quoting Dr. Türay's opinion (D. 128-3, p. 7, ¶ 4(d))) (emphasis added).  The government urges the court to defer to Türkiye's construction of the term evidence, namely, that the cellphone is evidence.  (D. 144, p. 3) (D. 73-4, p. 21).  The government's point is well-taken.

---

[22] Although the opinion does not mention the cellphone (D. 128-3, p. 7, ¶ 4(d)), it implicitly pertains to the cellphone.  As indicated, Tok uses the opinion as the only cited support for her argument that the cellphone is not "evidence" under article 281.  Placed in that context, Dr. Türay's opinion is only relevant if interpreted to mean that the cellphone does not have a function in proving the article 281 offense.

To begin, Dr. Türay's opinion amounts to a legal opinion about the meaning of "evidence" under Turkish law.  (D. 128-3, p. 7, ¶ 4(d)).  Specifically, Dr. Türay gives a four-paragraph explanation of what constitutes "evidence" within the meaning of article 281, which includes the above opinion.  *See* (D. 73-4, p. 16) (article 281 makes it a crime for any person to, inter alia, "conceal[] or damage[] evidence of an offence . . . .").  That opinion conveys that the cellphone does not have a function in proving the article 281 offense and is therefore not evidence.[23]

In contrast to Dr. Türay's opinion, Türkiye's official response states that it does consider the cellphone evidence.  (D. 73-4, p. 21) (discussing article 281 and stating "[Tok] prevented the police or people from finding the cell phone, *which we consider as evidence*, . . . .") (emphasis added).  Dr. Türay's opinion therefore contradicts the Turkish government's opinion.  It is well settled that "contradictory evidence properly may be excluded."  *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) (citations omitted).  Exercising this court's discretion, Dr. Turay's opinion is excluded as contradictory.  Moreover, Türkiye presents a reasonable interpretation of the statutory term "evidence".  *See Taylor*, 484 F. Supp. at 18 (deferring to foreign

---

[23] *See supra* note 23.

country's interpretation of its own laws where foreign government presented reasonable interpretation) (citations omitted).  That interpretation considers the cellphone as evidence, and the court defers to that construction.

To be sure, Türkiye's official response adds that the cellphone "may contain many photographs and videos of the accident scene." (D. 73-4, p. 20).  Tok, however, conflates this statement as meaning that the cellphone itself is not evidence.  Regardless, because the official response states that Türkiye considers the cellphone as evidence, the additional statement does not meaningfully detract from the court's adherence to this reasonable interpretation of Turkish law.  As a result, Tok's insistence that the cellphone is not evidence lacks merit.

### 3.  Dual Criminality

Tok argues that her conduct regarding the cellphone does not make out a charge under either of the two federal statutes the government identifies, 18 U.S.C. § 1512(b)(3) ("section 1512(b)(3)") and 18 U.S.C. § 1512(c)(2) ("section 1512(c)(2)"), or under an offense listed in the Treaty's appendix.  She is incorrect.

Dual criminality entails examining whether the offenses for which extradition is sought are crimes in both countries.  *See, e.g., Taylor*, 484 F. Supp. 3d at 16 (determining whether "charges

for which extradition is sought [were] crimes" under "both Japanese and United States law and covered by" treaty); *accord D'Monte*, 2023 WL 7402921, at *8, *10 (ascertaining whether treaty covers offense for which extradition is sought entails "determining whether an offense is punishable under the laws of both countries"). Notably, the dual criminality doctrine does not "require exact congruity of [the] offenses." *Matter of Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989) (citing *Collins v. Loisel*, 259 U.S., 309, 312 (1922)). "It is enough if the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312; *Manzi*, 888 F.2d at 207 ("'[D]ouble criminality' requires only 'that the acts upon which the charges are based are proscribed by similar provisions of federal law . . . .'") (quoting *Brauch v. Raiche*, 618 F.2d 843, 847 (1st Cir. 1980)). The law also "does not require that the name by which the crime is described in the two countries . . . be the same; nor that the scope of the liability . . . be coextensive." *Collins*, 259 U.S. at 312. What's more, "[e]ach element of the offense purportedly committed in a foreign country need not be identical to the elements of the similar offense in the United States." (citation omitted).

The language of the Treaty sets out dual criminality as satisfied in either one of two instances. (Treaty, Arts. 2(a)(1),

2(1)(b)).   First, as quoted previously, the Treaty defines
extraditable offenses as those "which are punishable under *both*
the *federal* laws of the United States and the laws of Turkey"
regardless of whether they are listed in the appendix.  (Treaty,
Art. 2(1)(a)) (emphasis added).   Second, the Treaty defines
extraditable offenses "*listed in the Appendix* to this Treaty which
are punishable under *both the laws* of the Requesting Party and the
Requested Party . . . ." (Treaty, Art. 2(1)(b)) (emphasis added).
At a minimum, the language in the first provision includes federal
offenses in the United States even if not listed in the appendix.
The language in the second provision encompasses offenses listed
in the Treaty's appendix under "the laws" of the United States in
contrast to the limitation to "federal laws" in the first
provision.   As such, the second provision includes state law
charges listed in the appendix.

     To briefly recount Tok's conduct, it includes taking the
cellphone, which Türkiye considered evidence, from the security
guards, saying that she knew the owner and would give it to him.
The information was not true.  (D. 73-4, p. 20) (T.C. and Saltoğlu
stated that "Tok took the phone from the security guards, saying
that she 'knew the owner and would give it to him". As it can be
understood from this, it is clearly stated . . . that Elyem Tok
took evidence, which may contain many photographs and videos of

the accident scene."); (D. 11, p. 91) ("With this untrue information, Elyem Tok took an item that could be evidence and left."). Tok also chastised Öcalgiray when she gave her name and number to the security guards, "saying 'why are you giving your name and number, I wish you hadn't.'" More, Tok took the cellphone "with the belief that it may contain evidence of the accident and with the intention of concealing the evidence." (D. 73-4, p. 21). Still more, in taking the cellphone, she "prevent[ed] the law enforcement officers and the judicial officers from intervening effectively and quickly in the incident." (D. 73-4, p. 20). Türkiye's official response adds that this "is sufficient for the trial of TOK under the Article 281" offense. (D. 73-4, p. 21).

Tok's acts are therefore criminal under Turkish law, namely, article 281. As set out in the preceding paragraph and the more fulsome factual background, her actions concealed "evidence of [T.C.'s] offense to prevent the truth from emerging." T.C.C. Art. 281. The Turkish prosecutor's report and Türkiye's official response reflect that Tok lied to and misled the security guards that she knew the owner of the cellphone. She then took the cellphone, which Türkiye considered evidence, and concealed it by leaving it under the rear right seat of the Volvo.

Tok's conduct could also be charged under section 1512(b)(3). This federal statute makes it a crime to "knowingly . . . engage[]

in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(b)(3). The statute's language exemplifies that Congress intended section "1512(b)(3) not merely to safeguard the integrity of ongoing or imminent federal investigations, but more broadly to facilitate federal law enforcement's ability to gather information about possible federal crimes—including federal crimes that are not yet under investigation at the time of the offense." *United States v. Bailey*, 405 F.3d 102, 108 (1st Cir. 2005).

Here, Tok's conduct consists of giving the security guards untrue information. In particular, she misleadingly stated to the security officers that she knew the owner of the cellphone, and she refused to return the phone when asked. She thereby frustrated the ability of law enforcement investigators to gather information by removing and/or concealing the cellphone, which Türkiye considered evidence. Impactfully, this impeded the investigation because previously the administrative supervisor had the phone and instructed the security guards that "they could hand it over to the police." (D. 73-3, p. 35). As additionally posited by the government, GPS location data on the phone could show where the victim with the phone (I.G.) was located and the speed at which he

was thrown by the impact with the Porsche.  By concealing the cellphone, Tok prevented investigators from accessing this information to facilitate the investigation.[24]

In sum, relative to article 281 as an extraditable offense, dual criminality exists under Turkish law and the federal law of the United States.

With respect to protecting the offender under article 283, Tok's conduct is criminal under Turkish law.  (D. 73-4, p. 22) (Türkiye's official response stating Tok committed the offense). She removed T.C. from the accident scene in Saltoğu's car and ultimately arrived at Tok's residence.  After transferring T.C. and his suitcase to the vehicle driven by Saltoğu, Tok told Saltoğu to drive to the airport.  At the airport, she purchased one-way tickets for herself and T.C., and they flew to the United States. By taking T.C. out of the country and to the United States, she "provide[d] an offender," T.C., with the opportunity to avoid a search, his detention, or arrest."  (D. 11, p. 87) (prosecutor's report quoting article 283).

---

[24] Tok argues she did not threaten, intimidate, or mislead anyone in relation to the cellphone.  To the contrary, she misled the security guards.  She also asserts there was no allegation that the cellphone contained information she was trying to conceal from law enforcement authorities.  In addition to other evidence, Türkiye's official response renders the argument unconvincing.  It states that Tok took possession of the cellphone "with the belief that it might contain evidence of the accident and with the intention of concealing the evidence."  (D. 73-4, p. 21).

Tok's conduct in helping T.C. to escape Türkiye and avoid apprehension by purchasing the airline tickets and flying with him to the United States is also proscribed by federal law. Specifically, her conduct could be charged under 18 U.S.C. § 3 ("section 3") as an accessory after the fact to an offense against the United States, i.e., T.C.'s flight to avoid prosecution under 18 U.S.C. § 1073 ("section 1073").[25]  An accessory after the fact is anyone who, "knowing that an offense against the United States has been committed, receives . . . or assists the offender in order to hinder or prevent his apprehension, trial or punishment . . . ."  18 U.S.C. § 3.  Section 1073 is the corresponding offense committed by T.C. of fleeing "to avoid prosecution . . . under the laws of the place from which he flees," Türkiye.  18 U.S.C. § 1073. Hence, dual criminality exists under Turkish and federal law to render article 283 an extraditable offense.

## 4.  <u>Charged or Being Prosecuted with an Offense</u>

Next, Tok argues she is not being prosecuted for and has not been charged with an offense under the Treaty.  Article 1 of the Treaty requires the United States to surrender persons "who are being prosecuted for or have been charged with an offense."

---

[25] Tok's failure to develop an argument against this contention by the government (D. 83, p. 16) waives the issue.

Whereas the government contends that the arrest warrants satisfy Article 1, Tok maintains that the arrest warrants for each offense do not, in fact, seek her arrest. Rather, she submits they seek her statement so that Turkish authorities can thereafter evaluate whether to arrest her. In addition, Tok characterizes the arrest warrant for the article 281 offense as only instructing law enforcement units to *contact* the prosecutor's office with regard to Tok's statement.[26] (D. 153). The Turkish prosecutor's report and Türkiye's official statement are deficient, or so Tok contends, because they simply refer to an intent to investigate Tok.[27] As

---

[26] In full, the language in the article 281 the arrest warrant states that:

> When [Tok] is captured, her statement shall be taken by the law enforcement units. After her statement is taken, as it is evaluated whether she will be arrested, it shall be contacted with Istanbul Chief Public Prosecutor's Office.

(D. 11, p. 140).

[27] As support, Tok quotes the conclusion in the prosecutor's report, which requests Tok's extradition "so that the investigation against her could be completed." (D. 153) (quoting D. 11, p. 94). She also quotes an excerpt from the official response that "extradition is necessary 'for the Turkish judicial authorities to *evaluate* her legal status' before proceeding with any potential prosecution." (D. 153) (quoting D. 73-3, p. 25). This latter quote is, to a degree, taken out of context. The complete paragraph is not as supportive to Tok's position as she implies. The paragraph reads as follows:

> For the reasons explained [Tok] *committed both offences*. *There are no circumstances, preventing the prohibition of her arrest.* In terms of the offence of concealing, altering and destroying the evidence of the offence[,] the fact the evidence is linked to the evidence within the scope of the offence of protecting the offender[] makes the extradition of [Tok] necessary for the Turkish judicial authorities to evaluate her legal status and to carry out investigation and prosecution about her due to both offences.

(D. 73-4, p. 25) (emphasis added).

explained below, the court finds that Tok has "been charged with an offense" anent articles 281 and 283.[28]    To begin, the arguments invoke principles of treaty interpretation.   "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín v. Texas*, 552 U.S. 491, 506–07 (2008) (citing *Air France v. Saks,* 470 U.S. 392, 396–397 (1985)).   Articles 1 and 7 use the verb "charged".   The definition of the verb "charged" in Black's Law Dictionary (12th ed. 2024) is "[t]o accuse (a person) of an offense."   Charge (vb.), Black's Law Dictionary (12th ed. 2024).   Hence, the ordinary meaning of charged equates to accused.

In any event, no language qualifies or restricts the Article 1 phrase "have been charged with an offense" to "*formally* charged with an offense," such as indicted, charged in a criminal complaint, or the like.   If Türkiye and the United States wished to impose a requirement that the fugitive be "formally charged," they could have included that language in Article 1.   *See Manrique v. Kolc*, 65 F. 4th 1037, 1041-1043 (9th Cir. 2023) (construing Article I of United States-Peru treaty requiring extradition of persons "charged with" extraditable offense as not "limited to

---

[28] It is therefore not necessary to address whether she is "being prosecuted for" either offense. Consequently, Tok's argument (D. 153, p. 2) that an arrest warrant does not satisfy Article 1's "being prosecuted" language based on *Aguasvivas*, 984 F.3d at 1059, wherein the Treaty provided for extradition of persons "sought . . . for prosecution," *id.*, does not persuade.

formal charges" based on "ordinary meaning of the verb 'charge'" as to "accuse someone of a crime") (citation omitted);[29] s*ee also In the Matter of Assarsson*, 635 F.2d 1237, 1243 (7th Cir. 1980) (If "parties had wished to include" an "additional requirement that a formal document called a charge be produced, they could have so provided."); *accord Aguasvivas*, 984 F.3d at 1060 (quoting this language in *Assarsson* and agreeing with court's holding "and the *rationale*") (emphasis added).

The absence of a formal charging document or document setting forth the charges in the Article 7 list of documents which must accompany an extradition request supports this construction.  That list does not even mention "charged", "a charge", or "the charge". Hence, the fact that Türkiye and the United States in the Treaty did not require the extradition file to contain any document regarding a charge in Article 7 reinforces that they did not intend to require the fugitive to be formally charged in Article 1.  *See Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1448, n.3 (9th Cir. 1987) (rejecting argument that Article 1(1) of treaty required "public

---

[29] It is true that the plaintiff in *Manrique* relied on a document issued *after* completion of an investigation ("an *Acusación Fiscal*") as satisfying the Article I "charged with" language.  *See id.* at 1041-41.  That document preceded issuance of a formal charge by a judge ("an *Orden de Enjuiceamiento*").  Even so, the court's reasoning that "[n]othing in *the language* of the Treaty *unambiguously* requires an *Orden de Enjuiciamiento*, as opposed to an *Acusación Fiscal*, to trigger extradition" applies equally and convincingly to the case at bar.  *Id.* at 1042 (emphasis added).

charge . . . having been filed against the extraditee" based on reasoning in *Assarsson*, 635 F.2d at 1242-1243, including that *Assarsson* treaty did not require extradition file to contain "copy of formal charges"); *accord Assarsson*, 635 F.2d at 1242-1243; S*acirbey v. Guccione*, 589 F.3d 52, 64-65 (2d Cir. 2009) (collecting cases rejecting "'formal charge' arguments").[30]

Relatedly, both the *Assarsson* and *Emami* treaties required certain documents to accompany or support the extradition request. Significantly, like the language in Article 7, such documents included an arrest warrant but did *not* include a document setting forth the charge(s). *See Aguasvivas*, 984 F.3d at 1060.[31] Further, the treaties in *Emami* and *Assarsson* included provisions similar to

---

[30] Under Article I of the treaty in *Sacribey*, the parties "agree[d] to deliver up persons who having been charged with or convicted of any of the crimes and offenses specified in [Article II] . . . ." *Sacirbey*, 589 F.3d at 57. Article III of the same treaty set out the documents required to accompany an extradition request, i.e., an arrest warrant and "other evidence upon which such warrant was issued." *Id.* (emphasis omitted). The Treaty between the United States and Türkiye includes similar language, respectively, in Articles 1 and 7. Neither treaty requires the extradition file to include a copy of the charge, such as an indictment or criminal complaint.

[31] As indicated, the list of the required documents in the *Aguasvivas* treaty included an arrest warrant and "the document setting forth the charges." Extradition Treaty, Dominican Republic-United States, art. 7, § 3(b), Jan. 12, 2015, T.I.A.S. No. 16-1215. Primarily to avoid rendering "the document setting forth the charges" phrase superfluous, the majority rejected the government's argument that the arrest warrant could perform "double duty" by serving as both the arrest warrant and the document setting forth the charges. *Aguasvivas*, 984 F.3d at 1058, 1061-63. This key finding in *Aguasvivas* differs from the issues presently before the court. Nonetheless, the decision remains predictive, most notably because the majority agreed with the holdings and rationale of *Emami* and *Assarsson*.

the language in Article 1 of the Treaty that requires a party to extradite persons who "have been charged with an offense." Article 1 of the treaty in *Emami* imposed the obligation to extradite persons found in a party's territory "who have been charged with an offense." Treaty of Extradition June 20, 1978, United States-Federal Republic of Germany, 32 U.S.T. 1485, T.I.A.S. No. 9785. Similarly, Article 1 of the treaty in *Assarsson* required each party to extradite "persons found in its territory who have been charged with or convicted of any of the offenses specified in Article II of this Convention committed within the territorial jurisdiction of the other." Convention on Extradition, Oct. 24, 1961, United States-Sweden, 14 U.S.T. 1845, T.I.A.S. No. 5496.

Indeed, courts have consistently reasoned that, where, as here, a treaty does not require the submission of a charging document to accompany or support an extradition request, formal charges are not required, notwithstanding use of the term "charged" in Article 1 of the treaties at issue. *See Sacirbey*, 589 F.3d at 64-67; *Emami*, 834 F.2d at 1448, n.3; *Assarsson*, 635 F.2d at 1242-1244; *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 987 (D. Or. 2011) (rejecting Handanovic's argument that fugitive "cannot be extradited because she has not been 'charged with or convicted of' any crime [under Article 1], but is merely a suspect wanted for investigation" because treaty did "not make extradition

36

conditional on the filing of formal charges");[32] *see In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1187 (W.D. Okla. 2015) (arrest warrant satisfied treaty's Article 1(1) language requiring extradition of persons who "requesting Party have charged with an offense" and list of documents required arrest warrant but not "separate document akin to an indictment or felony information"); *cf. Vitkus v. Blinken*, 79 F.4th 352, 355, 365-367 (4th Cir. 2023) (taking "no issue with the Secretary of State's" extradition of "persons not yet criminally charged" under the treaties in *Emami*, *Assarsson*, and *Handanovic* but finding likelihood of success on merits that extradition request failed to comply with *Vitkus* treaty, which required extradition request to include copy of "*the* charging document").

Notwithstanding the above distinction in *Vitkus*, Tok argues that the court in *Vitkus* concluded that an arrest warrant was insufficient to establish that the fugitive was either "sought for prosecution" or "charged with a crime" as required by the extradition Treaty in that case. (D. 153). She contends that the

---

[32] In that vein, the court in *Handanovic* observed that, "[s]imilar to the treaties in both *Emami* and *Assarsson*, Article III of the" *Handanovic* treaty did "not list formal charges among the documents required to be produced by the requesting country." *Handanovic*, 829 F. Supp. 2d at 987.

court did not abide by the Secretary of State's interpretation of
the Treaty that a formal charge was not required.  (D. 153).

The argument is not convincing.  Unlike Article 7, the list
of required documents in the *Vitkus* treaty included a copy of "*the*
charging document."  *Vitkus*, 79 F. 4th at 355.  Crucially, the
*Vitkus* court emphasized "*the* charging document" language as
opposed to *a* charging document.  *Id.* at 363, 366.  The latter
language provided greater flexibility to encompass more documents
that would satisfy the "charged with" language in Article 1 of the
Treaty.  *Id.* at 363, 366.  *The* charging document language used in
the *Vitkus* treaty, however, referred to a discrete document, i.e.,
one "that has initiated criminal charges against a person," such
as an indictment or criminal complaint.  *Id.*; *accord id.* (A
"definite article ('the') coupled with a singular noun ('charging
document') indicates that 'the charging document' refers to the
document that has initiated criminal charges against a person.").
Thus, the *Vitkus* court determined that "the charging document"
language in the list of documents "unambiguously 'eliminate[d] the
permission to proceed" with the extradition despite the "charged
with" language in Article 1.  *Id.* at 366.

In contrast, the Treaty here does not include any language
referring to "the" charging document" in Article 7 or elsewhere.
Second, as noted above, the court took "no issue with the Secretary

of State's contention" of extraditing "persons not yet criminally charged" under *other* treaties, namely, those in *Emami*, *Assarsson*, and *Handanovic*. *Id.* at 365. Those three treaties have language in Article 1 similar to the "charged with an offense" language in the Treaty here, and they also lack the charging document mandate in the list of accompanying documents.

Tok also maintains that she is simply being investigated and that the Turkish documents in the extradition file only refer to an intent to investigate. The record belies this assertion and establishes unambiguously that Turkish officials view Tok as a suspect. The arrest warrant for the article 281 offense identifies Tok as a "*suspect*" who "has been ordered" to be "apprehended." (D. 11, p. 140). Further, the accompanying decision states that, "An arrest warrant *shall* be issued against the *suspect* . . . ." (D. 11, pp. 138, 140). More, Türkiye's official statement leaves no doubt where it states that, "[I]t is certain that she committed the offence[] of concealing, altering and destroying the evidence . . . ." (D. 73-4, p. 22). *See Republic of France v. Moghadam*, 617 F. Supp. 777, 781 (D.C. Cal. 1985) (Treaty language requiring extradition for persons "having been charged with" an offense was satisfied by arrest warrant and "statement by the American Charge

d'Affaires that Moghadam has been charged with violating French

narcotics laws.").[33]

In sum, the record establishes that Tok has been charged with

and/or is being prosecuted for a criminal offense within the

meaning of the Treaty.

**E.  Probable Cause**

Tok raises several arguments challenging probable cause,

focusing primarily on the absence of probable cause regarding the

article 281 offense.  As previously summarized regarding

concealing the cellphone, she asserts that: (1) Türkiye's official

response states only that the phone *may* contain evidence or *could*

be in the nature of evidence; (2) she did not intend to conceal

the cellphone and the fact that she returned to the scene of the

accident does not show otherwise; and (3) she did not take the

cellphone because the evidence shows that Öcalgiray took the

phone.[34]  The evidence shows otherwise.  As detailed in the factual

---

[33] Tok in a single sentence footnote also incorporates by reference the arguments
T.C. made based on the Turkish version of the Treaty.  In an opinion issued
simultaneously to this one, the court rejected T.C.'s arguments.  The court
rejects them here for the same reasons.

[34] The court focuses on the cellphone concealment, which is one of three means
that the government alleges Tok violated article 281.  (D. 83, p. 19).  Adhering
to the government's framework, Tok addressed each of these three alleged
violations separately in describing the facts and setting out the absence of
probable cause.  (D. 143).  Against the backdrop of this consonant framework,
any one of the three means provides a basis to certify Tok's extradition to the
Secretary of State on the article 281 offense *if* the five elements set out in
the legal standard have been satisfied.  *See Matter of Extradition of Taylor*,
484 F. Supp. 3d 13, 15 (D. Mass. 2020) (listing five elements).  Tok's three

background and explained below, probable cause exists for both the article 281 and article 283 offenses.

In order to certify a requested extradition, the court must "deem[] the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184; *see Smyth*, 2024 WL 2093460, at *2. The standard equates to probable cause to believe that Tok committed the article 281 and 283 offenses. *See Aguasvivas*, 984 F.3d at 1062; *see also Collins*, 259 U.S. at 314 (stating, in context of extradition proceeding, "function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); *Kin-Hong*, 110 F.3d at 117 ("purpose of the evidentiary portion of the extradition hearing is to determine whether the United States, on behalf of the requesting government, has produced sufficient evidence to hold the person for trial"). "[P]robable cause is established if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in

---

alleged violations are: (1) taking the victim's cellphone from security guards, claiming she knew the owner, and then leaving it in her driver's vehicle where it was not discovered until a week later; (2) facilitating the removal of T.C. and two of his friends from the accident scene, thus preventing police from observing and questioning them immediately after the incident; and (3) removing T.C. from the accident scene, which prevented police from testing him for alcohol and drug use. (D. 83, p. 19).

the probable guilt of the accused." *Taylor*, 484 F. Supp. 3d at 17 (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).    The government bears "the burden of showing probable cause . . . ." *Kin-Hong*, 110 F.3d at 118.    The court finds that it has met it's burden.

### 1.    The Article 281 Offense — Concealing Evidence

Multiple statements by witnesses, the prosecutor's report, and other evidence in the record provide ample probable cause for the destroying, concealing, or altering evidence offense.    At the accident scene, Z.H.D. used the flashlight on I.G.'s cellphone to view the wound on I.G.'s head.    Thereafter, he absentmindedly put the cellphone in his pocket.    A short time later, Z.H.D. arrived at the security gate and the security officers gained possession of the cellphone.    After Tok arrived, several witnesses recounted that she took the cellphone from one or more security officers saying she would give it to the owner.    Kiziltepe stated that Tok took the phone from the security officers, saying that she "knew the owner and would give it to him."    D.O.O. likewise stated that he heard Tok inform a security officer that she knew the phone's owner and "will give the phone back" to him.    Z.H.D. recited that Tok took the cellphone from a security officer and said she would give it to the owner.    Saltoğlu, in turn, recounted that Tok took the phone from security officials and said that she "knew the owner

and would give it to him."  Öcalgiray denied taking or touching the cellphone.

Further, when the security administrator or a security officer handed Öcalgiray a pen and paper to write down her name and contact information, Tok reacted with words to the effect, "[W]hy are you giving your name and number, I wish you hadn't." The official response described this statement by Tok to Öcalgiray as "almost an expression of the intention" by Tok.  (D. 73-4, p. 20).

Then on the way to the airport, Tok left the cellphone in the Volvo.  When Kiziltepe was cleaning the Volvo a few days later, he discovered the cellphone under the rear back seat and turned it over to police.  In light of the foregoing, the record supports a finding of probable cause that Tok concealed evidence.

To be sure, there is conflicting evidence.  For example, all of the security officers stated that they handed the cellphone to Öcalgiray.  Notwithstanding the conflicting evidence, however, the record, even including the police report, provides probable cause.[35]  *See generally Aguasvivas*, 984 F.3d at 1063 (noting

---

[35] The court accepts the police report as explanatory evidence anent probable cause.  *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) (citation omitted).  In addition, having addressed the article 281 offense as concealment of the cellphone and found probable cause, it is not necessary to address Tok's probable cause arguments in 7(a) (removing T.C. and his friends because she did

existence of "considerable amount of conflicting evidence" regarding probable cause but finding magistrate judge had adequate evidence to find "a reasonable ground to believe Aguasvivas guilty").

2.  **The Article 283 Offense – Protecting the Offender From Arrest**

The record also amply provides probable cause to find that Tok helped T.C. avoid detention or arrest. After leaving T.C. at the residence, Tok and Kiziltepe returned to the scene. However, they turned around when Tok saw the police officers and returned to the residence. (D. 11, pp. 97, 101). While Kiziltepe stayed outside, T.C., Bülent Cihantimur, and Tok went into the house. After 20 or 25 minutes, they came out of the house and had a suitcase with them. They got into two vehicles and left the residence. After T.C. got into Tok's vehicle along with the suitcase, Tok instructed Saltoğlu to drive to the airport.

Within three hours of the accident, photographs show Tok and T.C. passing through airport security and a passport control point. Tok purchased one-way tickets for herself and T.C. for Cairo and, from there, they flew to the United States. (D. 11, p. 92). Less than one week later, the Istanbul Chief Public Prosecutor's office

---

not act deliberately) and 7(b) (removing T.C. to prevent drug and alcohol testing).

prepared a letter, and an arrest warrant issued against Tok for the protecting offender offense.

Accordingly, the court finds that certification to the Secretary of State for the relator's extradition is warranted.

## VI. <u>DETENTION</u>

In moving for her release, Tok asserts that special circumstances exist and that she is neither a flight risk nor a danger to the community. The request is denied for the reasons stated below.

First, and most compelling, the Treaty unequivocally forecloses any consideration of release where it provides that "the person sought *shall* be detained until the competent authorities of the Requested Party reach their decision." (Treaty, Art. 9) (emphasis added). The court reads this provision as mandating the relator's detention during all judicial proceedings.

Second, even assuming Article 9 is not intended to moot the issue, and even presuming that Tok's release would not present a serious risk of flight or danger, the record still does not evince special circumstances warranting release.

To begin, Tok maintains that two special circumstances alone, or in combination, satisfy this requirement. First, she argues that she has raised substantial claims that have a high probability of success on the merits. Second, she purportedly experienced a

serious deterioration of her mental and physical health while in custody.  (D. 97).

By way of background regarding Tok's health, her attorney attests that she struggles to sleep at night, experiences panic attacks, and has lost weight while housed at the Donald W. Wyatt Detention Facility ("Wyatt").[36]  She has spoken with medical personnel at Wyatt to address her difficulty sleeping and her anxiety and been prescribed medication for the conditions.  Medical notes reflect that her psychiatric needs do not exceed Wyatt's capability of meeting those needs.  (D. 101-2).

Four years ago, she began suffering from epilepsy which, prior to her arrest, was under control.  While at Wyatt, however, she has had at least two seizures and has not been provided any medication or care for her epilepsy, according to her attorney. (D. 92-1).  In contrast, the government's attorney describes Tok's interactions with the medical staff at Wyatt as limited.  Other than mental-health related interactions, Tok has requested creams and lotions.  (D. 101-1).

Tok also has a history of back surgeries.  She had three  back surgeries before her arrest and was considering undergoing a fourth

---

[36] Twelve days after her arrest, Tok underwent an interview with probation.  She denied any history of mental health treatment and described her physical health as good.

surgery due to continued pain.  While at Wyatt, she has experienced increased pain and numbness which, she asserts, interfere with her daily activities.  She has a double mattress due to these multiple surgeries.

The law is straightforward.  There is a presumption against bail and the burden falls squarely on the relator to show that: (1) she is neither a flight risk nor a danger to the community; and (2) there are special circumstances that justify release on bail.  *See United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996); *Taylor*, 471 F. Supp. 3d at 393-394; *Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 96 (D. Mass. 2015).

Special circumstances "are limited to situations in which '"the justification [for release] is pressing as well as plain."'" *Kin-Hong*, 83 F.3d at 524 (citation omitted).  "[W]hat constitutes a 'special circumstance'" falls within the "Court's sound discretion." *Drumm*, 150 F. Supp. 3d at 96 (citation omitted); *see Beaulieu v. Hartigan*, 554 F.2d 1, 1 (1st Cir. 1977) (stating "bail may be granted in the sound discretion of the district court" but "should be approached with caution" and granted "only upon a showing of special circumstances").

Pertinent to Tok's first argument, courts have found special circumstances "[w]here the extraditee raises substantial claims showing a high probability of success on the merits."  *United*

*States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 56 (D. Mass. 2010) (citations omitted). As is evident from the prior discussion rejecting Tok's claims, however, Tok has not raised substantial claims that have a high probability of success.

Addressing Tok's second basis for release, courts also have concluded that, "[A] *serious* deterioration in the relator's health" that cannot be accommodated or managed at the facility may provide a basis for bail. *See Kin-Hong*, 83 F.3d at 524 (emphasis added); *In re Extradition of Huerta*, No. H-08-342M, 2008 WL 2557514, at *2 (S.D. Tex. June 23, 2008) (finding no special circumstance because Huerta's medical conditions, while serious, "are not lifethreatening, nor are they so novel or complex as to be beyond the capacity of federal authorities to manage while he is in their custody."); *accord Matter of Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *4 (N.D. Ill. Dec. 19, 2017) (finding no special circumstances because extraditee's medical condition was not "life threatening or so serious and exigent that his medical needs [could not] be accommodated . . . while in custody.").

Tok's medical and psychiatric needs are being adequately addressed at Wyatt. She has a double mattress for her back. With respect to her epilepsy, she expressed a concern that she might have an epileptic seizure to her therapist on July 20. She was

48

instructed that if she felt any symptoms of a seizure to report the matter right away to a correctional officer. (D. 101-2). Her interactions with medical staff at Wyatt have related to her mental health except insofar as she requested creams and lotions. Whereas this is her first time in prison, and she is, understandably, concerned about her son who is incarcerated in a separate facility, she fails to meet her burden to show a serious health threat that cannot be accommodated at Wyatt. *See Matter of Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1217 (D. Nev. 1993) (stating Nacif's health condition . . . is not debilitating," is "easily controlled," and "[p]erfect health has never been a requirement of institutional incarceration"). In short, the special circumstances Tok identifies, whether considered alone or in combination, lack merit.

## VII.  <u>CONCLUSION</u>

In conclusion, Tok's motion to dismiss (D. 13) and amended motion for release on bail (D. 97) are **<u>DENIED</u>**. Based on the foregoing, this matter is certified to the Secretary of State in order that a warrant may issue, upon the requisition of the proper authorities in Türkiye, for the surrender of Tok on the charges of protecting the offender under article 283 of the Criminal Code of Türkiye as well as destroying, concealing or altering evidence

under article 281 of the Criminal Code of Türkiye, according to the provisions of the Treaty between the United States and Türkiye.

No later than seven days after the date of this decision, the government shall file a proposed extradition certification and order of commitment.

The court will then order that the clerk of court forward a certified copy of this Extradition Certification and Order of Commitment, together with a copy of all the evidence taken before this court, to the Secretary of State, Department of State, to the attention of the Office of the Legal Adviser. Tok shall remain in the custody of the U.S. Marshal for this District, to be held pending final disposition of this matter by the Secretary of State and pending his surrender to the government of Türkiye.

/s/ Donald L. Cabell
DONALD L. CABELL, Ch. U.S.M.J.

DATED: February 11, 2025